**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| INTELIQUENT, INC., | |
| Plaintiff, | Hon. John R. Blakey |
| v. | Case No. 16 cv 06976 |
| FREE CONFERENCING CORPORATION, individually and d/b/a HD TANDEM; HDPSTN, LLC d/b/a/ HD TANDEM; WIDE VOICE , LLC; and JOHN DOES 1-10, | SECOND AMENDED COMPLAINT AND JURY DEMAND |
| Defendants. | |

**SECOND AMENDED COMPLAINT AND JURY DEMAND UNDER RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND OTHER LAWS**

This is Inteliquent's Complaint for damages, declaratory relief, and injunctive relief against defendants (i) Free Conferencing Corporation ("Free Conferencing"), individually and doing business as HD Tandem; (ii) HDPSTN, LLC d/b/a HD Tandem; (iii) Wide Voice, LLC ("Wide Voice");[1] and (iv) John Does 1-10. In support of this Complaint, Inteliquent, Inc. ("Inteliquent") alleges as follows.

<u>Overview</u>

1.      The defendants knowingly, willingly, and recklessly have engaged and are continuing to engage in a scheme to cheat Inteliquent of millions of dollars in the form of false and unlawful charges that Inteliquent paid to them or their associated entities for calls to telephone numbers associated with defendant Free Conferencing. The defendants have committed and are continuing to commit repeated predicate acts of wire fraud, mail fraud, and

---

[1] The caption has been changed to reflect the defendants' representation that HD Tandem is the business name for HDPSTN, LLC.

money laundering in furtherance of their fraudulent scheme. They have also engaged in theft by deception as well as other activities in furtherance of their conspiratorial and unlawful conduct. This lawsuit seeks to recover the amounts the defendants have wrongfully taken and to require the defendants to end their scheme.

2.     The defendants have overlapping ownership, management, and financial interests, which enables them to act in concert with each other and with multiple non-party co-conspirators to perpetrate the underlying scheme. Their scheme is nuanced and complex, and requires the detail set forth in this Complaint to appreciate its scale, subtleties, and ongoing nature. Inteliquent anticipates that additional aspects and evidence demonstrating the scope and details of the defendants' and their co-conspirators' activity will be adduced through discovery. This overview section and this Complaint in general aim to set forth basic facts that explain the general nature of the defendants' misconduct as it has impacted Inteliquent.

3.     As detailed below, the scheme has multiple stages. It begins with an arrangement under a telecommunications framework that purports to permit the defendants and their co-conspirators (i) to charge Inteliquent very high telecommunications "access charges" for terminating long distance calls, and (ii) to split the revenues from those charges among themselves. Then the scheme adapts and morphs into a commercial arrangement that inextricably depends upon the supposed lawfulness of the imposition of those high charges and that further enables the schemers to take a cut out of the charges they impose on Inteliquent. In its third stage, the scheme returns back to the imposition of access charges, again which the defendants assert the right to be able to charge to Inteliquent and which further prolongs their ability to collect and share their unlawful proceeds. As explained in the paragraphs and pages below, each aspect of the scheme involves multiple false representations, concealment, and

predicate acts of racketeering, as the charges under the "access charge" regime and the commercial arrangements are wholly illegitimate and unlawful.

4.      Inteliquent is a telecommunications carrier based in Chicago with facilities in Chicago, Los Angeles, and several other cities.  It provides local and long distance (inter-exchange) services.  At issue in this matter are certain of its long distance services.  With respect to the services at issue in this case, Inteliquent acts as an inter-exchange carrier ("IXC").  This means that Inteliquent takes calls from its customers and delivers them to local exchange carriers ("LECs") (or intermediary companies that in turn deliver the calls to the LECs), which in turn deliver the calls to the called parties (or "end users" in telecom lexicon).   In the typical arrangement, long distance carriers like Inteliquent get paid by their customers, and then pay the LECs "access charges" for the LECs' services in delivering the calls to end users.  The dollar amount of access charges that Inteliquent and other IXCs must pay to the LECs or their proxies depends on various factors.

5.      In simplest terms, federal rules premised on reasonable cost recovery permit access charges that can be higher the more the called party's physical location is rural and the longer the call lasts (in simple terms, there are "mileage" and minutes-of-use factors).  The mileage factors depend on specified coordinates that measure the actual distance between what is known as a "tandem" switch (where long distance calls meet the local exchange) and an "end office" switch (the location within the local exchange where calls are switched and then routed directly to the called party).  How the LECs may charge their own customers on the receiving end (the called parties) depends on other federal rules as well as the LECs' federal and state tariffs.

6.      Defendant Free Conferencing is (supposedly) a major called party customer (end user) of certain LECs associated with rural locations and telephone numbers in parts of South Dakota (among many other places).  Persons that call Free Conferencing numbers receive "free" services like conference calling, chat lines, and streaming radio.  Free Conferencing provides these services to callers that use Inteliquent's long distance services (among other callers).  In other words, long distance customers of Inteliquent place calls to Free Conferencing numbers, the calls travel over Inteliquent's systems and are delivered to the LECs or other intermediaries, and then Free Conferencing provides its services to the calling parties.  Pertinent here, Free Conferencing has numerous telephone numbers associated with specific South Dakota rural exchanges located on two tribal reservations that supposedly accept such inbound calls seeking Free Conferencing's services.

7.      Defendant Wide Voice owns some of the key equipment (for example, in Los Angeles, Chicago, Miami, and possibly other cities) that is used to accept the handoff of traffic from IXCs like Inteliquent and to route calls to Free Conferencing numbers.  Wide Voice has supplied telecommunications equipment that the defendants used to perpetrate the fraud.  Wide Voice provides equipment and services to the LECs in the South Dakota tribal locations, which in turn ostensibly allows those LECs to provide telecommunications services that are part of the scheme alleged in this Complaint.  Upon information and belief, Wide Voice provides that equipment and services at little or no effective cost to the LECs, which also facilitates and fosters their participation in the scheme alleged in this Complaint.  Wide Voice is also a LEC and a party that has unlawfully charged Inteliquent as part of the scheme alleged in this Complaint.

8.      Defendant HD Tandem presents itself as an intermediary or proxy that can facilitate the interconnection and handoff of traffic between Inteliquent and the LECs servicing

called parties like Free Conferencing.  After Inteliquent was already paying high access charges, HD Tandem and the other defendants (including Free Conferencing and Wide Voice) signed a contract with Inteliquent (the "Master Addendum" attached as Ex. A) in which HD Tandem

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ two LECs in South Dakota named Native American Telecom, LLC and Native American Telecom—Pine Ridge, LLC (together the "Native American Telecom LECs").  HD Tandem is not certificated by the Federal Communications Commission or any similar state regulatory agency and has not made any state or federal regulatory filings that common carriers are required to make.  The use of the Master Addendum as a vehicle to try to take calls to Free Conferencing numbers out of the access charge regime and into a commercial context is central to the defendants' scheme.

9.     As detailed in this Complaint, the fraudulent scheme here flows from (i) the nature of calls to Free Conferencing and the largely free services that it provides to its conference calling, chat line, and radio streaming customers; (ii) the access charge regime that would apply by default to calls to Free Conferencing numbers; (iii) the actual paths that calls take to reach Free Conferencing numbers and the locations of Free Conferencing equipment; (iv) sham relationships between Free Conferencing and certain LEC carriers, which in recent months have been conclusively established by a federal court as not permitting the imposition of access charges; and (v) the defendants' efforts to remove their scheme from the regulated industry through the use of a supposedly legitimate payment arrangement in a commercial contract (the Master Addendum).

10.     Given the nature of the services Free Conferencing provides, calls to Free Conferencing are often of far longer duration than typical conversational calls.  Because the calls last a long time and are (supposedly) delivered to rural areas, the LECs associated with the Free Conferencing numbers claim to be permitted to charge high access charges to the IXCs (like Inteliquent) whose customers place the calls.  Free Conferencing then does not charge its customers (the people who call it) for its various services.  Instead, it earns revenue through arrangements with the Native American Telecom LECs and other LECs (now effectively established as shams) to share the high access charges that those LECs are able to charge the IXCs, like Inteliquent, whose customers are calling Free Conferencing.  Free Conferencing thus generates inbound traffic to those LECs, who profit from the associated access charges, and share those charges back with Free Conferencing.

11.     In this case, the defendants through the Master Addendum  One of the most significant components of those rates is the embedded and specified mileage factor—typically known as the "tandem transport" component—that is and legally must be based on the actual distance between two designated points (for the "tandem" and "end office" switches) in South Dakota over which the LECs must transport the inbound Free Conferencing calls after receiving the handoff from Inteliquent.[2]  The lucrative profitability of the scheme in this Complaint hinges on the ability of the Native American Telecom LECs to collect some of the highest access charges in the country

---

[2] As explained below, new Internet-based technologies can offer the "functional equivalent" of these same services through somewhat different mechanisms.

for those atypically long (minutes-of-use) calls to Free Conferencing numbers—and on HD Tandem's effort to remove these arrangements from the regulated context █████████████ ████████████████████████████████████████████████████████████████████████████ ████████████.

12. Further to the illegitimate purpose of advancing this scheme, Free Conferencing says that it has located certain media server equipment in South Dakota on the Native American Telecom LECs' premises and it has been assigned telephone numbers associated with the Native American Telecom LECs' exchanges in South Dakota. It claims to use that equipment to provide its various services (a dubious claim) that can be reached through the South Dakota numbers associated with exchanges run by the Native American Telecom LECs on tribal reservations near Fort Thompson and Pine Ridge, South Dakota. Again ,because the areas served by the Native American Telecom LECs are rural, the access charges that those LECs claim to be able to impose on IXCs like Inteliquent are generally much higher than in urban locations like Chicago and Los Angeles where the parties are headquartered and where (among other locations) they actually interconnect. One of the key components (though not the only one) again is the mileage factor based on the specified distance over the "public switched telephone network" that the LEC must transport the calls as part of the "tandem transport" function.

13. These factors associated with the rates that could be applied for calls to actual locations and actual customers in South Dakota mean that the charges associated with calls to Free Conferencing that Inteliquent would have to pay to the Native American Telecom LECs— ████████████████████████████████████████████████████████████—would be inordinately high (if they were legitimate).

14.     Since the parties entered into the Master Addendum, Inteliquent delivered to HD Tandem and was charged for hundreds of millions of minutes for calls that were destined for Free Conferencing numbers supposedly associated with the particular South Dakota local exchange areas.

15.     But the defendants' actions are all part of a large fraudulent scheme that they have been perpetrating against the telecommunications industry at large, including now against Inteliquent.   At various points, the Master Addendum's ████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████. For those LECs to charge those rates for any particular call, they (i) would have to be providing "tandem transport" services between specified points in South Dakota, and (ii) would have to be delivering the traffic to legitimate "end user" customers in South Dakota.[3]   HD Tandem and Free Conferencing's leadership made multiple and specific representations to Inteliquent—for the purposes of inducing Inteliquent to sign the Master Addendum and then to continue operating under it—that this traffic really was being delivered to South Dakota and that the charged services truly were being provided.

16.     In fact, those functions are not being provided, those representations were false, Free Conferencing is not a distinct and legitimate end user, and the defendants concealed material information.

---

[3] As explained below, because this traffic is what is known as "VoIP" traffic, the charges could be legitimate if the defendants were providing the "functional equivalent" of the types of services described here.  They are not.

a.  As it turns out, the actual switching services occur within a short distance (at most a few blocks) from where Inteliquent connects to HD Tandem (e.g., at the Wide Voice equipment in Los Angeles or Chicago, or potentially in other cities like Miami, Atlanta, or Dallas). All functions beyond fall into the separate category of "end office" functions, not tandem functions. (This assumes there is even a legitimate end user on the other end.) End-office functions are not subject to the time and mileage access-charge formulas under which defendants have billed Inteliquent (or on which they have directly or implicitly based their billings to Inteliquent) for inordinately high charges.

b.  For calls to Free Conferencing numbers, no one is providing the tandem transport services between specified points in South Dakota (or the functional equivalent), because the calls never reach South Dakota, and are instead terminated in Los Angeles or other locations where Free Conferencing has facilities. Thus, the defendants are not providing services ████████████████████████████████████████ though the defendants purposefully and deceptively act and charge as if they or the Native American Telecom LECs were doing so.

c.  As the United States District Court for the District of South Dakota determined in a decision issued on August 4, 2016, Free Conferencing is not even a legitimate end user customer of Native American Telecom (which it would have to be for the LECs to impose access charges, ████ ████████████████████████████████████████

██████████████████. Mem. Op. & Order, *Sprint Commc'ns Co., LP v. Native Am. Telecom et al.*, 4:10-cv-04110 (D.S.D. Aug. 4, 2016). (That decision is hereafter referred to as the *Sprint/NAT Decision* and the underlying litigation the *Sprint/NAT Litigation*.) This means that the Native American Telecom LECs cannot charge any access charges to long distance carriers like Inteliquent. I██████████████████

████████████████████████████████████████

██████████████████████ (A copy of the *Sprint/NAT Decision* is attached to this Complaint as Ex. B.)

    d.    In testimony that recently became available, Native American Telecom and Free Conferencing have admitted to the United States District Court for the District of South Dakota that calls to Free Conferencing numbers may never reach South Dakota, even though the dialed numbers are associated with Native American Telecom LEC exchanges. Native American Telecom provided a diagram in evidence in a recent trial in South Dakota, including through testimony by David Erickson (Free Conferencing's president and CEO), confirming that calls to Free Conferencing numbers do not get delivered in South Dakota. A copy of diagrams used in evidence in that case is attached to this Complaint as Ex. C and incorporated by reference.[4] It was Exhibit 127 in that dispute.

---

[4] Inteliquent does not concede that this diagram is fully accurate or tells the whole story of how calls reach Free Conferencing numbers. The salient point for purposes of this Complaint is that the diagram constitutes an admission that there are undeniably calls that never reach South Dakota.

e. Mr. Erickson has further admitted that Free Conferencing has "a large facility in One Wilshire in Los Angeles" and "a facility in Florida, in Miami in Terremark." (Tr. of Trial, Vol. VI at 1140, *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, No 0:10-cv-00490 (D. Minn. filed Feb. 12, 2016).)

f. On information and belief, Native American Telecom's president, Andrew Nickerson, has admitted to representatives of Sprint (the telephone company) that many calls to Free Conferencing numbers never reach South Dakota, even though the dialed numbers are associated with Native American Telecom exchanges.

17. In all events, no tandem transport services at all (or their functional equivalents) are being provided to Inteliquent in South Dakota (or anywhere) for calls to Free Conferencing numbers. Calls to Free Conferencing are actually received by HD Tandem (through Wide Voice's equipment) thousands of miles away from South Dakota—in Los Angeles, Chicago, and possibly other cities like Miami. Any services provided to Inteliquent by the defendants are (if anything) at most "end office" functions (also known in telecom terminology as "line side" functions) that follow the handoff of traffic (in Los Angeles, Chicago, or elsewhere) and for which much lower rates (if any) would apply. The services provided do not match the charges imposed or the representations made to Inteliquent to induce it into signing the HD Tandem agreement.

18. Inteliquent could not have been lawfully charged access charges for calls to Free Conferencing at the South Dakota numbers before entering into the Master Addendum ▮

███████████████████████████████████████████████████

████████████████████████

19.     █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

20.     █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

21.     In addition, as noted, the media servers used for many if not all of Free Conferencing's services are not located in South Dakota.  They appear to be in Los Angeles and Chicago, or other cities like Miami, Dallas, or Atlanta, very close to the handoff locations.

22.     To the extent Free Conferencing does have any media servers in South Dakota that receive calls from Inteliquent customers, then the defendants' fraud is even worse.  It would be wholly unnecessary to locate systems in South Dakota when the far more efficient and sensible location would be near the Wide Voice equipment.  The only reason to locate any media servers in South Dakota would be for the sole reason of trying to find some basis for the defendants or their associated LECs to make a claim of entitlement to high access charges.  That is patent overcharging for unnecessary services.

23.     There is more.  ██████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ only to the degree that Free Conferencing could be considered a legitimately separate end user customer purchasing services like any other end user under the Native American Telecom LECs' tariffs. But in truth, all of the defendants along with the Native American Telecom LECs are conjoined and associated in many direct and indirect ways. Sometimes in whole and sometimes in part, they have common ownership, investors, executives, and physical locations. They are all in business to profit from their efforts to charge Inteliquent (and others like it) exorbitant fees. Free Conferencing is not a true end user customer. If anything, the Native American Telecom LECs connect to Free Conferencing through what appears to be the equivalent of a private system outside of the public switched telephone network—which would flatly foreclose those LECs from charging access fees to anyone.

24. In fact, the United States District Court for the District of South Dakota recently held that Free Conferencing is definitively not an end user of services from Native American Telecom—and denied Native American Telecom's claimed right to be able to charge a long distance carrier with access charges when calls are made to Free Conferencing telephone numbers associated with Native American Telecom's local service area. The court's factual findings and its rulings that Free Conferencing is not an end user and that Native American Telecom may not charge access charges for calls to Free Conferencing numbers are adopted and incorporated by reference into this Complaint. (*See* Ex. B, *Sprint/NAT Decision*.)

25. As noted, to its profiteering ends, Free Conferencing does not charge many of its customers anything at all (i.e., the customers who use its calling services). Thus its name is "Free" Conferencing. Under a particularly aggressive "traffic pumping" business model heavily frowned upon in the telecommunications industry, it gives callers free services for the precise

reason that it wants to encourage high volumes of calls that will generate enormous access charges from long distance carriers. Those charges ██████████████████████ are then shared among the defendants and their cohorts through "marketing arrangements" that Free Conferencing has with the LECs. These "marketing arrangements" are not the result of any uncompromised bargaining. They instead are insular arrangements between and among closely related parties created to provide them a hook to divide and share the proceeds from high access charges. Those arrangements are gimmicks, albeit difficult ones to detect.

26.     HD Tandem is likewise not an independent and credible intermediary that could legitimately interpose itself between Inteliquent and Free Conferencing or the Native American Telecom LECs. It is deeply connected and related to Free Conferencing in numerous aspects of its operations.

27.     The main function of the Master Addendum appears to be a laundering effort, through which the defendants try to use HD Tandem as a vehicle to remove the compensation arrangements for traffic destined to Free Conferencing out of the regulated context (where it could be even more heavily scrutinized) and into the private commercial context. It is a deceptive means to try to evade and escape regulation. As explained below, the premise of the Master Addendum w██████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████ meaning that the very premise on which Inteliquent entered into the agreement was false and misrepresented to Inteliquent.

28.     The facts in the foregoing paragraphs are not easy to discover.  The defendants take careful and deliberate steps to conceal their misconduct.  They shield the location of telecommunications equipment and computer servers that actually sit in places like Los Angeles and Chicago (not South Dakota), they launder their scheme in the form of a seemingly legitimate commercial contract with a supposedly genuine entity in HD Tandem, they engage in dilatory litigation tactics to resist efforts to bring their network architecture to light (as has happened recently in the separate litigation in South Dakota), they exaggerate the need for and role of equipment (if any) in South Dakota, and they make repeated explicit and false representations to Inteliquent that their network and billing practices are appropriate and support the lawful imposition of these charges.

29.     The defendants do not tell the truth.  Their representations to Inteliquent on the key facts here have been deliberately false.  Each invoice Inteliquent has received and paid under the Master Addendum has been riddled with illegal overcharges and sent over the interstate wires.  In short, the defendants and their associated cohorts employ a "business" model in which they entice callers to place calls of long duration to be made to Free Conferencing numbers, bilk money out of long distance carriers like Inteliquent, and share those ill-gotten gains with each other.  They are "traffic pumpers" of the worst possible kind.

30.     Their scheme has continued to expand and worsen in its harm even since this case was initially filed.  As this Court knows, HD Tandem disconnected Inteliquent's systems on July 27, 2016, after Inteliquent filed its initial complaint and brought the RICO scheme to light.  Once those systems were disconnected, Inteliquent had to find new pathways to deliver calls to the numbers associated with Free Conferencing—including to the Native American Telecom LECs and Wide Voice.  In a few cases, Inteliquent was able to use a direct connection to the Native

American Telecom LECs and Wide Voice, and it began re-delivering calls to those connections. As part and parcel of the scheme, those LECs quickly sent invoices to Inteliquent (over the interstate wires) charging Inteliquent for switched access—i.e., the very charges that they cannot lawfully impose, for example as the United States District Court for the District of South Dakota has determined—with the intent of sharing any payments with Free Conferencing (again as part of the ongoing scheme).

31.     The defendants thereby ███████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████ or (ii) just go ahead and impose those charges directly in the form of switched access charges through their affiliated or associated entities like the Native American Telecom LECs and Wide Voice. In either case, the charges are unlawful and part of their scheme.

32.     In summary fashion, the defendants' scheme can be viewed as consisting of three separate but related stages.

a.      The first stage begins with Free Conferencing entering into arrangements with the applicable LECs—not independent arrangements, because the entities are connected in the many ways described here. Free Conferencing receives telephone numbers supposedly associated with those LECs' rural exchanges. Those LECs, in turn, issue high access charges to long distance carriers, like Inteliquent, whose customers call Free Conferencing numbers. Unbeknownst to the long distance carriers, these arrangements between Free Conferencing and the LECs are shams and the services being charged are not provided. As the United States

District Court for the District of South Dakota determined in the *Sprint/NAT Decision*, it is unlawful for Native American Telecom to charge *any* access charges for calls to Free Conferencing numbers. Those LECs are not providing the services necessary to permit them to charge access charges, and Free Conferencing is not a true "end user" of their services.

b.   In the second stage, long distance carriers like Inteliquent are approached by HD Tandem, a purportedly separate company that is actually operated and managed by the same set of individuals as Free Conferencing. HD Tandem and the other defendants make representations (described in this Complaint) about the legitimacy of the charges that can be imposed for calls to Free Conferencing, ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████. The actual motivation for the approach to use a commercial contract is because the defendants know (and knew) that the illegality of the imposition of regulated access charges eventually would come to light. They believed using a commercial contract would enable them to escape the kind of oversight exemplified by the *Sprint/NAT Decision*. The contract thus is an evasive tactic to extend

their scheme as long as possible before the regulatory regime catches up to them.

c.     In the third stage (which has occurred here since July 2016), the defendants and their cohorts do everything they can to maintain their revenue stream once their contractual arrangements come under threat— including by imposing access charges again and drumming up false assertions that they can be paid millions of dollars in supposed "security" arrangements under the Master Addendum. This happens after a party like Inteliquent disputes the lawfulness of the charges under the Master Addendum, for example as Inteliquent did through this action. Once that happens, the defendants cease providing services under the Master Addendum (as they now have done) and then the Native American Telecom LECs (as well as Wide Voice) once again impose the unlawful access charges. In addition, the defendants engage in vigorous efforts to resist efforts by parties like Inteliquent to find alternative and less costly routes to deliver traffic to the South Dakota Free Conferencing telephone numbers. That is because less costly routes would reduce the access charges that could be imposed, and thus reduce the share of access charges that the defendants and their co-conspirators would be able to collect.

33.     All of this conduct is racketeering activity of the first order. The defendants are perpetrating this scheme in furtherance of an association-in-fact enterprise consisting of:

a.      Defendant Free Conferencing and non-party co-conspirator Yakfree LLC, which are companies that provide services like conferencing calling, chat lines, and radio streaming to telephone consumers, and related services;

b.      Defendant HD Tandem, designed to present a false air of credibility and to avoid the express requirements of rates specified in regulatory tariffs;

c.      Non-party co-conspirators Native American Telecom and Native American Telecom—Pine Ridge in South Dakota;

d.      Defendant Wide Voice, a company with telecommunications facilities in Los Angeles and Chicago (and other possible locations) whose equipment and charges facilitate the defendants' activity, whose executives participate in the scheme, which has signed and billed Inteliquent under the Master Addendum, and which has separately invoiced Inteliquent for false and unlawful charges;

e.      Another non-party co-conspirator known as Wyde Voice LLC that manufactures the equipment used as part of the defendants' scheme;

f.      One or more key individuals working specifically with these other parties to achieve these ends; and

g.      On information and belief, several currently unidentified co-conspirators that may be added to this lawsuit as facts are developed and their identities become known.

34.    This racketeering activity is open-ended and continuous. It encompasses the defendants' business practices covering multiple years, with a specific direction toward Inteliquent since 2015. (The *Sprint/NAT Litigation* describes conduct going back several years

before 2015.)  It continues to date and will continue indefinitely into the future unless stopped in this action.  Activities even since the initial and First Amended Complaints were filed reaffirm that this conduct will not stop absent this Court's intervention.

35.     It is possible that additional parties and claims may be added to this case as discovery proceeds, including one or more of the co-conspirators and others.  There may be additional conference calling service providers to which calls are directed and revenues shared, and there may be additional LECs or other entities involved in the pathways supposedly needed to reach those entities.

36.     The scheme also reflects the defendants' business model applied to the industry at large.  There are undoubtedly other victims besides Inteliquent, and detailed descriptions of the impact of the racketeering scheme on other victims in the industry will be added to this one as the case proceeds.  In its current format, this iteration of the Complaint focuses primarily on the traffic being exchanged between Inteliquent and HD Tandem that is directed to Free Conferencing numbers in certain South Dakota exchanges.  But there are other exchanges in other states and other numbers that are also generating heavy amounts of traffic under the Master Addendum.  Discovery may show that the scheme as directed against Inteliquent goes much farther than just the traffic directed to Free Conferencing.  This Complaint addresses the scheme as it is understood as of this point, but Inteliquent anticipates that discovery may show that other entities are involved and that the scheme has additional components and the damages more widespread.

37.     The defendants also have flatly breached the Master Addendum, ██████████ ████████████████████████████████████████████████████████████and their implied covenant to act in good faith with regard to many of its specific provisions.

38.     This Court's intervention is needed.  Inteliquent seeks declaratory, monetary, and injunctive relief to remedy the harm that the defendants have inflicted and will continue to inflict upon it if their activities are unchecked.

## The Parties

39.     Plaintiff Inteliquent is a Delaware corporation with its principal place of business in Chicago, Illinois.  Its business includes serving other telecommunications companies in a variety of capacities.

40.     Defendant Free Conferencing Corporation is a Nevada corporation with its principal place of business in Long Beach, California.  Free Conferencing is not a Telecommunications Carrier, Common Carrier, or Local Exchange Carrier as defined in the Communications Act of 1934.  Its key personnel include or have included David Erickson (President, CEO, Secretary, Treasurer, and Director), Josh Lowenthal (Chief Operating Officer), Scott Southron (Chief Financial Officer), Eugene Tcipnjatov (Chief Technology Officer), and Jeff Holoubek (until November 2015, Director of Legal and Finance).  Its majority owner reportedly is the Erickson Family Trust.  As detailed below, Free Conferencing is a party to the Master Addendum with Inteliquent, a copy of which is attached to this Complaint as Ex. A and incorporated by reference.  Free Conferencing does business throughout the country, including in Chicago.

41.     HD Tandem purports to be a limited liability corporation organized and operating under the laws of the State of California under the formal name HDPSTN, LLC.  It has represented in this Court that its president and CEO is David Erickson.  Its Internet domain name was registered by Ambuj K. Nayar, a Free Conferencing employee who identifies himself as HD Tandem's Executive Vice President.  HD Tandem is a party to the Master Addendum.  Although

HD Tandem holds itself out as being authorized to provide its services, it does not hold a certificate from the Federal Communications Commission or any state regulatory agency that would permit it to provide regulated services and has not made any state or federal regulatory filings that common carriers are required to make.

42. Defendant Wide Voice, LLC, is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada. It has a California address at the same location as Free Conferencing. Jeff Holoubek was its Director of Legal and Finance until November 2015. Andrew Nickerson is its Chief Executive Officer (and also the President of the Native American Telecom LECs, as described below). As Native American Telecom informed the United States District Court for the District of South Dakota in the *Sprint/NAT Litigation*, Wide Voice owns and operates telecommunications network equipment at One Wilshire Boulevard in Los Angeles and in Chicago (and possibly in other cities). That equipment is used to facilitate the scheme described in this Complaint. Wide Voice is a Local Exchange Carrier as defined in the Communications Act of 1934 and allegedly provides local exchange services in North Dakota, California, Massachusetts, New York, Florida, Pennsylvania, and Nevada. Wide Voice also supplies services to the Native American Telecom LECs to assist them in providing telecommunications services as LECs—services central to the facilitation of the scheme outlined in this Complaint. Wide Voice is also a party to the Master Addendum.

43. John Does 1-10 are unnamed co-conspirators of the defendants whose involvement and culpability will be determined through discovery.

**Non-Party Co-Conspirators**

44. Native American Telecom, LLC is a limited liability company organized under the laws of the Crow Creek Sioux Tribe with its principal place of business in Fort Thompson,

South Dakota. On information and belief, Wide Voice directly or indirectly owns or controls a substantial minority share in Native American Telecom. Until November 2015, Mr. Holoubek likewise was Native American Telecom's President and a board member, and was materially involved in decisions concerning its relationship with Free Conferencing. The majority of Mr. Holoubek's compensation came from Free Conferencing (where he served as Director of Legal and Finance), not Native American Telecom. Andrew Nickerson now serves as the President of Native American Telecom and is also the CEO of Wide Voice. David Erickson (identified below) has been a board member of Native American Telecom. Mr. Erickson testified as Native American Telecom's corporate representative in a trial earlier this year in the United States District Court for the District of South Dakota in the *Sprint/NAT Litigation*.

45. Native American Telecom—Pine Ridge, LLC is a limited liability company organized under the laws of the Oglala Sioux Tribe with its principal place of business in Pine Ridge, South Dakota. Jeff Holoubek has been listed as its registered agent and, on information and belief, likewise served in an executive and board-level capacity for Native American Telecom—Pine Ridge. Andrew Nickerson is currently its President. The majority of Mr. Holoubek's compensation came from Free Conferencing, not Native American Telecom—Pine Ridge.

46. Yakfree LLC is a California limited liability company with its principal place of business in Long Beach, California. Yakfree is not a Telecommunications Carrier, Common Carrier, or Local Exchange Carrier as defined in the Communications Act of 1934. Yakfree is a party to the Master Addendum. Its registered agent is Joshua Lowenthal, and its CEO has been identified as David Erickson as well as Mr. Lowenthal. Mr. Lowenthal reportedly was its founder.

47.     David Erickson is the founder, president, and CEO of Free Conferencing.  Mr. Erickson is also the president and CEO of HD Tandem.  The Erickson Family Trust is the majority owner of Free Conferencing and a minority owner of Wide Voice.  Directly or indirectly, and through that family trust, Mr. Erickson has or directs a substantial interest in each of the named defendants.  He is also a board member of Native American Telecom and Native American Telecom—Pine Ridge.

48.     Non-party co-conspirator Wyde Voice LLC manufactures or distributes conference bridges, media servers, and other equipment that is used to perpetrate the scheme. Mr. Erickson has testified that he "formed" Wyde Voice in 2006 and that he is its owner.  (Tr. of Trial, Vol. VI at 1133, *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, No 0:10-cv-00490 (D. Minn. filed Feb. 12, 2016); Tr. of Trial, Vol. II at 241, *Sprint/NAT Litigation*, No. 4:10-cv-04110 (D.S.D. filed May 8, 2016).)

49.     The non-party co-conspirators are linked substantially to the defendants, and the defendants and the non-party co-conspirators view themselves as part of the same enterprise. After HD Tandem disconnected its systems from Inteliquent on July 27, 2016 (as described below), the president of each of Native American Telecom, Native American Telecom—Pine Ridge, and Wide Voice wrote three identical letters to Inteliquent.  The letters were dated July 28, 2016, and were sent by private interstate carrier and by interstate email.  The same person, Andrew Nickerson, serves as president of each entity.  Mr. Nickerson is paid by Wide Voice and is on its payroll, as witnesses for Native American Telecom testified in the *Sprint/NAT Litigation*.  In each letter, Mr. Nickerson c███████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ the completely identical text in each letter

was no accident.  It reaffirms that these entities are in substance all run by and through the same

persons and are all participants in the scheme described here.  (A copy of Mr. Nickerson's letters

to Inteliquent are attached to this Complaint and incorporated by reference as Exs. D-F.)

### Jurisdiction and Venue

50.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C.

§ 1964, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

51.     This Court likewise may issue declaratory relief under 28 U.S.C. § 2201.

52.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28

U.S.C. § 1391 because the defendants are subject to personal jurisdiction in this judicial district

and the defendants conduct substantial business in this district.  Inteliquent is based in this

district, and all invoices and charges for the services that are part of this fraudulent scheme were

directed to Inteliquent in Chicago.  Wide Voice also has telecommunications equipment in

Chicago that is used to perpetrate the scheme.

### Additional Factual Allegations

**A.     The General Telecommunications Framework**

53.     Among other things, Inteliquent is a long distance carrier, referred to in

telecommunications industry terminology as an "interexchange carrier" or "IXC."  Its customers

typically consist of other carriers, which in turn have end user customers who make long distance

telephone calls.  Those carriers (i.e., Inteliquent's customers) deliver those calls to Inteliquent.

On behalf of its customers, Inteliquent then delivers those long distance calls to local exchange

carriers, which in turn are supposed to transport that traffic and deliver it to their legitimate end

user customers (i.e., the persons or entities that receive calls).

54.     Under the traditional "public switched telephone network" ("PSTN"), an IXC carries its customers' long distance traffic to a local geographic area served by a LEC.  The IXC pays the LEC "terminating access charges" for the LEC's services in taking the traffic from the IXC and delivering it to the ultimate end user.  These access charges consist of several distinct components that the LEC must specify in tariffs filed with the Federal Communications Commission ("FCC").

55.     Among these distinct components of terminating access charges can be a fee for "switching" functions where the handoff of traffic occurs between the long distance and local segments (often known as the "tandem" switching fee), a "tandem transport" charge for delivery from the tandem switch to the LEC's "end office" facility (often tagged to specific real-world miles designated as the distance between the tandem switch and end office facilities), and specified "end office" rates for the services the LEC provides at its end office for switching and final delivery of the traffic from the end office and to the end user.  The transport charges between the tandem switch (where the long distance carrier hands off the traffic in the PSTN) and the LEC's end office switch typically have a mileage component, while the other charges are either time-based (linked to "minutes of use" based on the call duration) or flat fees.[5]

56.     Because some of these access charge components depend on the duration of the call, longer-lasting calls will generate higher access charges to be paid by the IXC to the LEC. In addition, the services that LECs provide to switch and deliver calls in rural areas may involve higher costs than in urban areas because of more dispersed customer locations.  Longer calls and calls delivered to rural areas thus generally will have comparably higher access charges.

---

[5] It is possible that these components at the point where the IXC hands off the traffic may be provided by more than one entity.  For example, one entity may provide tandem switching services, another may provide transport from the tandem switch to the end office, and another may provide end office services.

57.     A local exchange carrier may not impose access charges on a long distance carrier if the supposed end user customer of the LEC (in this case, Free Conferencing) is not a true and legitimate customer.   Traffic delivered to sham entities or under sham or insufficiently independent arrangements cannot be the basis for access charges.   *In the Matter of Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 24 FCC Rcd. 14801 (2009); *In the Matter of Total Telecomm. Servs., Inc. v. AT&T Corp.*, 16 FCC Rcd. 5726 (2001).  An entity that receives free service from a LEC is not an end user under the Communications Act of 1934.   *In the Matter of Qwest Commc'ns, Co. LLC v. N. Valley Commc'ns, LLC*, 26 FCC Rcd. 8332 (2011).  A local carrier likewise generally cannot impose access charges for calls that are terminated to private networks.  The calls must be terminated over the PSTN.

58.     Additionally, under longstanding law, a LEC can only charge an IXC under the LEC's tariff for services the LEC actually performs.  A LEC cannot collect for its tariffed functions if its network does not perform those functions as set forth in the tariff.  *See, e.g., AT&T Corp. v. YMax Commc'ns Corp.*, 26 FCC Rcd. 5742, ¶¶ 36-42 (2001).

59.     In some situations, an IXC like Inteliquent may sign a commercial contract with an intermediary company (not the LEC) that agrees to take the traffic from Inteliquent and make arrangements with LECs for all of the switching and transport that must occur after the handoff from the IXC.  In this situation, the intermediary will charge the IXC according to the terms of the commercial contract and the intermediary will then pay the LEC as required under the tariffs.  Such a commercial contract, in turn, can ███████████████ specifically base its rates on components of the LEC's tariffed rates.  If the tariffs do not support the charges, then neither can a commercial contract that depends upon the tariffs.

B.      **Voice Over Internet Protocol**

60.     In recent years, telecommunications technologies have advanced to the point that many calls are no longer transmitted via the traditional PSTN methods.  They instead are transmitted using a mechanism known as "voice over internet protocol" ("VoIP").  The calls involved in this Complaint use VoIP technology.  With VoIP service, regular "analog" voice calls are converted into digital signals, transmitted by "packet technology" over broadband internet pathways (as opposed to the PSTN), and then delivered to the end user (whether and when they are converted back into analog signals depends on various factors).  The physical topography of how VoIP calls traverse telecommunications networks and travel from the calling party to the called party can vary (in small or large degrees) from the traditional PSTN. Precisely where the analog/digital conversions occur and how the technology operates can vary depending on the particular carriers involved, as can the location where the handoffs occur between IXCs and LECs.

61.     Some aspects of the locations of VoIP calls may be "virtual" as opposed to mechanical.  For example, "switching" can be done using different types of computers and software that direct the broadband signals over the internet, as opposed to analog calls being physically switched through the equipment used for regular voice calls over the PSTN.  VoIP calls may also be handed off from the IXC to the terminating LEC at locations outside the LEC's area and then transmitted over the internet by the LEC (or parties acting on its behalf) to the end user in the LEC's area.

62.     But these "virtual" functions are immaterial for present purposes of this Complaint.  The same compensation rubrics that apply to PSTN calls will—for purposes of this case—apply to VoIP calls, so long as the services that a carrier provides with VoIP technologies

actually occur and are "functionally equivalent" to the services that would apply over the traditional PSTN. At least for the time being, and as relevant to this dispute, the basic tariffed framework for payment of access charges and the means by which carriers compensate each other remains effectively in place. If the called party has a telephone number associated with a particular LEC, the call is delivered to that LEC and is ultimately switched and delivered by the LEC to the end user.

63.     Consistent with these points, Free Conferencing itself has taken the position that VoIP service should be considered indistinguishable from traditional services, so long as the VoIP service provides the "functional equivalent" of the traditional services. (*See* 2d Am. Compl., Doc. 55, ¶¶ 20-23, *Free Conferencing Corp. v. Comcast Corp.*, No. 2:15-cv-4076 (C.D. Cal. filed April 1, 2016).) Native American Telecom has done the same, having filed a tariff with the FCC that states: "Pursuant to 47 CFR § 51.913, all Toll VoIP-PSTN traffic will be assessed switched access charges at the same rates set forth in this tariff for *the functionally equivalent traffic* whether it be VoIP-VoIP, TDM–TDM, or any other traffic distinguished by its underlying technology and/or method of transmission, at rates set forth in Section 3 of this tariff." (Native American Telecom Tariff FCC No. 3 at 1st Revised Page 25 (emphasis added).) Native American Telecom—Pine Ridge has the same provision in its FCC tariff. (Native American Telecom—Pine Ridge Tariff FCC No. 3 at 1st Revised Page 25.)

## C.     Traffic Pumping (or Access Stimulation)

64.     Free Conferencing and similar businesses offer services to telephone customers that involve calls of frequently long duration. Examples of these services include conference services, chat lines, and live radio streaming of programs like religious services and news shows. A customer calls into a particular number associated with Free Conferencing, the call connects to

a Free Conferencing media server, and then the customer receives the service sought (a chat line, streaming radio, or a conference call).

65.     Free Conferencing does not charge its calling customers for its services (or charges them virtually nothing).  The services are effectively "free" to the callers who use them.

66.     Free Conferencing instead makes money in the following manner.  It establishes arrangements in which it purposefully secures telephone numbers associated with LECs in rural areas (like in tribal reservations in South Dakota).  To use the conferencing services, an IXC's customers dial long distance calls to those Free Conferencing numbers.  The IXC (like Inteliquent) delivers the long distance call to the LEC associated with the telephone number (e.g., in South Dakota), the call arrives at the point of interconnection (e.g., a tandem switch), and the LEC supposedly provides tandem transport services and end office services, ultimately delivering the call to Free Conferencing.  At that point, Free Conferencing provides the caller with its services.[6]  As noted, these calls may involve VoIP, in which case the "virtual" functions performed are (or must be) the functional equivalent to those described in this paragraph.

67.     In what is known as "traffic pumping" or "access stimulation," Free Conferencing's arrangements are deliberately designed to authorize the applicable LEC to charge the IXC with high terminating access charges.  Free Conferencing sets up its services in a manner that ensures that callers will make long distance calls of long duration to numbers associated with a LEC in a rural area (and thus making the LEC able to charge higher access charges).  The lack of any charge from Free Conferencing naturally incentivizes callers to use its services.  The LEC then shares with Free Conferencing a substantial portion of the revenues it receives as access charges from the IXC.  The terms of this sharing between the LEC and the

---

[6] For conference calling services, other callers go through the same steps and the callers seeking conference services are connected to each other through the conferencing platform.

access stimulator are typically set forth in so-called "marketing" arrangements in which the conference calling company receives some portion of the access charges the IXC pays to the LEC. Free Conferencing likewise may share revenues with other customers to which it provides service or makes its conferencing, chat line, or radio streaming available.

68.     In other words, Free Conferencing earns substantial revenue by receiving a cut of the (high) terminating access charges that the LEC receives from the IXC. As Free Conferencing recently stated to the United States District Court for the Central District of California:

> Free Conferencing's business focuses on providing conference calling services *without charging organizer fees* to the party hosting the calls. Under its business model, local phone companies known as local exchange carriers ("LECs") are willing to pay Free Conferencing, as well as other subscribers whose services generate a relatively high volume of telephone traffic, to direct some traffic to the LECs' locations.

(2d Am. Compl., Doc. 55, ¶ 15, *Free Conferencing Corp. v. Comcast Corp.*, No. 2:15-cv-4076 (C.D. Cal. filed April 1, 2016) (emphasis added).)

69.     Free Conferencing uses computer media servers and other equipment to provide its services. It has taken the position in the United States District Court for the District of South Dakota that this conferencing equipment is in effect the "end user" (i.e., equivalent to a person who receives calls), and therefore that the LEC serving this "end user" is entitled to impose access charges (which generally are chargeable only where calls go to paying customers). These servers and other equipment are, of course, physical devices that must be located somewhere.

70.     Precisely where Free Conferencing locates its equipment is not easy to detect. In litigation in the United States District Court for the District of South Dakota, Native American Telecom has averred that Free Conferencing locates some equipment at that LEC's end office (e.g., at a location in South Dakota collocated at the Native American Telecom facilities). But according to the founder of Native American Telecom, Gene DeJordy, Native American

Telecom has very small facilities. As he has testified, "It's a fairly small shelter." (Tr. of Trial, Vol. I at 28, *Sprint/NAT Litigation*, No. 4:10-cv-4110 (D.S.D. filed May 8, 2016).) The court in that case entered a finding of fact that the location "was 'a fairly small shelter' approximately '8-by-10 [feet], [and] kind of a small room.'" (Ex. B, *Sprint/NAT Decision* at 6.) Yet David Erickson of Free Conferencing has testified that, to provide its services, Free Conferencing requires "close to 200,000 ports of actual conferencing equipment, hundreds and hundreds of servers . . . probably above 500 servers and under 600 . . . [and t]hey're spread out throughout the United States and the world." (Tr. of Trial, Vol. VI at 1140, *Qwest Commc'ns. Co., LLC v. Free Conferencing Corp.*, No 0:10-cv-00490 (D. Minn. filed Feb. 12, 2016).)

71. Even if Free Conferencing has some small equipment located in South Dakota, the far more sensible location to provide its voluminous traffic (serving hundreds of millions of minutes of traffic per month) would be for that equipment to be a very short distance (the same building or within a few blocks) from the location where the IXC hands off traffic to the entities that ultimately deliver the traffic to Free Conferencing. On information and belief, the equipment (if any) that Free Conferencing claims to house in South Dakota is wholly insufficient for the full range of services it claims to provide. Substantial equipment thus is and must be elsewhere—most likely collocated with or immediately adjacent to the Wide Voice equipment.

72. Under the applicable tariffs, the LEC then charges the IXC for access charges, including transport services that are supposed to cover (under the tariff) specified distances of more than 100 miles within the LECs' service areas located in rural South Dakota. The LEC charges the IXC for the full terminating access charges under the tariff (including the mileage-based transport component) and then shares the resulting revenues with Free Conferencing under their marketing arrangements. The IXC thus pays terminating access charges that include a

mileage-based transport component for services that the LEC (supposedly) performed, and the LEC shares those gains with Free Conferencing. But imposition of these access charges is only appropriate if the traffic is actually terminated to an end user physically located in South Dakota.

73. Mr. Erickson, Free Conferencing's President and CEO, has testified that access stimulation is Free Conferencing's line of business:

> While I believe that Sprint's preferred "traffic pumping" terminology is pejorative, I am not opposed to the term "access stimulation," which has been adopted by the FCC in its rules that were released at the end of 2011.

(Decl. of David Erickson, Ex. B to Doc. 150-2, ¶ 14, *Sprint/NAT Litigation*, No. 4:10-cv-04110 (D.S.D. filed April 18, 2012).)

74. Free Conferencing then purportedly executes agreements with its affiliated LECs to share access charge revenues generated when the LECs are on the receiving end of calls that carry high access charges.

75. Regulators and others have given increasing levels of scrutiny to these types of arrangements, which are known as "traffic pumping" or "access stimulation" models. Free Conferencing likes to claim that the Federal Communications Commission has generally approved these arrangements. That is not true. The Federal Communications Commission has acknowledged the need to "curtail wasteful arbitrage practices" of this kind. It has decried this activity as "one of the most prevalent arbitrage activities today." *In the Matter of Connect America Fund*, 27 FCC Rcd. 4040 ¶¶ 33, 649 (2011). Its website states:

> Access stimulation is harmful to consumers and competition in a number of ways. First, it distorts investment incentives. As a result of an access stimulation scheme, the long distance companies are forced to recover the inflated access costs from all of their customers, even though many of them do not use the services that caused the stimulation in demand. It also harms competition by giving companies that offer, for instance, free conference calling services a competitive advantage against companies that charge their customers for the service.

www.fcc.gov/general/traffic-pumping.

76.     As explained throughout this Complaint, the traffic-pumping scheme perpetrated by these defendants is wholly illegitimate.

**D.     The Tariff Structures of the Native American Telecom LECs and Wide Voice**

77.     Native American Telecom and Native American Telecom—Pine Ridge publish the following tariffed rates for access charges.

      a.     Switched Transport Service usage charges of $.000240 per minute for tandem switch transport, termination; $.000030 per mile for tandem switch transport, facilities; and $.000036 per minute for common transport multiplexing.  (Native American Telecom Tariff FCC No. 3 at 1st Revised Page 86; Native American Telecom—Pine Ridge Tariff FCC No. 3 at 1st Revised Page 86.)

      b.     End Office usage charges for termination traffic of $.000807 per minute for local switching and $.000306 per minute for common trunk port charges.  (Native American Telecom Tariff FCC No. 3 at 2d Revised Page 87; Native American Telecom—Pine Ridge Tariff FCC No. 3 at Revised Page 87.)

78.     These LECs may charge those rates "only when a specific rate element is used." (Native American Telecom Tariff FCC No. 3 at Original Page 80; Native American Telecom—Pine Ridge Tariff FCC No. 3 at Original Page 80.)  In other words, the tariffs forbid the LECs from charging the rate components if the services are not provided.  As explained, that is the law in any event.

79.     Both tariffs define the "End Office access service category" as follows:

The End Office access service category includes:  (1) The switching of calls at the Company's End Office Switch and the delivery of such calls to or from the called party's premises; (2) The routing of calls to the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service or a non-interconnected VoIP service that does not itself seek to collect switched access charges, regardless of the specific functions provided or facilities or technology used; or (3) Any functional equivalent of the

> incumbent local exchange carrier End Office access service provided by
> the Company via analogous services.
>
> End Office access service, or its functional equivalent, includes the
> following rate elements: Local Switching—Originating, Local
> Switching—Terminating, Common Trunk Port, Interconnection Charge,
> Information Surcharge, and Dedicated Trunk Port charges. The End
> Office rate category is composed of the rate elements set forth below [in
> the tariff] based on the functions performed.

(Native American Telecom Tariff FCC No. 3 at 1st Revised Page 72; Native American

Telecom—Pine Ridge Tariff FCC No. 3 at 1st Revised Page 72.)

80. Native American Telecom also publishes a "Composite Rate" for termination

traffic of $.004719, which requires that Native American Telecom transport the traffic 111 miles

between the tandem switch and Native American Telecom's End Office in Kimball, South

Dakota, "measured as airline mileage using the V&H coordinates method in accordance with

standard industry practices." The description of the Composite Rate expressly states that it

"includes … Tandem Switched Transport – Facility (per mile)." When Native American

Telecom charges an IXC the Composite Rate, over 70% of the charge relates to a mileage

element ($.00333/$.004719). (Native American Telecom Tariff FCC No. 3 at 84 & n.1.) The

111 miles must be a real-world actual distance of tandem transport services (or their functional

equivalent).

81. Carey Roesel is a representative of a billing company and was called to testify by

Native American Telecom in the *Sprint/NAT Litigation*. In his testimony, Mr. Roesel made clear

that his company was directly involved at Native American Telecom's request to help draft its

tariff. He specified that the tariff purposefully describes the individual rate elements and how

each element applies. The clear implication of his testimony is that each element of service is

provided (and that charges could not be levied if elements are not provided). Mr. Roesel stated:

> But *we did need to be very clear about things like what mileage was going to be involved*. So, for example, if you look in the tariff, you'll see that not only do we describe the rate elements and how they apply, but we also put those rate elements together into a composite. This is how all of these elements add up into a single rate *that covers all of the services that Native American is providing*. And we [his company] provide the calculations, *the actual mileage*. Most CLECs don't go to that extent to explain their rates.

(Tr. of Trial, Vol. I at 130-31, *Sprint/NAT Litigation*, No. 4:10-cv-4110 (D.S.D. filed May 8, 2016) (emphasis added).)

82. Native American Telecom—Pine Ridge similarly publishes a Composite Rate for termination traffic of $.009879, which requires that Native American Telecom—Pine Ridge transport the traffic 283 miles between the tandem switch and Native American Telecom—Pine Ridge's End Office in Pine Ridge, South Dakota, "measured as airline mileage using the V&H coordinates method in accordance with industry practices." The description of the Composite Rate again expressly states that it "includes … Tandem Switched Transport – Facility (per mile)." When Native American Telecom—Pine Ridge charges an IXC the Composite Rate, over 85% of the charge relates to a mileage element ($.00849/$.009879). (Native American Telecom—Pine Ridge Tariff FCC No. 3 at 84 & n.1.) The 283 miles must be a real-world actual distance of tandem transport services (or their functional equivalent).

83. Unquestionably implicit within the Composite Rates that the Native American Telecom LECs publish in their tariffs is the representation that they legitimately provide—and therefore can charge for—the miles of transport services described in their tariffs. If they do not provide it, they cannot charge for it.

84. The Native American Telecom LECs receive extraordinarily high numbers of minutes of termination traffic from IXCs each month. The vast majority of that traffic is routed to Free Conferencing numbers. These entities have very few if any local voice customers, and

those that they have claimed exist (in other litigation) appear to be connected to the LECs' networks on materially different terms and equipment than Free Conferencing (if at all).

85.     The founder of Native American Telecom, Gene DeJordy, testified to the United States District Court for the District of South Dakota in the *Sprint/NAT Litigation* that "[t]he tribal members that obtain service from Native American Telecom do not make an actual payment to Native American Telecom." (Tr. of Trial, Vol. I at 44, *Sprint/NAT Litigation*, No. 4:10-cv-4110 (D.S.D. filed May 8, 2016).) The services provided to them are "telephone and broadband services to tribal members through a high-speed, fixed, wireless network that's on the Crow Creek reservation." This service is "free to tribal members." (*Id.* at 46.)

86.     In fact, the Native American Telecom LECs' tariffs grant them the sole discretion on whether to actually bill end user customers such as Free Conferencing. The Native American Telecom LEC's tariffs contain identical language, which provides as follows:

> In the event Company, in its sole discretion, chooses to forgo billing customer for access services in any particular month(s), Company reserves the right to back bill customer for any unbilled recurring or non-recurring charges for a period of twenty-four (24) months.

(Native American Telecom Tariff FCC No. 3 at Original Page 45; Native American Telecom—Pine Ridge Tariff FCC No. 3 at Original Page 45.)

87.     The Wide Voice tariff contains identical language. (Wide Voice, LLC Tariff FCC No. 3 at Original Page 39.) Upon information and belief, the Wide Voice and the Native American Telecom LEC's have not consistently billed entities such as Free Conferencing for services allegedly provided under the tariffs.

88.     In this case, the arrangement between Free Conferencing and the involved LECs to share access charges is not the result of a neutral and fair negotiation between independent actors. It is part of an orchestrated plan among entities that (as demonstrated above) are

associated in many ways. Free Conferencing has strong affiliations with the LECs that serve it. Directly or indirectly, it and the other defendants have overlapping executive functions, board members, and ownership with each other and the LECs. Free Conferencing purposely aligns itself with the associated LECs in rural locations so that the access charges that get generated by Free Conferencing's services will be higher than in more urbanized areas.[7]

89.     In findings incorporated here, the United States District Court for the District of South Dakota has ruled in pertinent part:

> Free Conferencing was *not an "end user" or "customer"* under [the relevant Native American Telecom tariff]. . . . The evidence adduced at trial demonstrates that Free Conferencing did not obtain End User Access Service under § 4.1 of NAT's interstate tariff because NAT did not calculate or bill Free Conferencing for the local exchange service described in § 5.2 of NAT's Tribal tariff. NAT's theory ignores the explicit requirements of its tariffs and contracts and relies, instead, on unwritten and unverifiable amendments to those documents. Similarly, NAT did not pass-through USF contributions to Free Conferencing as required by its interstate tariff, and NAT has not shown that it offered Free Conferencing a variety of non-tariffed services under an "all-inclusive" rate. Also, the flow of money between NAT and Free Conferencing favors Free Conferencing." As described [elsewhere in the decision], the fact that NAT billed Free Conferencing for something that NAT labeled "End User Fees" does not immunize the NAT-Free Conferencing relationship from scrutiny.

(Ex. B, *Sprint/NAT Decision* at 36 (emphasis added).)

90.     In findings also incorporated here, the United States District Court for the District of South Dakota has further ruled in pertinent part:

> [T]here is considerable evidence that NAT did not treat Free Conferencing like a typical customer and that NAT's agreements with Free

---

[7] The United States District Court for the District of South Dakota has also held that Native American Telecom cannot charge an IXC (Sprint) for services provided to deliver calls destined for Free Conferencing, on the ground that Free Conferencing was not an actual paying customer of the LEC. *Sprint Commc'ns Co. LP v. Crow Creek Sioux Tribal Court*, 121 F. Supp. 3d 905, 918-19 (D.S.D. 2015). (This ruling was under a predecessor tariff.)

> Conferencing do not resemble traditional agreements for the provision of tariffed service . . . .
>
> The NAT-Free Conferencing relationship does not resemble a normal carrier-customer relationship. Rather, it resembles a relationship between business partners attempting to operate in a manner only superficially consistent with the FCC's rules and regulations.

(*Id.* at 36-37.)

### E.  The Master Addendum

91.  Prior to 2015, Inteliquent delivered inconsequential amounts of traffic as an IXC to the Native American Telecom LECs. The access fees that Inteliquent paid to those LECs thus were comparably minimal in the aggregate, despite the high rates the LECs charged for each individual call.

92.  There also were (and continue to be) circumstances where Inteliquent itself provided "tandem-switching" services where *other* IXCs (not Inteliquent) were sending traffic to the Native American Telecom LECs, under an arrangement where Inteliquent served as the designated "access homing tandem" for the Native American Telecom LECs. Under the regulatory framework, a LEC can designate a particular party to provide the tandem switching services necessary for IXCs to establish a point of interconnection with the LECs' local networks. This is known as a "homing tandem" arrangement. But in those circumstances, the traffic coming to Inteliquent's tandem was long distance traffic being transported to the tandem by other IXCs. Any mileage-based component in those circumstances would have been paid by other IXCs (not Inteliquent) to the LECs.

93.  Inteliquent does not know what rates the LECs charged those IXCs, as any invoices went directly from the LECs to the IXCs. Inteliquent generally understands that some other IXCs have had disputes with one or more of the defendants on the amounts that the

defendants could charge for access fees, and their arrangements are now governed by confidential settlement terms.

94.     Many of the elements of the defendants' scheme have been in place for multiple years.  The defendants' conduct in furtherance of this particular aspect of their illegal enterprise dates back at least to 2009 and potentially even before then.  Events in roughly the past year have seen the defendants adapt and modify their larger scheme and direct it specifically at Inteliquent through the use of HD Tandem and the Master Addendum.

95.     The defendants' conduct began to effectuate noticeable harm upon Inteliquent once Inteliquent itself began delivering substantial volumes of its own customers' long distance traffic destined to Free Conferencing numbers.  Inteliquent's role as an IXC delivering its own customers' long distance traffic to the Native American Telecom LECs expanded only recently.

96.     In mid-2015, Inteliquent agreed with a separate wireless phone company (not a party here) to carry that company's long distance traffic (i.e., Inteliquent serves as the long distance company when that wireless company's callers make long distance calls).  Inteliquent understood that some of that traffic would be destined for numbers associated with the Native American Telecom LECs and where Free Conferencing was the called party.  By that time, there was open litigation involving other carriers against the Native American Telecom LECs, where parties were debating the legitimacy of access charges for traffic destined to the Native American Telecom LECs (particularly to numbers associated with Free Conferencing).  As a precaution, Inteliquent sought specific confirmation from representatives of the defendants and the Native American Telecom LECs that the access charges were for legitimate services being delivered to South Dakota through properly chargeable means.  Inteliquent received repeated and express assurances from the defendants that they were entirely legitimate.

97.    These assurances included multiple specific references prior to and after execution of the Master Addendum that Inteliquent would only be charged for legitimate services actually performed.  These assurances came from Joshua Lowenthal of HD Tandem and Free Conferencing to John Schoder of Inteliquent in (i) the summer of 2015 (before the Master Addendum was executed), and (ii) in April 2016 at the telecommunications industry "Incompass" trade show in Las Vegas.

98.    Free Conferencing's representatives have been adamant—repeatedly—in representations to Inteliquent that their services are legitimate.   Free Conferencing's representatives made repeatedly clear that traffic dialed to the South Dakota numbers in South Dakota was being delivered to locations in South Dakota and over pathways that supported the imposition of the high access charges that Inteliquent would have to pay.  Inteliquent justifiably relied on those forceful representations.  The representations were false.

99.    These assurances lulled Inteliquent into a false sense of security.  It justifiably relied on the truthfulness of the statements made by the defendants' representatives.  With no reason to believe anything improper was occurring, Inteliquent entered into the Master Addendum, effective October 22, 2015.  The parties to the Master Addendum contemplated that Inteliquent would not terminate its own IXC traffic to the Native American Telecom LECs through Inteliquent's own tandem switch, but instead would hand off the traffic to HD Tandem.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

100.    The pertinent part of the Master Addendum thus provides:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████

(Ex. A, Master Addendum at § 3 (emphasis added).)[8]

101.    Inteliquent is invoiced by HD Tandem and the other parties to the Master Addendum *after* services are provided by HD Tandem.  Inteliquent delivers the traffic to HD Tandem, and then HD Tandem sends Inteliquent invoices ████████████████████ ████████████████ Inteliquent provides the service, then HD Tandem invoices the rates.

102.    Other provisions in the Master Addendum ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[8] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████

(*Id.* at § 7 (emphasis added).) ███████████████████████████████

████████████████████████████████

103.     The Master Addendum's entire structure ██████████████████████

████████████████████████████████████████████████████

███████.

104.     As demonstrated in this Complaint, the defendants falsely represented that the

rates ███████████████████████████████████████████████

████████████████████████████████████████

██████████████As explained throughout this Complaint, the defendants also controlled and

concealed the information necessary for Inteliquent t████████████████████████

████████████████████████████████████████████████████

███████████████████████████████.

105.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

106.     During August 2015, Inteliquent began to carry increasingly more traffic destined

for Free Conferencing.  In roughly October 2015, Josh Lowenthal and Andrew Nickerson of the

defendants complained to Inteliquent that Inteliquent had miscalculated the payments owed to

the defendants. According to them, Inteliquent should have delivered traffic to HD Tandem b ████████████████████████████████████████████████████ ████████████████████████████████████████ By raising that complaint, the defendants again represented to Inteliquent that it was necessary and reasonable to charge the rates being charged because of the services the Native American Telecom LECs actually were providing. As part of a settlement of that dispute, Inteliquent began to deliver traffic to Native American Telecom and Native American Telecom—Pine Ridge numbers through HD Tandem.

107. For the month of November 2015, Inteliquent delivered at least ██████████ minutes of traffic to the defendants and their associated or affiliated entities through the Master Addendum, believing ██████████████████████████████████ the rates supposedly justifiable under the terms of the Master Addendum. More than ██ million of those minutes were destined for numbers associated with the Native American Telecom LECs. As part of the scheme described in this Complaint, the defendants transmitted the bills for these services to Inteliquent by use of the interstate wires, including emails to Inteliquent on December 3, 2015, December 7, 2015, and December 18, 2015. The emails originated from the defendants in Long Beach, California; Las Vegas, Nevada; and Sioux Falls, South Dakota, and were sent to Inteliquent and its billing agent in Chicago, Illinois, and Fairfax, Virginia.

108. For the month of December 2015, Inteliquent delivered at least ██████████ minutes of traffic to the defendants and their associated or affiliated entities through the Master Addendum, believing █████████████████████████████████ the rates supposedly justifiable under the terms of the Master Addendum. More than ██ million of those minutes were destined for numbers associated with the Native American Telecom LECs. As part of the scheme described in this Complaint, the defendants transmitted the bills for these services

to Inteliquent by use of the interstate wires, including emails to Inteliquent on January 7, 2016, January 8, 2016, and January 21, 2016. The emails originated from the defendants in Long Beach, California; Las Vegas, Nevada; and Sioux Falls, South Dakota, and were sent to Inteliquent and its billing agent in Chicago, Illinois, and Fairfax, Virginia.

109. For the month of January 2016, Inteliquent delivered at least ███████ minutes of traffic to the defendants and their associated or affiliated entities through the Master Addendum, believing ████████████████████████████ the rates supposedly justifiable under the terms of the Master Addendum. More than ██ million of those minutes were destined for numbers associated with the Native American Telecom LECs. As part of the scheme described in this Complaint, the defendants transmitted the bills for these services to Inteliquent by use of the interstate wires, including emails to Inteliquent on February 4, 2016, February 6, 2016, February 22, 2016, and February 23, 2016. The emails originated from the defendants in Long Beach, California; Las Vegas, Nevada; and Sioux Falls, South Dakota, and were sent to Inteliquent and its billing agent in Chicago, Illinois, and Fairfax, Virginia.

110. For the month of February 2016, Inteliquent delivered over ████████ minutes of traffic to Native American Telecom and Native American Telecom—Pine Ridge allegedly through HD Tandem. As part of the scheme described in this Complaint, HD Tandem transmitted the bills for these supposedly justified services to Inteliquent by email on March 4, 2016. This bill was transmitted from HD Tandem in Long Beach, California, to Inteliquent in Chicago, Illinois.

111. For the month of March 2016, Inteliquent delivered ████████ minutes of traffic to Native American Telecom and Native American Telecom—Pine Ridge allegedly through HD Tandem. As part of the scheme described in this Complaint, HD Tandem transmitted the bills

for these supposedly justified services to Inteliquent by email on April 6, 2016.  This bill was transmitted from HD Tandem in Long Beach, California, to Inteliquent in Chicago, Illinois.

112.    Examples of the invoices sent by the defendants to Inteliquent are attached as group Ex. G to this Complaint and are incorporated by reference.  These invoices show calls to the numbers associated with the "applicable LECs," including without limitation to defendant Wide Voice and to the non-party co-conspirators Native American Telecom and Native American Telecom – Pine Ridge.  These invoices show that the defendants directed payments to be wired to HD Tandem's account at JPMorgan Chase.

113.    Inteliquent paid each of the foregoing invoices through an electronic payment. The defendants deposited the amounts that Inteliquent paid into bank accounts.

114.    As described in this Complaint, the defendants suspended service to Inteliquent under the Master Addendum on and after July 27, 2016.  As shown in Exs. D-F, the president of the Native American Telecom LECs and Wide Voice has sent correspondence to Inteliquent in connection with the defendants' scheme.

115.    Since July 27, 2016, and after the disconnection by HD Tandem as described in this Complaint, Native American Telecom has sent two invoices over the interstate wires to Inteliquent for services rendered for the period since July 27, 2016.  These invoices improperly seek to impose access charges under the Native American Telecom tariff for calls to Free Conferencing numbers.  They amount to wire fraud committed by members of the conspiracy and components of the Enterprise, all in furtherance of the fraudulent scheme.  Copies of the pertinent portions of the invoices are attached as Exs. H and I to this Complaint and are incorporated by reference.  These invoices were dated August 10, 2016, and September 10, 2016,

respectively, and were transmitted over the wires. These invoices seek to impose illegal charges based on the *Sprint/NAT Decision* and the other reasons set forth in this Complaint.

116.  Since July 27, 2016, and after the disconnection by HD Tandem as described in this Complaint, Native American Telecom—Pine Ridge has sent two invoices over the interstate wires to Inteliquent for services rendered for the period since July 27, 2016. These invoices improperly seek to impose access charges under the Native American Telecom—Pine Ridge tariff for calls to Free Conferencing numbers. They amount to wire fraud committed by members of the conspiracy and components of the Enterprise, all in furtherance of the fraudulent scheme. Copies of the pertinent portions of the invoices are attached as Exs. J and K to this Complaint and are incorporated by reference. These invoices were dated August 10, 2016, and September 10, 2016, respectively, and were transmitted over the wires. These invoices seek to impose illegal charges based on the *Sprint/NAT Decision* and the other reasons set forth in this Complaint.

117.  Since July 27, 2016, and after the disconnection by HD Tandem as described in this Complaint, Wide Voice has sent two invoices over the interstate wires to Inteliquent for services rendered for the period since July 27, 2016. They amount to wire fraud committed by Wide Voice and members of the conspiracy, all in furtherance of the fraudulent scheme. Copies of the pertinent portions of the invoices are attached as Exs. L and M to this Complaint and are incorporated by reference. These invoices were dated August 10, 2016, and September 10, 2016, respectively, and were transmitted over the wires.

118.  Each of those invoices, in whole or in part, charged Inteliquent for services that were improper and unlawful for the reasons described in this Complaint.

119. The above examples of charges to Inteliquent are not meant to be exhaustive and only reflect the portions of the overall scheme involving Free Conferencing calls to numbers associated with the Native American Telecom LECs. As explained, Inteliquent anticipates that the misconduct may extend to services involving other LECs and other dialed numbers, and reserves all rights to amend this Complaint as more information comes to light.

## F. The False Transport Scheme

120. Inteliquent has been wrongly charged and continues to be wrongly charged. Through its own dealings with Free Conferencing and through filings that Native American Telecom has made to the United States District Court for the District of South Dakota, Inteliquent now understands that the traffic it delivers to HD Tandem under the Master Addendum has been delivered to defendant Wide Voice in Los Angeles and Chicago (and possibly other cities). This means that (a) Inteliquent is receiving no tandem transport services or their functional equivalent that any applicable LEC could provide; ████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████ (c) the rate it was being charged should be down to zero because Free Conferencing is not a legitimate end user, as the United States District Court for the District of South Dakota has ruled; and ██████████████████████████████████████████ ████████████████████████████████████████████ This information is based in considerable measure on the best available public information. Additional discovery will be required to elicit further evidence showing the defendants' scheme.

121. The bulk of the media servers and other equipment that must be used by Free Conferencing to provide its services are not located in South Dakota at all, but must be proximate to the Wide Voice equipment in Los Angeles or Chicago (or possibly other cities like

Miami, Atlanta, or Dallas). It would make no economic or technological sense to install those media servers in South Dakota, as the defendants would have to incur massive and unnecessary costs to carry the traffic to South Dakota, with the further risk that call quality would deteriorate over the long distance travelled. If the defendants claim that this is what they are doing (incurring those costs), then the *only* reason to put the bulk of the equipment in South Dakota would be to find some hook to be able to charge high access charges. That hook would be insufficient anyway, because the functions beyond the Wide Voice equipment are "line side" end office functions (meaning no tandem transport component could be justifiably charged).

122. A simple review of the equipment in the Native American Telecom territory confirms that Free Conferencing cannot have any significant media servers or other equipment located there. According to information supplied by Free Conferencing in the *Sprint/NAT Litigation*, it collocates some equipment with Native American Telecom equipment in the Fort Thompson area. But there is insufficient physical space in the specified Native American Telecom facilities to house the equipment necessary to provide the services that Free Conferencing claims are being provided when Native American Telecom numbers are called. Public information from Native American Telecom on its own website showing the relatively sparse equipment at its Fort Thompson location confirms that it is physically impossible for the media servers necessary to support Free Conferencing's operations to be located there. On information and belief, the same would be true for Native American Telecom—Pine Ridge.

123. The defendants have used the Master Addendum to try to take their traffic pumping model outside the direct scope of tariff regulation by sanitizing it within a commercial contract. This step enabled the defendants to avoid immediate regulatory oversight and to circumvent tariff-based litigation like they have faced in South Dakota.

124.    To entice Inteliquent into using this arrangement, the defendants a

125.    The defendants presented HD Tandem as a seemingly independent and neutral party that would take the traffic from Inteliquent and see to the eventual delivery to the LECs. The use of this intermediary cast a false air of legitimacy and credibility to the arrangement.  HD Tandem presented itself as an independent entity from Free Conferencing that would serve as an intermediary t███████████████████████████████████████████ In the various contractual documents, HD Tandem represented itself as a California corporation with its principal place of business in Long Beach.

126.    In short: (i) calls to Free Conferencing are handed off to HD Tandem at Wide Voice's facilities in Los Angeles, Chicago, or Miami (or elsewhere like Atlanta or Dallas), and any services provided beyond those locations are end office functions and do not involve tandem transport services (or their functional equivalent); (ii) no "applicable LEC" could or does provide tandem transport services to Inteliquent for such calls; (iii) calls to end users associated with Native American Telecom and Native American Telecom—Pine Ridge evidently do not go to Free Conferencing facilities supposedly located on tribal reservations in South Dakota and likely never even enter that state or those reservations (and if they somehow do, then the defendants are charging for wholly unnecessary transport); and (iv) there is no "functional equivalent" of the

---

9 ████████████████████████████████████████████████████████████████

hundreds of miles of transport services that the LECs would need to be providing to charge the transport component of the access charges ████████████████████ ██████.

127.     In the *Sprint/NAT Litigation*, Native American Telecom has provided evidence in the form of diagrams showing the pathways that it claims some calls take to reach Free Conferencing numbers.  While Inteliquent reserves the right to explore the facts related to these diagrams, at a minimum they are clear cut admissions showing that a substantial number of calls never reach South Dakota.  A copy of the diagrams presented to the United States District Court for the District of South Dakota is attached to this Complaint as Ex. C and incorporated by reference as if fully set forth herein.  When discussing those diagrams in open court, Mr. Erickson conceded that some calls to Free Conferencing numbers associated with the Native American Telecom LECs may never reach South Dakota at all.  Yet the Native American Telecom LECs still impose access charges ████████████████████ ███████████████████.

128.     On information and belief, Mr. Nickerson, Native American Telecom's president and chief executive officer, has explicitly admitted that some calls for which Native American Telecom has charged access charges do not terminate at any facilities in Native American Telecom's location.

### G. The Sham Customer

129. Free Conferencing is not a legitimate end user that has the kind of arrangement with the LECs that would permit the LECs to impose tariffed access charges on IXCs for calls going to it.

130. Under the Master Addendum, w███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

That question, in turn, depends on whether Free Conferencing can legitimately be said to have subscribed to the Native American Telecom LECs' services like any other customer. It has not done so.

131. Free Conferencing does not pay any meaningful amount to the Native American Telecom LECs for services.

132. The Native American Telecom LECs do not treat Free Conferencing like other customers. To the extent there are any Free Conferencing media servers on Native American Telecom premises, no other conference calling companies' equipment could be physically accommodated.

133. Free Conferencing has an effectively exclusive relationship with the Native American Telecom LECs for the services provided to it. It is treated very differently than other purported customers.

134. The Native American Telecom LECs handle Free Conferencing traffic differently than they handle other customers' traffic. Native American Telecom does not have any paying customers apart from traffic pumpers like Free Conferencing. There are approximately 150 residents of the Crow Creek Tribe who reportedly obtain telecommunications services over a

wireless and broadband facility that Native American Telecom provides to them. But they do not pay any money at all for this service. It is free. Native American Telecom and Native American Telecom—Pine Ridge are not subsidized by the federal government to provide free services or discounted telecommunications services to tribal members. They have not applied to be an eligible member to provide federal "Lifeline Services" or Lifeline discounts to tribal members.

135. The Native American Telecom LECs and the other defendants have arrangements with Free Conferencing that do not resemble traditional arrangements for their tariffed services. In many respects, these arrangements appear to create what is essentially a private network for Free Conferencing, as to which access charges cannot apply.

136. For example, in telecommunications industry terminology, the first six digits of a phone number are the area code and the prefix, denoted NPA-NXX. The NPA-NXX of 605-477 is used in Native American Telecom's local exchange by Free Conferencing. Yet those numbers cannot be dialed—not even in the local Fort Thompson area—without incurring a toll charge. "Normal" local customers in the Fort Thompson area actually have telephone numbers that start with 605-245 but are served by a switch provided by Midstate Communications out of Kimball, South Dakota. In other words, even though the 605-477 numbers have the appearance of a local phone number when within the local area, they are always toll numbers (so calls to them always generate access charge revenues to the schemers).

137. The Native American Telecom LECs have not complied with certain of their obligations regarding required Universal Service fund contributions for some or all of the period since the Master Addendum has been in effect.

138.    Local customers in the Native American Telecom LECs' service areas cannot complete calls to Free Conferencing over local numbers.  The numbers are always toll calls. Free Conferencing is not a typical local end user customer.

139.    The United States District Court for the District of South Dakota ruled that Native American Telecom cannot charge access charges to a long distance carrier for calls dialed to Free Conferencing numbers associated with Native American Telecom exchanges.   (*See generally* Ex. B, *Sprint/NAT Decision*.)  This ruling means that Inteliquent could not be charged anything at all for calls to numbers associated with Native American Telecom telephone numbers.

140.    ██████████████████████████████████████████████████████████ ██████████████████████████████████  Inteliquent should not be charged anything for calls destined to Free Conferencing numbers associated with the Native American Telecom LECs.  On information and belief, effectively the same structures, arrangements, and pathways are used when calls are destined to numbers associated with the exchanges operated by Native American Telecom—Pine Ridge and Wide Voice.  Calls to Free Conferencing numbers associated with those LECs thus cannot be subject to access charges.

## H.    The Defendants' Concealment

141.    The defendants and the non-party co-conspirators have engaged in an elaborate effort to conceal their scheme.  Their efforts include:

a.    Falsely representing to Inteliquent that traffic destined for Free Conferencing is legitimately terminated in South Dakota;

b.    Falsely representing to Inteliquent that Native American Telecom and Native American Telecom—Pine Ridge—██████████████████████████

████████████████—perform transport services in South Dakota as provided in their respective tariffs;

c. Requiring Inteliquent to accept artificial rates with, and transfer traffic to, a fictitious entity that is the alter ego of Free Conferencing;

d. Implying that HD Tandem has an existence separate and distinct from Free Conferencing;

e. L█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

f. Billing access fees to Inteliquent, a███████████████████████████

█████, implying that the Native American Telecom LECs provide transport services that they do not actually provide;

g. Publicly and privately representing that the Native American Telecom LECs perform End Office services in South Dakota but concealing that all "trunk side" services related to the traffic are provided in Los Angeles and Chicago; and

h. Establishing switches to serve Free Conferencing in the immediate proximity of access tandems, rather than in South Dakota.

**I. Inteliquent's Reliance on the Defendants**

142. Inteliquent has relied on the defendants to provide accurate billing statements that present legitimate charges for services actually rendered and necessary. Inteliquent would not have paid or have agreed to pay HD Tandem or the Native American Telecom LECs (or Wide

Voice or anyone else involved in the scheme) any amounts for services not actually provided. Inteliquent's reliance was reasonable.

**J.    Use of the Interstate Wires**

143.    It is illegal under 18 U.S.C. § 1343 to use the interstate wires for the purpose of executing a scheme or artifice to defraud.  A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5).

144.    As detailed above, the defendants as well as their non-party co-conspirators repeatedly and knowingly have used the interstate wires to effectuate their scheme.  Their invoices described above are sent from California to Chicago by electronic means.  The transmission of every invoice done as part of the scheme is an independent act of wire fraud, examples of which are detailed above.

145.    The letters attached as Exs. D-F from defendant Wide Voice as well as the Native American Telecom LECs were knowingly transmitted via email over the interstate wires and were in furtherance of the scheme.

146.    In addition, the entirety of the defendants' and their associates' business and the scheme described here involves use of the interstate wires.  The business itself involves interstate exchange and delivery of telecommunications traffic over the PSTN and Internet broadband pathways.  Wire fraud is inherent in all aspects of the defendants' scheme.

**K.    Use of Interstate Delivery Service**

147.    It is illegal under 18 U.S.C. § 1341 to deposit or cause to be deposited any matter or thing to be sent or delivered by any private or commercial interstate carrier for the purpose of executing a scheme or artifice to defraud.  A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5).

148.    As described above, defendant Wide Voice has knowingly caused interstate correspondence to Inteliquent to be delivered by Federal Express dated July 28, 2016, in furtherance of the scheme.  (Ex. F.)

149.    As described above, non-party conspirator Native American Telecom has caused interstate correspondence to Inteliquent to be delivered by Federal Express dated July 28, 2016, in furtherance of the scheme.  (Ex. D.)

150.    As described above, non-party conspirator Native American Telecom—Pine Ridge has knowingly caused interstate correspondence to Inteliquent to be delivered by Federal Express dated July 28, 2016, in furtherance of the scheme.  (Ex. E.)

**L.    Theft/Larceny**

151.    Under Illinois law, 720 ILCS 5/16-1(a)(2), a person commits theft "when he or she knowingly . . . [o]btains control over property of another by deception."  Each act of billing and accepting payment from Inteliquent as described in this Complaint has been an act of theft under Illinois law by the defendants.

152.    Under California Penal Code 484-502.9, a person commits theft "who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money[.]"  Each act of billing and accepting payment from Inteliquent as described in this Complaint has been an act of theft under California law by the defendants.

**M.  Money Laundering**

153.    It is a crime under 18 U.S.C. § 1956 to conduct financial transactions involving the proceeds of unlawful activity.  A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5).

154.    The defendants have violated this statute each time they have billed and accepted payment from Inteliquent as described in this Complaint and, on information and belief, have deposited those proceeds in financial institutions.

**N.  The Traffic Pumping Enterprise**

155.    The defendants and the non-party co-conspirators are associated-in-fact and form an enterprise whose activities affect interstate commerce.

156.    The enterprise is referred to in this Complaint as the "Traffic Pumping Enterprise" or the "Enterprise."  It exists to enable the defendants to charge Inteliquent the equivalent of terminating access charges for services that the defendants falsely represent that they or their associates provide, but do not in fact provide.  The Enterprise profits from the collection and sharing of terminating access charges received for transport services that are not actually provided.

157.    Defendant HD Tandem is associated with the Enterprise.  It serves as the contractual vehicle through which the defendants seek to evade the rule that Inteliquent cannot be charged under tariffs for services that the applicable LEC did not perform.  It sends invoices to Inteliquent that seek to impose charges for services never performed.

158.    Defendant Free Conferencing is associated with the Enterprise as it shares the terminating access fees that the Native American Telecom LECs receive from IXCs for transport services that they do not provide.  It likewise shares moneys received from Inteliquent under the

Master Addendum t█████████████████████████. It does not charge the vast majority of its actual customers for any services it provides to them. Its business model thus is wholly dependent on and profits from the ability of the defendants to continue to charge high transport rates for services they do not provide.

159. Defendant Wide Voice is associated with the Enterprise as it is a party to the Master Addendum that serves as a vehicle to perpetuate the fraud, has the aforementioned connections to other parties associated with the Enterprise, owns and operates equipment in Los Angeles and Chicago (and possibly other cities) that is used to perpetuate the defendants' scheme, and provides services to the Native American Telecom LECs that are used to perpetuate the scheme. A witness for Native American Telecom named Carey Roesel testified in the United States District Court for the District of South Dakota in the *Sprint/NAT Litigation* that Wide Voice "is the network provider for Native American Telecom." (Tr. of Trial, Vol. I at 120, *Sprint/NAT Litigation*, No. 4:10-cv-4110 (D.S.D. filed May 8, 2016).) Wide Voice thus is intimately involved with and participates in all aspects of the fraudulent scheme.

160. Non-party co-conspirator Yakfree is associated with the Enterprise. On information and belief, it shares terminating access fees that the Native American Telecom LECs receive from IXCs for transport services that they do not provide and it likewise shares moneys received from Inteliquent under the Master Addendum. On information and belief, it does not charge its actual customers for any services it provides to them. On information and belief, its business model is wholly dependent on the ability of the defendants to continue to charge for services they do not provide.

161.    Non-party co-conspirator David Erickson is associated with the Enterprise as an owner, partner, shareholder, member, or executive of each of the other defendants and as the primary orchestrator of the scheme.

162.    Non-party co-conspirator Native American Telecom is associated with the Enterprise as it has the various aforementioned connections to other parties associated with the Enterprise, shares terminating access charges with Free Conferencing, and is one of the entities ███████████████████████████████████████████ purportedly providing transport services that are not in fact provided.

163.    Non-party co-conspirator Native American Telecom—Pine Ridge is associated with the Enterprise as it has the various aforementioned connections to other parties associated with the Enterprise, shares terminating access charges with Free Conferencing, and is one of the entities ███████████████████████████████████ purportedly providing transport services that are not in fact provided.

164.    Non-party co-conspirator Wyde Voice LLC is associated with the Enterprise as it manufactures conference bridges, media servers, and other equipment that is used to perpetrate the scheme, and provides them to other co-conspirators at free or reduced-cost rates for the purpose of allowing those co-conspirators to participate in the scheme.

165.    As stated above, the president of Native American Telecom, Native American Telecom—Pine Ridge, and Wide Voice has referred to the defendants, Native American Telecom, Native American Telecom—Pine Ridge, and Wide Voice as "us" in recent correspondence.  (*See* Exs. D-F.)  The use of that term reflects and confirms that they are part of the Enterprise.

166.    Each of the defendants is further associated with each other and the Enterprise through the various ways they are directly and indirectly associated or affiliated with each other, as described throughout this Complaint.  As explained, it is further anticipated that other entities may be directly or indirectly associated or affiliated with the defendants and involved in the scheme.

167.    Representatives of many of the defendants and non-party co-conspirators have explicitly acknowledged the association among several of these entities.

168.    For example, Jeff Holoubek simultaneously served as the President of Native American Telecom, the registered agent for Native American Telecom—Pine Ridge, the Director of Legal and Finance for Free Conferencing, and the Director of Legal and Finance for Wide Voice and HD Tandem.  In his "Linked In" biography available in 2016, he referred to a "Free Conferencing Corporation conglomerate of companies" and defined them together by the acronym "FCC."  He stated:  "For the past seven years, I have served as Director of Legal Affairs for *the Free Conferencing Corporation conglomerate of companies* including, *Free Conference Call (Conference Calling)*, Free Conference Call Global (International Conference Calling), StartMeeting (Screen Sharing and Video Conferencing), *Wide Voice* (Carrier Operations), *Wyde Voice* (Technology), and *HD Tandem* (Traffic Transit) ('FCC')."  (Emphasis added.)

### Count I
### Violation of RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants)

169.    The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

170.    The Traffic Pumping Enterprise is an enterprise engaged in and whose activities affect interstate commerce.  The defendants are employed by or associated with the Enterprise.

171.    The defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of wire fraud and money laundering done for unlawful purposes, including intentionally defrauding Inteliquent.

172.    Pursuant to and in furtherance of their scheme, each of the defendants committed numerous and related acts of wire fraud, including the use of the interstate wires in connection with the receipt of millions of minutes of IXC calls from Inteliquent and the corresponding use of the wires to share revenues improperly received from Inteliquent under the Master Addendum.

173.    Pursuant to and in furtherance of the illegal scheme, the defendants made use of the interstate wires to send invoices to Inteliquent improperly charging rates that include a false transport component, as detailed above.

174.    Pursuant to and in furtherance of the illegal scheme, defendant Wide Voice allowed use of its facilities in One Wilshire Boulevard, Los Angeles, California, for the receipt of millions of minutes of interstate calls from Inteliquent and other IXCs.  Each such receipt of an IXC call is a use of the interstate wires in furtherance of the scheme.

175.    Wide Voice and the Native American Telecom LECs have used an interstate private or commercial carrier in furtherance of the scheme.

176.    Each of the defendants has used the interstate wires in furtherance of the scheme.

177.    Each of the defendants (along with the non-party co-conspirators) has engaged in predicate acts of racketeering.

178.    The acts set forth above relating to the use of the interstate wires violate 18 U.S.C. § 1343 and are part of a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

179.    The acts set forth above relating to the use of an interstate private or commercial carrier violate 18 U.S.C. § 1341 and are part of a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

180.    The acts set forth above relating to money laundering violate 18 U.S.C. § 1956 and are part of a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

181.    The acts set forth above involves open-ended continuity as the term is used in the context of 18 U.S.C. § 1962.  The defendants' scheme has been in place for multiple years, has been directed against Inteliquent specifically since the execution of the Master Addendum in October 2015, and is continuing to date and for the foreseeable future unless checked by this action.

182.    The defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

183.    As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Inteliquent has been injured in its business and property in the overcharges that it has been billed for and has paid under the Master Addendum, and in other ways described throughout this Complaint, and Inteliquent will continue to be injured absent relief from this Court.

WHEREFORE, Inteliquent requests that this Court declare that the defendants are violating 18 U.S.C. § 1962(c) and enter judgment against the defendants, including for treble damages, attorney's fees, and an order requiring the defendants to cease billing Inteliquent for any services not actually performed, as well as any other relief that may be available to remedy the defendants' actions.

**Count II**
**Conspiracy to Violate RICO in Violation of 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

184.    The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph

185.    As set forth above, the defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

186.    The defendants have intentionally conspired and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

187.    The defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

188.    Each defendant has committed multiple predicate acts of racketeering in the form of wire fraud as described above.  Wide Voice has also committed mail fraud in furtherance of the conspiracy.  Other co-conspirators have likewise committed predicate acts as described in this Complaint.

189.    Each such predicate act described in the preceding paragraph is also an overt act in furtherance of the conspiracy.

190.    Each defendant has committed an overt act in furtherance of the conspiracy that has injured Inteliquent and that constitutes a predicate act under the RICO statute.

191.    The defendants have also engaged in theft of services by deception in furtherance of the conspiracy.

192.    Each defendant agreed to and is a party to the Master Addendum, which is a significant component of the defendants' scheme.  Each defendant further agreed to the scheme as reflected in their numerous conjoined activities, their overlapping and interconnecting leadership, their agreement to share access charge revenues, and their agreement to share revenues from the charges that Inteliquent pays under the HD Tandem agreement.

193.    Defendants HD Tandem and Free Conferencing have sent numerous bills over interstate wires to Inteliquent that falsely overcharge Inteliquent for services not rendered.

194.    Defendant Wide Voice permits the use of its equipment on each telephone call that is part of the scheme against Inteliquent.

195.    Inteliquent has been injured by the overt acts, including by the billings presented to it by Free Conferencing and HD Tandem that falsely represent that Inteliquent's IXC calls were legitimately transported as well as the defendants' sharing of revenues paid by Inteliquent under the Master Addendum.

196.    The defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

197.    As a direct and proximate result of the defendants' conspiracy and racketeering activities and violations of 18 U.S.C. § 1962(d), Inteliquent has been injured in its business and property in the overcharges that it has been billed for and has paid under the Master Addendum, and in other ways described throughout this Complaint, and Inteliquent will continue to be injured absent relief from this Court.

WHEREFORE, Inteliquent requests that this Court declare that the defendants are violating 18 U.S.C. § 1962(d) and enter judgment against the defendants, including for treble damages, attorney's fees, and an order requiring the defendants to cease billing Inteliquent for

any services not actually performed, as well as any other relief that may be available to remedy the defendants' actions.

**Count III**
**Fraud and Fraud in the Inducement**
**(Against All Defendants)**

198.    The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

199.    Defendants Free Conferencing Corporation and HD Tandem have concealed the network architecture involved in delivering calls to Free Conferencing and have misrepresented ███████████████████████████████████████████.

200.    These misrepresentations were made in the direct oral representations described above that led to the formation of the Master Addendum.

201.    The defendants have compounded and expanded upon their misrepresentations in the Master Addendum's ██████████████████████████████████ ████████████ and in the bills submitted to Inteliquent under the Master Addendum t██ ████████████████████████████.

202.    The defendants knew and intended that Inteliquent would enter into the Master Addendum lacking knowledge that the ███████████████████████████ ███████████████████████████.

203.    The defendants knew and intended that Inteliquent would be deceived into believing t███████████████████████████████ ██████████████████████.

204.    In executing the Master Addendum, Inteliquent reasonably and justifiably relied on the defendants' false representations and concealments of fact.

205.     In paying bills submitted to it under the Master Addendum, Inteliquent reasonably and justifiably relied on the defendants' false representations and concealments of fact.

206.     Inteliquent has been damaged in an amount to be proved at trial, which is at least equal to the rates and charges it has paid under the Master Addendum for services that were never rendered.

WHEREFORE, Inteliquent requests that the Court enter judgment against defendants and award Inteliquent damages in an amount to be proved at trial and that continues to accrue, along with punitive damages as well as any other relief that may be available to remedy the defendants' actions.

### Count IV
### Breach of Contract
### (Against All Defendants)

207.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

208.     The Master Addendum is a valid and enforceable contract.

209.     Contracts, including the Master Addendum, contain an implied covenant of good faith and fair dealing.

210.     Under the terms of the Master Addendum, I ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. A, Master Addendum at § 3 (emphasis added).)

211.     Inteliquent has been charged and continues to be charged a rate higher than the Master Addendum permits.

212.    The defendants have not complied with their covenant to act in good faith in performing the rate terms of the Master Addendum.

213.    The improper charging applies to any instance under the Master Addendum where Inteliquent █████████████████████████████████.

214.    For example, the tariffed ███████████ rates for Native American Telecom and Native American Telecom—Pine Ridge amount to ████████ per minute.

215.    Because Free Conferencing is not a legitimate end user customer of the Native American Telecom LECs, ███████████████████████████████████████████ █████████████████████████████████████████.

216.    Free Conferencing and HD Tandem have charged, and continue to charge, Inteliquent rates for traffic destined for Native American Telecom that exceed the permissible amounts under the Master Addendum.

217.    Inteliquent likewise has been charged more than the end office rates for traffic destined to other LECs.

218.    Any payment by Inteliquent under the Master Addendum has been under actual and constructive protest.

219.    Free Conferencing and HD Tandem have materially and substantially breached the Master Addendum, causing Inteliquent damages as set forth in this Complaint.

WHEREFORE, Inteliquent requests that the Court declare that the Master Addendum prohibits the defendants from charging Inteliquent any amounts above the end office rates of the applicable LECs, enter judgment against the defendants, and award Inteliquent damages in an amount that continues to accrue and as proven at trial.

**Count V**
**Unfair Competition (California Statute)**
**(Against All Defendants)**

220.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

221.     The defendants knew and intended that Inteliquent would be deceived into believing that ███████████████████████████████████████████ ███████████████████████████████████████

222.     The defendants knew and intended that Inteliquent would be deceived into believing that Free Conferencing was a legitimate end user of the Native American Telecom LECs (and possibly other LECs).

223.     Cal. Bus. & Prof. Code § 17200 makes unlawful fraudulent business acts or practices, and unfair, deceptive, untrue, or misleading advertising.

224.     Each defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

225.     By holding themselves out as providing various telecommunications services to different intended customer groups in California, including IXCs like Inteliquent, the defendants affect commerce and trade within the State of California.

226.     The defendants violated, and continue to violate, Cal. Bus. & Prof. Code §§ 17200, *et seq.* by concealing the network architecture actually involved in delivering traffic to Free Conferencing and misrepresenting the services are actually provided to Inteliquent under the Master Addendum.

227.     The defendants knew and intended that Inteliquent would be deceived into believing ███████████████████████████████████████████ ███████████████████████████████████████

228.    The actual services a LEC provides pursuant to various rate elements under a tariff are material facts upon which IXCs rely.

229.    Acting as a reasonable IXC, Inteliquent would never have paid mileage-based transmission facility charges or a fee based on mileage-based transmission facility charges had Inteliquent known that ████████████████████████████████████████.

230.    As a direct and proximate result of these unfair, deceptive, and unconscionable practices, Inteliquent has suffered damages in the form of fees it would not otherwise have paid to the defendants (i.e., Restitution Damages).

231.    As statements by the FCC described above help confirm, traffic pumping schemes impose harms on competition and consumers.

232.    As evidenced by the *Sprint/NAT Decision*, the defendants' conduct extends beyond Inteliquent and affects the industry at large.

233.    The defendants' scheme is perpetrated on the telecommunications industry as part of their traffic pumping model and harms competitors and consumers alike.

234.    The deception imposes harms upon the public and consumers at large, especially those paying for Inteliquent's services.

235.    Inteliquent also seeks the recovery of attorney's fees pursuant to Cal. Code of Civ. P. § 1021.5, which awards such fees to a prevailing plaintiff that obtains relief benefitting the general public.  The defendants have effectively shifted the cost of doing "free" business onto the unwitting customers of Inteliquent and other IXCs through fraudulent and inflated access fees.

WHEREFORE, Inteliquent requests that the Court enter judgment against the defendants and award Inteliquent damages and all relief available under Cal. Bus. & Prof. Code §§ 17200, *et*

*seq.*, including all compensatory and monetary relief permitted by the statute as well as attorney's fees, as well as any other relief that may be available to remedy the defendants' actions.

**Count VI**
**Unfair Competition (Illinois Statute)**
**(Against All Defendants)**

236.    The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

237.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, prohibits fraud, unfair methods of competition, and unfair or deceptive practices in the conduct of trade or business.

238.    The defendants have engaged in deceptive acts and practices.

239.    The deceptive acts were material.

240.    The defendants intended that Inteliquent rely on their deceptions.

241.    The deceptions occurred in the course of conduct involving trade and commerce.

242.    The defendants have engaged in conduct that includes theft of services by deception.

243.    Inteliquent suffered actual damages from the deception.

244.    As statements by the FCC described above help confirm, traffic pumping schemes impose harms on competition and consumers.

245.    As evidenced by the *Sprint/NAT Decision*, the defendants' conduct extends beyond Inteliquent and affects the industry at large.

246.    The defendants' scheme is perpetrated on the telecommunications industry as part of their traffic pumping model and harms competitors and consumers alike.

247.     The deception imposes harms upon the public and consumers at large, especially those paying for Inteliquent's services.

248.     Inteliquent is based in Illinois and substantial portions of the defendants' actions were directed at Inteliquent in Illinois.

WHEREFORE, Inteliquent requests that the Court enter judgment against the defendants and award Inteliquent damages and all relief available under the Illinois Consumer Fraud and Deceptive Business Practices Act, including all compensatory and monetary relief permitted by the statute as well as attorney's fees, as well as punitive damages to the fullest extent available.

### Count VII
### Unjust Enrichment
### (Against All Defendants)

249.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

250.     The defendants have concealed the Native American Telecom LECs' network architecture and misrepresented the services that Native American Telecom and Native American Telecom—Pine Ridge actually provide.

251.     The defendants knew and intended that Inteliquent would be deceived into believing that ████████████████████████████████████████████ ████████████████████████████████████████████

252.     The defendants knew and intended that Inteliquent would be deceived into believing that Free Conferencing was a legitimate end user of the Native American Telecom LECs (and possibly other LECs).

253.     The defendants have engaged in conduct that includes theft of services by deception.

254.    Inteliquent was unaware of the falsity of the defendants' representations.

255.    Inteliquent would never have paid mileage-based transmission facility charges or a fee based on mileage-based transmission facility charges had Inteliquent known that the ███████████████████████████████████████████

256.    The defendants have acquired and retained money belonging to Inteliquent as a result of their wrongful conduct.  Each bill paid by Inteliquent generates ill-gotten profit to the defendants at Inteliquent's expense.

257.    Under the principles of equity, the defendants should not be allowed to keep the money belonging to Inteliquent because the defendants unjustly received it as a result of unlawful actions.

258.    Inteliquent seeks Restitution Damages and any other forms of damages available under law for the defendants' unlawful conduct.

WHEREFORE, Inteliquent requests that the Court enter judgment against the defendants and award Inteliquent damages and all relief available to Inteliquent as a result of the defendants becoming unjustly enriched at Inteliquent's expense, as well as any other relief that may be available to remedy the defendants' actions.

### Count VIII
### Civil Conspiracy
### (Against All Defendants)

259.    The allegations of all the foregoing and following paragraphs are incorporated herein by reference.

260.    The defendants agreed to perpetrate the scheme against Inteliquent.

261.    The defendants agreed on the objective and method to perpetrate their scheme.

262.    The scheme was unlawful.

263.    Each defendant committed an overt act in furtherance of the scheme.

264.    Inteliquent has been injured by the conspiracy.

WHEREFORE, Inteliquent requests that the Court enter judgment against the defendants and award Inteliquent damages and all relief available to Inteliquent as a result of the conspiracy, as well as any other relief that may be available to remedy the defendants' actions.

**Count IX**
**Breach of Contract**
**(Against All Defendants)**

265.    The allegations of all the foregoing and following paragraphs are incorporated herein by reference.

266.    The Master Addendum requires HD Tandem to deliver traffic as set forth in this Complaint, and at appropriate rates.  H█████████████████████████████████ ████████████████████████████████████████████████ (Ex. A, Master Addendum at rec. B, *see also id.* § 2 (███████████████████████████ ████████████████████).)

267.    In retaliation for the filing of the first version of this complaint, the defendants threatened to and then did suspend services to Inteliquent.  They have no legal or factual basis to do so.

268.    The defendants have breached the Master Addendum.

269.    The purported basis for the defendants' decision to suspend services are certain provisions under the Reciprocal Master Services Agreement effective August 2013 (the "Master Services Agreement" attached as Ex. N), a related contract between Inteliquent and HD Tandem.

270.    Under the Reciprocal Master Services Agreement, ████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████ (Ex. N, Master Services Agreement at Attachment A § A.1.)  The Master Addendum amended the Master Services Agreement, but also added the terms described throughout this Complaint.  The Master Addendum includes all the defendants as parties.

271.    The Master Addendum does not permit the defendants to suspend services to Inteliquent where Inteliquent has disputed charges—as Inteliquent has done.

272.    The Master Services Agreement █████████████████████████████:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████

(Ex. N, Master Services Agreement at § 4.7 (emphasis added).)

273.    Similarly, the Master Services Agreement ████████████████████████████ ████████████████████:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

(*Id.* at § 4.6 (emphasis added).)

274.    As noted, the Master Addendum modified, to an extent, the Master Services Agreement.  Like the Master Addendum, the Master Services Agreement is an enforceable contract.

275.    All contracts contain an implied covenant of good faith and fair dealing.

276.    The defendants were aware on July 5, 2016, that Inteliquent was disputing charges to it under the Master Addendum.  At 4:15 p.m. on that day, the defendants issued a notice to Inteliquent ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████Although aware that Inteliquent disputed the rates the defendants had billed, the defendants demanded that Inteliquent make a deposit of disputed amounts within two days of the notice (i.e., July 7, 2016).  The defendants offered no justification for that demand other than claiming the right to do so under the terms of the Master Services Agreement.  A copy of the July 5 notice is attached as Ex. O.

277.    On July 5, 2016, Inteliquent filed the initial complaint in this lawsuit.  Counsel for Inteliquent provided a same-day courtesy copy of the complaint to the defendants' counsel.

278.    On July 6, 2016, after receiving the complaint, the defendants issued a notice to Inteliquent that Inteliquent had allegedly defaulted on paying the May 2016 invoice.  Although aware that Inteliquent disputed the rates the defendants had billed, the defendants threatened that if Inteliquent did not pay the full amount of the invoice (████████) within seven days of the notice (i.e., July 13, 2016), the defendants would stop delivering Inteliquent's traffic.  A copy of the July 6 notice is attached as Ex.  P.

279.    The defendants implied that they had authority to do so under S████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ (Ex. N, Master Services Agreement at § 11.2(i) (emphasis added).)

280.     Contrary to the defendants' assertions, the defendants had no legal right to threaten imminent termination of services for Inteliquent's refusal to immediately pay nearly ███████ in disputed charges for services that Inteliquent alleges were not provided.

281.     On July 7, 2016, Inteliquent denied that the defendants had any basis for suddenly requesting that Inteliquent make a substantial security deposit well in excess of what the defendants could rightfully charge.  Without agreeing that the demand or the amount were proper, Inteliquent nonetheless provided assurances that its bank was willing to issue a letter of credit in the full amount demanded by the defendants ███████

282.     On July 11, 2016, the defendants issued a notice to Inteliquent purporting, for the first time since signing the Master Services Agreement and effective July 14, 2016, t███████

███████████████████████████████████████████

███████████     The defendants offered no justification for this decision other than claiming the right to do so under the terms of the Master Services Agreement.  The demand was baseless pretext to threaten retaliation against Inteliquent for raising a good-faith dispute about the defendants' overcharges.

283.     There is no basis for the defendants' assertion.  Inteliquent's financial position substantially improved since the signing of the Master Services Agreement and has continued to improve since the signing of the Master Addendum.  This improvement is exemplified by the material growth of Inteliquent's cash balance, year-over-year revenue growth, Inteliquent's steady earnings, and Inteliquent's consistent payment of a quarterly dividend to its shareholders. Inteliquent is a publicly traded company, and the foregoing information is readily accessible to the defendants through Inteliquent's filings with the Securities and Exchange Commission.

284.     The defendants further quoted from the Master Services Agreement that:

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
███████████████████.

A copy of the July 11, 2016 notice is attached as Ex. Q. The quoted portion of the Master Services Agreement also states ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (Ex. N, Master Services Agreement at Attachment A, § D.1 (emphasis added).)

285.    Later the same day, Inteliquent issued a notice to the defendants' counsel. Already having notified the defendants in several written documents—including the complaint filed July 5, 2016—that Inteliquent disputed the defendants' overcharges, ████████████████████

██████████████████████████████ all charges (i) based on traffic delivered to the Native American Telecom LECs and (ii) for traffic delivered by HD Tandem to other entities, except to the extent the charges reflected terminating end office charges rather than fictitious transport charges.

286.    Additionally, Inteliquent advised that, ███████████████████████ it was preparing to wire the undisputed sums due to the defendants ████████████ and that it would do so no later than July 12, i.e., before the defendants' deadline for making payment. Inteliquent also requested the defendants' assurances that they would continue to deliver Inteliquent's traffic under the Master Services Agreement and Master Addendum once Inteliquent made this payment in cure of the alleged non-payment identified in the defendants' July 6 notice.

287. Although it had not yet received the requested assurance that the defendants would continue to deliver the traffic pursuant to the Master Services Agreement and Master Addendum, Inteliquent wired the unpaid undisputed sum ███████ to the defendants at 8:02 a.m. CDT on July 12. Following the wire, Inteliquent's counsel provided confirmation to the defendants' counsel and again requested assurance by no later than 3:00 p.m. CDT that the defendants would continue to deliver the traffic pursuant to the Master Addendum (the email attached as Ex. R). On the same day, and as a show of good faith, Inteliquent wired the undisputed sum for the June 2016 invoice ██████ well in advance of the payment due date. The email to the defendants confirming this payment is attached as Ex. S.

288. At 2:56 p.m. CDT on July 12, just in time, the defendants contacted Inteliquent's counsel demanding that Inteliquent provide, within 24 hours, (i) the full amount of the demanded cash deposit, or an exemplar of the letter of credit to review; (ii) information regarding the complaint; and (iii) information identifying the specific charges on the May 2016 invoice that Inteliquent disputed, with the reasons for each dispute. In exchange, the defendants agreed only to continue delivering Inteliquent's traffic during the 24-hour response period.

289. No provision of the Master Addendum or Master Services Agreement permitted the defendants to impose 24-hour deadlines. Inteliquent nonetheless provided the requested information on July 13, 2016, within the time allowed by the defendants. In transmitting these responses, Inteliquent requested assurance by 3:00 p.m. CDT on July 14, 2016, that the defendants would continue to deliver the traffic pursuant to the Master Addendum at least through and including Monday, July 18.

290. On July 14, 2016, shortly before Inteliquent's request expired, the defendants notified Inteliquent' that (i) the defendants agreed to continue services through Monday, July 18,

and would provide at least 48 hours' notice prior to suspending services; but (ii) the defendants reserved the right to demand payment for unpaid (but disputed) charges in excess of the ███████████████████████████ Again, the defendants implied that if Inteliquent did not pay within three days of such a demand, the defendants would terminate service without further notice. The defendants also sent notice of their intent not to renew the Master Addendum or Master Services Agreement at the end of the term in October 2016. A copy of the July 14, 2016 letter is attached as Ex. T. The notices of termination under the Master Addendum and the Master Services Agreement are attached as Exs. U and V, respectively.

291. On July 15, 2016, Inteliquent's counsel transmitted confirmation of the issuance of the letter of credit in favor of HD Tandem to the defendants' counsel. A copy of the July 15, 2016 email is attached as Ex. W.

292. On July 20, 2016, the defendants renewed their attack. They sent a notice to Inteliquent once again demanding a cash deposit and claiming that the letter of credit was "not acceptable" because it was "not a customary industry standard letter of credit," was "inconsistent with the [Master Services Agreement]," contained █████████████████████████████ ███████████████████████████████" and was "written so Inteliquent [could] seek to avoid payment . . . by 'disputing' an invoice even if its 'dispute' [were] frivolous, as its current disputes are." In addition to demanding the cash deposit, the defendants purported █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████ The notice stated that if Inteliquent did not pay the disputed charges within three business days (i.e., by July 26, 2016), HD Tandem had "the right to suspend and/or terminate" services. A copy of the July 20, 2016 notice is attached as Ex. X.

293.    Inteliquent responded to the defendants on the same evening, disputing the defendants' accusations.   Further, Inteliquent highlighted ███████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████ Inteliquent also noted the uncertainty created by the timing of the defendants' demand for payment of over ████████ in disputed charges, which implied that the defendants might suspend services without further notice at the end of the business day on Monday, July 26.   Hoping to give the parties time to engage in reasonable efforts to resolve the disputes, Inteliquent requested assurance that the defendants would continue to deliver the traffic pursuant to the Master Addendum at least through and including Monday, August 1, 2016.

294.    As a further showing of good faith, and in an effort to avoid the need for immediate court intervention, Inteliquent notified the defendants on July 21, 2016, that it would deliver the ██████████ cash deposit demanded by the defendants, notwithstanding Inteliquent's continuing objection regarding the necessity to do so.   By agreeing to deliver the requested cash deposit, ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████ (*See* Ex. N, Master Services Agreement at Attachment A, § D.1.)

295.    In short, Inteliquent agreed by July 21, 2016, to provide the defendants every security to which they were entitled (and more) under the Master Addendum and Master Services Agreement, pending the outcome of the parties' attempts to resolve Inteliquent's

disputes regarding the amounts the defendants had charged for services the defendants were not providing.

296.    On July 22, 2016, the defendants sent a letter to Inteliquent's counsel acknowledging Inteliquent's agreement to deliver the cash deposit.  The defendants' July 22, 2016 letter reiterated the demand that Inteliquent pay all outstanding amounts ███████ ██████████████████████████ held open the possibility that the defendants might not suspend services on July 26, 2016, pending Inteliquent's further response.

297.    On the morning of July 25, 2016, counsel for the parties conferred by telephone. Inteliquent requested assurances that the defendants would not suspend services.  The defendants declined to provide the requested assurances.

298.    Rather than operate in good faith, the defendants raised pretext after pretext to attempt to strong-arm Inteliquent into making payments that are not supported by the Master Addendum or Master Services Agreement, and which are falsely premised on services the defendants are not actually providing.

299.    Inteliquent repeatedly warned the defendants that a precipitous disconnection could result in any number of problems in delivering traffic.  Inteliquent sought the defendants' agreement to delay any suspension and even sought a TRO from this Court to prevent any disconnection or at least reasonably delay its timing.

300.    On July 27, 2016, the defendants suspended services to Inteliquent.

301.    Inteliquent was forced to find other and costly routes to ensure that traffic got delivered to numbers associated with Free Conferencing and others.  These routes imposed costs on Inteliquent, injured it, and thus caused it damages.  Inteliquent seeks to recover those damages in this action.

302.    The defendants complained on multiple occasions about the manners in which calls got delivered to them after they disconnected Inteliquent.

303.    The defendants even took the drastic step of blocking or "blacklisting" traffic delivered by Inteliquent and thereby preventing calls from being completed to Free Conferencing.  The defendants admitted they engaged in this conduct in pleadings filed with this Court.

304.    The defendants had no right traffic suspend services or to block calls dialed to Free Conferencing. The defendants breached the express terms of the Master Addendum and Master Services Agreement as well as the implied covenant of good faith and fair dealing.

WHEREFORE, Inteliquent requests that the Court declare that the Master Services Agreement and Master Addendum required the defendants to deliver Inteliquent's traffic, including during the pendency of a dispute regarding the rates for that traffic, enter judgment in Inteliquent's favor, award Inteliquent damages in an amount to be proved at trial and any and all additional recovery of any kind available under law or equity and that the Court deems appropriate under the circumstances.

## Trial By Jury

Inteliquent demands trial by jury on all Counts where trial by jury is available.

Dated: October 6, 2016                          **INTELIQUENT, INC.**

By:    _/s/ John Hamill_                      

John J. Hamill (ARDC # 6217530)
Eric M. Roberts (ARDC # 6306839)
Olesya Salnikova (ARDC # 6313887)
**DLA PIPER LLP (US)**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
312.368.7036
john.hamill@dlapiper.com
eric.roberts@dlapiper.com
olesya.salnikova@dlapiper.com

Brian H. Benjet
**DLA PIPER LLP (US)**
1650 Market Street, Suite 4900
Philadelphia, PA 19103
215.656.3311
brian.benjet@dlapiper.com

Ricardo Meza
Kara Eve Foster Cenar
**GREENSFELDER, HEMKER & GALE PC**
200 West Madison Street, Suite 3300
Chicago, Illinois 60606
312.345.5027
rmeza@greensfelder.com
kcenar@greensfelder.com

**Certificate of Service**

I hereby certify that on October 6, 2016, I electronically filed the foregoing **Second Amended Complaint and Jury Demand under Racketeer Influenced and Corrupt Organizations Act and Other Laws** using the ECF System for the United States District Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois.  Notice of this filing will be sent by operations of the Court's electronic filing system to all counsel of record registered on the ECF system.


  /s/ *John Hamill*                                          
John J. Hamill