# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| INTELIQUENT, INC., | |
|       Plaintiff and<br>      Counterclaim Defendant, | |
|       v. | |
| FREE CONFERENCING CORP.,<br>individually and d/b/a HD TANDEM;<br>HDPSTN, LLC d/b/a HD TANDEM;<br>WIDE VOICE, LLC; and<br>JOHN DOES 1-10, | Case No. 16-cv-06976<br><br>Judge John Robert Blakey |
|       Defendants, | |
|       and | |
| MATTHEW CARTER, JR., | |
|       Counterclaim Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case began as a dispute between Inteliquent, Inc. ("Inteliquent"), a long-distance telecommunications carrier, and Free Conferencing Corp. ("Free Conferencing"), HD Tandem, LLC ("HD Tandem"), and Wide Voice, LLC ("Wide Voice"), other entities in the telecommunications industry.

Inteliquent originally filed suit on July 5, 2016, *see* Compl. [1], and now brings nine causes of action. Second Am. Compl. [55]. On December 23, 2016, Free Conferencing and HD Tandem filed counterclaims against Inteliquent and Matthew Carter, Jr. ("Carter"), Inteliquent's President and Chief Executive Officer. Second Am. Counterclaim [94].

On October 27, 2016, Wide Voice moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Inteliquent's Second Amended Complaint for failure to state a claim. Wide Voice Mot. Dismiss [65]. On January 18, 2017, Inteliquent and Carter filed 12(b)(6) motions to dismiss Free Conferencing and HD Tandem's counterclaims. Inteliquent Mot. Dismiss [102]; Carter Mot. Dismiss [104].

This Memorandum Opinion and Order addresses all three pending motions, which, for the reasons explained below, are each granted in part and denied in part.

## I. Background

### A. Inteliquent's Second Amended Complaint

#### 1. The Long Distance Telecommunications Framework

In the telecommunications industry, long distance telecommunications carriers—commonly referred to as "inter-exchange carriers" ("IXCs")—take calls from calling parties and transport them (over long distances, as their name implies) to geographic areas served by smaller, local exchange carriers ("LECs"). Second Am. Compl. [55] ¶¶ 4, 53-54. These LECs in turn deliver the calls to called parties (also known as the "end users") located within their respective geographic zones.



**Figure 1. Long Distance Telecommunications**

Under this default framework—which is heavily regulated—the IXC pays individual LECs tariffed "access charges" for taking traffic from the IXC and delivering it to the ultimate end user. *Id.* ¶ 54. Under federal communications law, the specific charges that an IXC must pay depend upon multiple factors. *Id.* ¶ 4. For example, access charges can include fees for: (1) "tandem switching"—the handoff of traffic between the IXC and the LEC at a geographical location known as the "tandem switch"; (2) "tandem transport"—delivery from the tandem switch to the LEC's "end office switch" (the location within the local exchange where calls are switched and routed to the called party); and (3) "end office" services—switching and final delivery of traffic from the end office switch to the end user. *Id.* ¶ 55.



**Figure 2. Access Charges**

Although some access charges are flat fees, others are time-based (*i.e.*, linked to the call duration). *Id.* ¶ 55. Moreover, tandem transport fees typically possess a mileage component (the mileage factor depends upon specified coordinates that measure the distance between the tandem switch and end office switch). *Id.* ¶¶ 5, 55. By extension, longer calls and calls delivered to rural areas generate relatively higher tariffed access charges. *Id.* ¶ 56.

In some circumstances, however, rather than deliver traffic and pay regulated tariff rates directly to an LEC, an IXC may sign a commercial contract with an intermediary. *Id.* ¶ 59. The intermediary accepts traffic from the IXC and arranges with LECs, on its own behalf, for switching and transport to end users. *Id.* In this scenario, the intermediary charges the IXC according to the terms of the commercial contract, then pays LECs their tariffed rates. *Id.*



**Figure 3. Long Distance Telecommunications (With Intermediary)**

### 2. The Relevant Actors

Inteliquent is an IXC with its principal place of business in Chicago, Illinois. Second Am. Compl. [55] ¶ 55. Free Conferencing is a Nevada corporation with its principal place of business in Long Beach, California. *Id.* ¶ 40. Persons that call Free Conferencing telephone numbers receive free or low-cost services such as conference calling, chat lines, and streaming radio (thus making it a potential end user of long distance calls). *Id.* ¶ 6. Some or all of Free Conferencing's telephone numbers are associated with LECs in rural areas, including tribal reservations in South Dakota. *Id.* ¶ 66. Native American Telecom, LLC, and Native American Telecom—Pine Ridge, LLC (collectively, "the Native American Telecom LECs") are two such LECs. *Id.* ¶ 8.

In August 2013, Inteliquent signed a Master Services Agreement ("MSA") with HD Tandem. *Id.* Ex. N. Under the MSA, HD Tandem agreed to provide, in exchange for negotiated fees, termination services for Inteliquent calls destined for certain areas.[1] In other words, instead of terminating its own IXC traffic with particular LECs, Inteliquent transferred calls to HD Tandem as an intermediary. *Id.* ¶ 99.

In mid-2015, Inteliquent agreed to carry the long distance traffic of T-Mobile, a national wireless communications provider. *Id.* ¶ 96. Some of T-Mobile's traffic terminates to Free Conferencing numbers via the Native American Telecom LECs. *Id.*

On October 22, 2015, Inteliquent entered into a "Master Addendum" agreement with Free Conferencing, HD Tandem, and Wide Voice.[2] *Id.* ¶ 99, Ex. A. The Master Addendum amended the terms of the MSA and added Free Conferencing and Wide Voice as parties. *Id.* ¶ 270. Under the Master Addendum, Inteliquent agreed that, under certain conditions, it would utilize HD Tandem as an intermediary to the Native American LECs. *Id.* Wide Voice owned some of the equipment used to accept the handoff of traffic between Inteliquent, HD Tandem, and the Native American Telecom LECs. *Id.* ¶ 7.

---

[1] The Second Amended Complaint [55] does not specify which geographic areas were covered under the MSA, or whether they included areas served by the Native American Telecom LECs.

[2] Free Conferencing also entered into the Master Addendum on behalf of Yakfree, LLC ("Yakfree"). Second Am. Compl. [55] Ex. A. Yakfree is not a party to the present litigation. *Id.*



**Figure 4.  Framework Under Master Addendum**

Under the Master Addendum, Inteliquent did not pay access charges to the Native American Telecom LECs.  *Id.* ¶ 99.  Instead, it paid HD Tandem at a rate slightly lower than the Native American Telecom LECs published tariffs.  *Id.* ¶ 124. Plaintiff claims that this discounted arrangement served as the hook that incentivized Inteliquent to agree to the contractual approach.  *Id.*  Inteliquent maintains, however, that the Master Addendum's ultimate agreed-upon rate was "tied to and dependent upon" the tariffed rates that the Native American Telecom LECs would otherwise be entitled to charge if services had been provided directly to Inteliquent.  *Id.* ¶¶ 99, 103, 124.

In conjunction with these assertions, Inteliquent also claims that, both before and after entering into the Master Addendum, representatives of Defendants and the Native American Telecom LECs assured Inteliquent that charges under the agreement would be for legitimate termination services.  *Id.* ¶ 96.  Specifically, Inteliquent claims that in the summer of 2015 and April 2016, Joshua Lowenthal, the Chief Operating Officer of Free Conferencing, assured John Schoder, an Inteliquent employee, that Inteliquent would only be charged under the Master

Addendum "for legitimate services actually performed." *Id.* ¶ 97. One of these misrepresentations purportedly occurred at the "Incompass" telecommunications trade show in Las Vegas, Nevada. *Id.* Inteliquent also claims that in October 2015, Lowenthal and Andrew Nickerson, President of the Native American Telecom LECs and Chief Executive Officer of Wide Voice, represented to Inteliquent that "it was necessary and reasonable to charge the rates being charged because of the services the Native American Telecom LECs actually were providing." *Id.* ¶ 106.

Between November 2015 and July 2016, Inteliquent delivered millions of minutes of telephone traffic each month to HD Tandem for Free Conferencing numbers associated with the Native American Telecom LECs. *Id.* ¶¶ 107-111. HD Tandem then billed Inteliquent for its termination services. *Id.* These invoices, which were transmitted via interstate email, occurred on at least ten separate occasions and itemized calls to numbers associated with Wide Voice and the Native American Telecom LECs. *Id.* The invoices directed that payments be electronically wired to HD Tandem's account at JPMorgan Chase. *Id.*

Inteliquent now asserts that these invoices, in whole or in part, charged Inteliquent for services that were unlawful and part of a concerted fraudulent scheme on the part of HD Tandem, Free Conferencing, and Wide Voice, as well as non-party co-conspirators, including the Native American Telecom LECs. *Id.* ¶ 118.

### 3.     The Alleged Scheme

#### a)     *Phase One: The "Traffic Pumping" Business Model and the "Sham" Customer*

Inteliquent describes Defendants' fraudulent scheme in three phases.  Second Am. Compl. [55] ¶ 32.  The first phase begins with Free Conferencing entering into supposedly improper "marketing arrangements" with LECs.  *Id.* ¶¶ 25, 32.  According to Inteliquent's portrayal of Free Conferencing's business model, instead of charging individual callers for its services, Free Conferencing purposefully secures telephone numbers associated with rural area LECs (such as the Native American Telecom LECs) to ensure that callers will make rural calls of long duration.  *Id.* ¶¶ 8, 65, 67.  This in turn allows the LECs to charge higher access charges to IXCs.  *Id.* ¶ 67.  The LECs then share, pursuant to the "marketing arrangements," a substantial portion of the access charges they receive with Free Conferencing.  *Id.*

Inteliquent asserts multiple objections to what they describe as this "traffic pumping" business model.  *See id.* ¶ 25.  First, according to Inteliquent, high mileage-based tandem transport fees are only appropriate if traffic actually terminates to an end user physically located in a rural area (here, South Dakota).  *Id.* ¶ 72.  Inteliquent claims, however, that the equipment Free Conferencing uses to provide its services (such as teleconference servers) is *not* found in South Dakota, but in locations close to tandem switch locations (the place where, absent a contractual arrangement, an IXC would otherwise transfer traffic to an LEC).  *Id.* ¶¶ 69, 71.  Under this theory, Inteliquent is not actually receiving the costly tandem

transport services that they are being charged for under the Master Addendum. *Id.* ¶ 120; *see supra* *3 (defining "tandem transport" as the delivery from the tandem switch to the LEC's "end office switch" (the location within the local exchange where calls are switched and routed to the called party)).

Inteliquent further alleges that Free Conferencing does not qualify as a legitimate telecommunications end user. *Id.* ¶¶ 129-140. According to Inteliquent, the "marketing arrangements" Free Conferencing makes with the Native American Telecom LECs do not resemble traditional arrangements for tariffed services, because Free Conferencing does not pay any meaningful amount to the Native American Telecom LECs. *Id.* ¶¶ 131, 135. Inteliquent further asserts that the Native American Telecom LECs are substantially linked, through ownership and management, to Free Conferencing. *Id.* ¶ 49. Inteliquent asserts that this essentially creates a private network for Free Conferencing to which tariffed access charges cannot apply. *Id.* ¶ 53.

### b) *Phase Two: The Commercial Arrangement*

In the second phase of the purported scheme, IXCs like Inteliquent are approached by HD Tandem. Second Am. Compl. [55] ¶ 32. HD Tandem presents itself as a seemingly independent and neutral party that will deliver traffic to LECs (such as the Native American Telecom LECs) at a cheaper rate than can be obtained under tariffs. *Id.* ¶ 125. According to Inteliquent, the use of this intermediary casts a "false air of legitimacy and credibility" to the arrangement. *Id.* Inteliquent alleges that, in reality, HD Tandem is not an independent intermediary,

but rather operated and managed by the same set of individuals as Free Conferencing. *Id.* ¶¶ 26, 32.

Inteliquent claims that, in pursuit of a commercial arrangement, HD Tandem and the other Defendants make false representations about the legitimacy of the access charges that can be imposed for calls to Free Conferencing. *Id.* ¶ 32. Defendants then induce parties like Inteliquent to enter into contracts such as the Master Addendum upon the false belief that the commercial arrangement offers some element of rate relief. *Id.* Inteliquent alleges that Defendants utilize these commercial arrangements as an "evasive tactic" to escape regulatory oversight of their improper tariffed access charges. *Id.*

### c) *Phase Three: Retaliation*

In phase three, Defendants attempt to maintain their revenue stream, even after an IXC disputes the lawfulness of the access charges that purportedly underlie the terms of the commercial arrangement. Second Am. Compl. [55] ¶ 32. When a dispute occurs, Defendants cease providing services under the commercial arrangement, and the LECs impose unlawful access charges upon IXCs directly via tariffs. *Id.* In addition, Defendants resist efforts by IXCs to find alternative and less costly routes to deliver traffic. *Id.*

Here, Inteliquent disputed the legitimacy of the charges under the Master Addendum in July 2016. *Id.* Exs. D-F. Inteliquent alleges that in response, Defendants improperly suspended service to Inteliquent on July 27, 2016. *Id.*

¶ 114.  Inteliquent claims that, despite the suspension, it has continued to receive fraudulent invoices from the Native American Telecom LECs.  *Id.* ¶ 115.

**B.     Free Conferencing and HD Tandem's Second Amended Counterclaim**

As one might expect, Free Conferencing and HD Tandem (collectively, "Counterclaiming Plaintiffs") describe the circumstances a bit differently.  They agree that Inteliquent and HD Tandem's business relationship began with execution of the MSA in 2013, and that Inteliquent agreed to be the sole provider of long distance services for T-Mobile in June 2015.  Second Am. Counterclaim [94] ¶¶ 27, 44.  According to Counterclaiming Plaintiffs, however, Inteliquent's agreement with T-Mobile burdened Inteliquent with the costs associated with a significant increase in traffic on Inteliquent's network.  *Id.* ¶ 46.  Moreover, Counterclaiming Plaintiffs assert that the rates Inteliquent offered to T-Mobile under their agreement were both aggressively low and guaranteed, thereby making the deal risky for Inteliquent.  *Id.* ¶ 47.  Inteliquent stood to suffer substantial losses (including termination of the T-Mobile agreement) if its costs were higher than expected and it failed to adequately perform.  *Id.* ¶¶ 48, 51.  To further complicate matters, Inteliquent began exploring merger opportunities with a major competitor in early 2016.  *Id.* ¶ 49.

Counterclaiming Plaintiffs allege that, by mid-2016, Inteliquent could not profitably satisfy the T-Mobile agreement.  *Id.* ¶ 59.  They allege that, by the end of the financial quarter, the company risked losing almost 20% of its stock value, which would undermine the prospect of its hoped-for merger.  *Id.*  Counterclaiming

Plaintiffs claim that in response, Inteliquent and Carter began implementing an unlawful plan to reduce its costs.

First, Inteliquent attempted to extort a rate reduction under the Master Addendum by threatening meritless litigation and withholding termination service fees. *Id.* ¶ 60. Specifically, in late June 2016, Carter accused Free Conferencing and HD Tandem of committing fraud and threatened to file a civil RICO action unless the Counterclaiming Plaintiffs agreed to a dramatic restructuring of their termination service rates. *Id.* ¶ 61. When they refused to acquiesce, Inteliquent commenced the present litigation on July 5, 2016. *Id.* ¶¶ 64-65.

The same day, Inteliquent began to default on its monetary obligations to HD Tandem. *Id.* ¶ 65. Currently, Inteliquent owes nearly $7 million in unpaid invoices. *Id.* ¶ 68. Counterclaiming Plaintiffs assert that Inteliquent withheld payments in order to force HD Tandem to default on its own agreements with LECs, leaving HD Tandem with little choice but to renegotiate Inteliquent's rate. *Id.* ¶ 63. Counterclaiming Plaintiffs allege that, as a result, HD Tandem defaulted on obligations to its LEC partners, causing significant harm to HD Tandem's business reputation. *Id.* ¶ 79.

The drama does not end there. Counterclaiming Plaintiffs also allege that in late July 2016—after HD Tandem terminated services to Inteliquent for its failure to pay—Inteliquent began to fraudulently route calls destined for Free Conferencing numbers over routes that removed or manipulated the call signaling information. *Id.* ¶ 82. Counterclaiming Plaintiffs allege that this severely compromised the

quality of calls to Free Conferencing or caused such calls to be dropped. *Id.* Counterclaiming Plaintiffs further claim that Inteliquent began to "pirate" Free Conferencing numbers, such that callers received error messages or were diverted to other services. *Id.* ¶¶ 82, 84.

Finally, Counterclaiming Plaintiffs assert that in October 2016, in concert with T-Mobile, Inteliquent launched a campaign to stifle traffic to Free Conferencing and HD Tandem. *Id.* ¶ 89. The campaign involved charging callers extra to make calls to conferencing services associated with HD Tandem (including Free Conferencing), but not conferencing services served by Inteliquent. *Id.* ¶ 90. Counterclaiming Plaintiffs assert that this effort has resulted in a 20-30% reduction in nationwide T-Mobile traffic to the Counterclaiming Plaintiffs. *Id.* ¶ 93.

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A motion to dismiss tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1039 (7th Cir. 1998). To survive a motion to dismiss, a complaint must first provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice" of what the claim is "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Second, the complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, the allegations must raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs. Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating a particular complaint, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the respective plaintiff. *Iqbal*, 556 U.S. at 678.

## III.  Discussion

The Court will first address the bulk of the issues arising in Inteliquent's Second Amended Complaint [55] and Wide Voice's Motion to Dismiss [65]. Next, the Court will analyze the majority of the issues in HD Tandem and Free Conferencing's Second Amended Counterclaim [94] and Inteliquent and Carter's

respective Motions to Dismiss [102, 104].  Finally, the Court will discuss specific claims from both the Second Amended Complaint and Second Amended Counterclaim that call for similar legal analysis.

### A.  Inteliquent's Second Amended Complaint [55] and Wide Voice's Motion to Dismiss [65]

Inteliquent asserts nine causes of action in its Second Amended Complaint [55]: (1) violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.* (Count I); (2) conspiracy to violate the RICO Act (Count II); (3) common law fraud and fraud in the inducement (Count III); (4) breach of contract (Count IV); (5) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* (Count V); (6) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS § 505/1, *et seq.* (Count VI); (7) unjust enrichment (Count VII); (8) civil conspiracy (Count VIII); and (9) breach of contract (Count IX).  Following a brief discussion of heightened pleading standards under Federal Rule of Civil Procedure 9(b), the Court addresses each claim in turn.

### 1.  Rule 9(b)'s Heightened Pleading Standards

Rule 9(b) mandates that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated "with *particularity*." Fed. R. Civ. P. 9(b) (emphasis added).  In adding "flesh to the bones" of the term, the Seventh Circuit has "often incanted that a plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'"  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v.*

*Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.,* 570 F.3d 849, 854 (7th Cir. 2009)).   In fraud cases involving misrepresentation, the plaintiff must state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994).

These heightened pleading requirements serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing "strike suits" and "fishing expeditions"; and (3) providing notice of the claim to the adverse party. *Id.* The importance of providing fair notice means that a plaintiff who pleads fraud "must 'reasonably notify the defendants of their purported role in the scheme.'" *Id.* at 778 (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)); *see also Guarantee Co. of N. Am., USA v. Moecherville Water Dist., N .F.P.*, No. 06-cv-6040, 2007 WL 2225834, at *2 (N.D. Ill. July 26, 2007) ("The purpose of the more restrictive pleading standard is to ensure that the accused party is given adequate notice of the specific activity that the plaintiff claims constituted the fraud, so that the accused party may file an effective responsive pleading.").   In a case involving multiple defendants, this means that the complaint "should inform each defendant of the nature of his alleged participation in the fraud."   *Vicom*, 20 F.3d at 777 (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)).

Notably, Rule 9(b) applies to "*averments* of fraud, not *claims* of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotations omitted) (emphasis added); *see also Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1083 (N.D. Ill. 2016) (mail and wire fraud predicates remain subject to the Rule 9(b) standards even when contained within a larger RICO count). Whether the rule applies, therefore, depends upon a plaintiff's factual allegations. *Id.* A claim that "sounds in fraud" (*i.e.*, one that is premised upon a course of fraudulent conduct) implicates Rule 9(b)'s heightened pleading standards. *Id.*

With this background in mind, the Court turns to the substance of Inteliquent's individual allegations.

### 2. Count I: Violation of the RICO Act

In Count I, Inteliquent alleges that all Defendants—including Wide Voice—violated § 1962(c) of the RICO Act. Second Am. Compl. [55] ¶¶ 169-83. To state a claim under § 1962(c), Inteliquent must allege: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)).

Wide Voice contends that Inteliquent fails to plead sufficient facts to show that *any* Defendant, let alone Wide Voice, engaged in a pattern of racketeering activity.[3] Wide Voice Mot. Dismiss [65] 11. The RICO Act defines "pattern of

---

[3] The Court's opinion only addresses the specific objection raised by Wide Voice. At this preliminary stage, the Court renders no judgment regarding other aspects of Inteliquent's RICO claim.

racketeering activity" as the commission of at least two acts of "predicate" activity enumerated in 18 U.S.C. § 1961(1) that occur within ten years of each other (excluding any period of imprisonment), with at least one act occurring after the enactment of RICO itself on October 15, 1970. Here, Inteliquent alleges that Defendants engaged in multiple acts of: (1) wire fraud, *see* 18 U.S.C. § 1843; (2) mail fraud, *see* 18 U.S.C. § 1341; and (3) money laundering, *see* 18 U.S.C. § 1956, all of which constitute predicate acts of racketeering activity under 18 U.S.C. § 1961(1). Second Am. Compl. [55] ¶¶ 178-80.

The Court, however, cannot rest here.[4]  In *H.J. Incorporated v. Northwestern Bell Telephone Company*, 492 U.S. 229, 236-50 (1989), the Supreme Court held that mere proof of two acts of racketeering activity, without more, does not establish a pattern.  *Id.* at 237-39.  Instead, the pattern element requires a showing of *continuity plus relationship*.  *Id.* (a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity") (emphasis in original).  Although proof of these two constituents of a RICO offense will often overlap in practice, they are discussed separately for analytic purposes.  *Id.* at 239.

### a)    Relationship

Predicate acts are related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *H.J.*,

---

[4] Much of the ensuing discussion is derived from this Court's extensive discussion of RICO's pattern requirement in *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1095 (N.D. Ill. 2016).

492 U.S. at 240 (quoting Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575 *et seq*.). In this way, RICO's pattern element "can be shown with either a 'horizontal' relationship between the predicate acts themselves or a 'vertical' relationship of the predicate acts to the RICO enterprise itself." *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1095 (N.D. Ill. 2016). Here, the specific predicate acts alleged were committed close in time to one another (between October 2015 and July 2016), involved the same victim (Inteliquent), and were part of a single scheme to defraud Inteliquent with unwarranted access charges. Thus, the Second Amended Complaint satisfies the "relationship" portion of the "continuity plus relationship" test.

### b)  *Continuity*

"Continuity" is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J.*, 492 U.S. 229 at 241. In either case, it is "centrally a temporal concept." *Id.* at 242. Allegations of conduct "that can be characterized as either closed- or open-ended suffice to satisfy the continuity prong of the pattern requirement." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 779 (7th Cir. 1994). Therefore, the Court examines whether the conduct alleged in Inteliquent's Second Amended Complaint meets either standard.

### (1)  **Inteliquent's Pattern Allegations Lack Closed-Ended Continuity**

Closed-ended continuity "involves a course of criminal conduct which has come to a close." *Midwest Grinding Co.,* 976 F.2d 1016, 1022 (7th Cir. 1992). In

order to demonstrate a pattern over a closed period, Inteliquent must allege "a series of related predicates extending over a substantial period of time." *H.J.*, 492 U.S. at 242; *Vicom,* 20 F.3d at 779. Once again, in passing the RICO Act, Congress was concerned with "long-term criminal conduct." *H.J.*, 492 U.S. at 242. Predicate acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.*

In *Morgan v. Bank of Waukegan,* the Seventh Circuit set out a number of factors for use in a close-ended continuity analysis, including: (1) the number and variety of predicate acts; (2) the length of time over which they were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries. 804 F.2d 970, 975 (7th Cir. 1986). This is a fact-specific inquiry, "with no one factor being necessarily determinative." *Id.* at 976. Nevertheless, "the second factor—duration—is considered to be the most important and the closest thing the Court has to a bright-line continuity test." *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 689-90 (N.D. Ill. 2012) (internal quotations omitted); *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 473-74 (7th Cir. 2007) ("The duration of the alleged racketeering activity is perhaps the most important element of RICO continuity.") (internal quotations omitted); *Vicom*, 20 F.3d at 780 ("[T]his court has placed great importance on the length of time the alleged predicate acts have spanned."). In the end, the Court applies the *Morgan* factors "with an eye toward achieving a 'natural and commonsense' result." *Vicom*, 20 F.3d at 780 (quoting *U.S.*

*Textiles, Inc. v. Anheuser-Busch Companies, Inc.*, 911 F.2d 1261, 1267 (7th Cir. 1990)).

Here, the alleged scheme to defraud Inteliquent took place over the course of only nine months, from late October 2015 to late July 2016. Although the Seventh Circuit "does not employ any bright-line rule for how long a closed period must be to satisfy continuity," *Menzies*, 197 F. Supp. 3d at 1100, cases in this circuit demonstrate that "a time frame of less than nine months likely does not satisfy the duration requirement." *Vicom*, 20 F.3d at 780; *see also Midwest Grinding,* 976 F.2d at 1024 (nine-month period insufficient to satisfy duration factor of continuity test); *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 922 (7th Cir. 1992) (concluding that "one scheme that lasted at most seven to eight months" was "precisely the type of short-term, closed-ended fraud" that "this circuit consistently has held does not constitute a pattern"); *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990) (calling six months a "short period of time"); *Sutherland v. O'Malley,* 882 F.2d 1196, 1204 (7th Cir. 1989) (no pattern where single scheme spanned a five-month period). Indeed, several Seventh Circuit cases have held that even longer time frames do not constitute a substantial period for the purposes of this analysis. *See, e.g., J.D. Marshall Int'l v. Redstart, Inc.,* 935 F.2d 815, 821 (7th Cir. 1991) (thirteen months); *U.S. Textiles,* 911 F.2d at 1266 (sixteen-months); *Hartz v. Friedman,* 919 F.2d 469, 473 (7th Cir. 1990) (eighteen-months). In light of this case law, Inteliquent's allegations do not meet the durational aspect of close-ended continuity.

Moving to the remaining *Morgan* factors, Inteliquent alleges only one criminal scheme. *See* Second Am. Compl. [55] ¶ 1 (alleging that Defendants "have engaged and are continuing to engage in *a* scheme to cheat Inteliquent") (emphasis added). While a plaintiff "need not prove multiple schemes to show a RICO pattern, the presence or absence of multiple schemes is highly relevant to the court's determination of whether a RICO pattern has been established." *Guaranteed Rate*, 912 F. Supp. 2d at 691 (internal citations omitted). This factor, therefore, also cuts against a finding of close-ending continuity.

Similarly, Inteliquent only identifies itself as a victim of Defendants' enterprise. Courts "have repeatedly found that the existence of only one victim cuts against closed-ended continuity." *Id.*; *see also Jennings,* 495 F.3d at 475 (finding no pattern in part because plaintiff was the only identifiable victim); *Triad Assoc., Inc. v. Chicago Housing Authority,* 892 F.2d 583, 595 (7th Cir. 1989) (same). Although Inteliquent alleges that "there are undoubtedly other victims besides Inteliquent," it does not identify any of them. Second Am. Compl. [55] ¶ 36. This lack of specificity falls well short of Rule 9(b)'s pleading requirements. *See Menzies*, 197 F. Supp. 3d at 1100 (finding allegations of only one victim where plaintiff alleged, without more, that defendants implemented fraudulent scheme against plaintiff "among others"); *Guaranteed Rate*, 912 F. Supp. 2d at 691 ("Although the Amended Complaint references five other Unsold Units purchased by the Buyers through different lenders, Guaranteed Rate does not provide any details regarding those transactions . . . . Guaranteed Rate does not allege the terms or circumstances of those sales, nor

does it offer the identity of the lenders or claim that those units were sold at inflated prices.  Accordingly, the Court determines that Guaranteed Rate is the only victim alleged in the scheme.").

Inteliquent also alleges only one kind of injury: economic loss resulting from the imposition of unlawful access charges.  Although these injuries purportedly result from multiple transactions, "courts have consistently viewed repeated economic injuries based on a single scheme to defraud as non-distinct."  *Id.*; *see also Triad,* 892 F.2d at 595; *U.S. Textiles,* 911 F.2d at 1269.  This factor, therefore, also weighs against a finding of close-ended continuity.

Finally, in terms of the predicate acts alleged, Inteliquent relies almost exclusively upon acts of mail and wire fraud.  The "mere 'multiplicity' of mailings or wire communications," however, "does not automatically translate into a pattern of racketeering activity."  *Menzies*, 197 F. Supp. 3d at 1100.

In sum, considering the totality of facts alleged, the Court finds that Inteliquent has not pled facts sufficient to establish a pattern of racketeering activity under the closed-ended continuity test.

### (2)    Inteliquent's Pattern Allegations Establish Open-Ended Continuity

Because the predicate acts alleged cannot support a finding of closed-ended continuity, the Court now examines whether Inteliquent can fulfill the continuity prong by establishing open-ended continuity.  *See Vicom*, 20 F.3d at 782.  Open-ended continuity "refers 'to past conduct that by its nature projects into the future with a threat of repetition.'"  *Id.* (quoting *H.J.,* 492 U.S. at 241).  When "a RICO

action is brought before closed-ended continuity can be established, liability depends on whether the *threat* of continuity is demonstrated." *Id.* (quoting *H.J.*, 492 U.S. at 242) (emphasis in original) (quotations and modifications omitted). Thus, "although a RICO plaintiff must show duration to allege closed-ended continuity, open-ended continuity may satisfy the continuity prong of the pattern requirement regardless of its brevity." *Id.* Once again, determining whether predicate acts establish open-ended continuity requires the Court to examine the specific facts of each case. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012). Open-ended continuity is present when: (1) a specific threat of repetition exists; (2) the predicates are a regular way of conducting an ongoing legitimate business; or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. *Vicom*, 20 F.3d at 782 (internal citations and quotations omitted).

It is important to note that, in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed "at the time the racketeering activity occurred." *Heinrich*, 668 F.3d at 410; *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924, 929 (4th Cir. 2013). Subsequent events "are irrelevant." *Heinrich*, 668 F.3d at 410. Thus, a lack of a threat of continuity "cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict." *Id.*

Here, no facts raised in the Second Amended Complaint support a finding that, had Inteliquent not disputed access charges in July 2016, Defendants would

not still be submitting allegedly fraudulent invoices for termination services provided under the Master Addendum. Although the "initial term" of the agreement was set to expire in October 2016 (twelve months after its effective date), the contract automatically renewed for successive three-month periods unless terminated by either party. Second Am. Compl. [55] Ex. A ¶ 9. Under the circumstances, such renewals were likely. The business relationship between Inteliquent and HD Tandem extended back to August 2013 (when the parties signed the initial MSA), *id.* Ex. N, and Inteliquent had recently agreed to carry T-Mobile's long distance traffic, some of which was destined for Free Conferencing numbers via the Native American Telecom LECs. *Id.* ¶ 99. In short, the Second Amended Complaint does not allege a "natural ending point" or "clear and terminable goal" of the alleged scheme that dispels any "threat" of repetition. *Vicom*, 20 F.3d at 782; *see also Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1296 (7th Cir. 1992) (finding threat of continuity partly due to parties' intent to continue doing business together). Therefore, the Court finds that, at this preliminary stage, Inteliquent has sufficiently pled a pattern of racketeering activity under the open-ended continuity test.

### c) Sufficiency Under Rule 9(b)

Of course, the predicate activity allegations of RICO mail and wire fraud are subject to Rule 9(b), *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994), as are claims of money laundering where, as here, those same claims are dependent upon mail and wire fraud allegations. *Shapo v. O'Shaughnessy*, 246 F.

Supp. 2d 935, 958 n.4 (N.D. Ill. 2002). Wide Voice claims that in this regard, Inteliquent offers insufficient particularity. Specifically, Wide Voice argues that the Second Amended Complaint "is devoid of *any* particularized allegation that *any* defendant made a specific misrepresentation about anything." Wide Voice Mot. Dismiss [65] 12.

Wide Voice's assertion, however, misreads the complaint. Although Inteliquent does levy numerous blanket allegations that are insufficient under Rule 9(b), *see, e.g.,* Second Am. Compl. [55] ¶¶ 15-16 ("HD Tandem and Free Conferencing's leadership made multiple and specific representations to Inteliquent . . . . [T]hose representations were false."), 28 ("[Defendants] make repeated explicit and false representations to Inteliquent that their network and billing practices are appropriate."), 115 (Defendants "[f]alsely represent[ed] to Inteliquent that traffic destined for Free Conferencing is legitimately terminated in South Dakota" and that the Native American Telecom LECs "perform transport services in South Dakota as provided in their respective tariffs"), Inteliquent also alleges the following:

- In the summer of 2015 and April 2016, Joshua Lowenthal, the Chief Operating Officer of Free Conferencing, assured John Schoder, an Inteliquent employee, that Inteliquent would only be charged under the Master Addendum "for legitimate services actually performed." *Id*. ¶ 97. One of these misrepresentations purportedly occurred at the "Incompass" telecommunications trade show in Las Vegas, Nevada. *Id.*

- In October 2015, Lowenthal and Andrew Nickerson, President of the Native American Telecom LECs and Chief Executive Officer of Wide Voice, represented to

Inteliquent that "it was necessary and reasonable to charge the rates being charged because of the services the Native American Telecom LECs actually were providing." *Id*. ¶ 106.

For purposes of predicate acts of mail and wire fraud involving misrepresentations, it is not required that the false representations themselves be sent through the U.S. mails or made through the use of interstate wires. *P & P Mktg., Inc. v. Ditton*, 746 F. Supp. 1354, 1362 (N.D. Ill. 1990) (citing *U.S. v. Lea,* 618 F.2d 426, 430 (7th Cir. 1980)). Rather, it is only necessary to have a scheme to defraud "*coupled* with a mailing or use of interstate wires in furtherance of the scheme." *Id*. (emphasis added). The use of the mails or interstate wires "need not be an essential part of the scheme"; it is sufficient "if such use is incident to an essential component of the scheme." *Id*. Moreover, the particular defendant at issue "need not have *personally* used the mails or interstate wires, it is sufficient that their use by others was reasonably foreseeable." *Id*. (citing *U.S. v. Massa,* 740 F.2d 629, 642 n.7 (8th Cir. 1984)).

A scheme to defraud can include billing for services either not rendered or unnecessary. *See, e.g., P & P Mktg.*, 746 F. Supp. at 1357-65 (charging for unnecessary parts and services); *State Farm Mut. Auto. Ins. Co. v. Abrams*, 96-cv-6365, 2000 WL 574466, at *12-15 (N.D. Ill. May 11, 2000) (charging for unnecessary medical services). In this regard, Inteliquent specifically alleges the following:

- On at least ten separate occasions (December 7, 2015; December 18, 2015; January 7, 2016; January 8, 2016; January 21, 2016; February 6, 2016; February 22, 2016; February 23, 2016; March 4, 2016; and April 6, 2016), HD Tandem transmitted invoices to Inteliquent via interstate

email. Second Am. Compl. [55] ¶¶ 107-11. These invoices show calls to numbers associated with Wide Voice and the Native American Telecom LECs. *Id.* Ex. G. Furthermore, the invoices direct that payments be wired to HD Tandem's account at JPMorgan Chase. *Id.*

- Since July 27, 2016, Wide Voice sent two invoices—one on August 10, 2016, the other on September 10, 2016—via interstate email to Inteliquent. Second Am. Compl. [55] ¶ 117, Exs. L-M.

Inteliquent alleges that these invoices, in whole or in part, "charged Inteliquent for services that were improper and unlawful." *Id.* ¶ 118.

In sum, at this preliminary stage, Inteliquent has adequately pled a pattern of racketeering activity, and these allegations contain sufficient particularity for the purposes of Rule 9(b). Therefore, Wide Voice's Motion to Dismiss [65], as it relates to Count I, is denied.

### 3. Count II: Conspiracy to Violate the RICO Act

In Count II, Inteliquent alleges that Defendants conspired to violate the RICO Act. Second Am. Compl. [55] ¶¶ 184-97. Wide Voice rests its motion to dismiss Count II solely upon the principle that "failure to make out a substantive RICO claim requires dismissal of a conspiracy claim based on the same nucleus of operative fact." *Meier v. Musburger*, 588 F. Supp. 2d 883, 911 (N.D. Ill. 2008). Although Wide Voice correctly states the law, as discussed above, its motion fails to undermine Inteliquent's substantive RICO claim in Count I. Therefore, Wide Voice's Motion to Dismiss [65], as it relates to Count II, is also denied.

#### 4. Count III: Fraud and Fraud in the Inducement[5]

In Count III, Inteliquent alleges fraud and fraud in the inducement. Second Am. Compl. [55] ¶¶ 198-206. Wide Voice claims that Inteliquent's fraud claims must be dismissed as to Wide Voice because Inteliquent's allegations are directed against other Defendants. Once again, Wide Voice misreads the complaint.

The language of Count III itself contains two allegations of fraud specific enough to satisfy Rule 9(b). In the first, Inteliquent alleges that "Defendants *Free Conferencing Corporation* and *HD Tandem* have concealed the network architecture involved in delivering calls to Free Conferencing and have misrepresented the services that the 'applicable LECs' actually provide to Inteliquent." *Id.* ¶ 199 (emphasis added). This language, of course, makes no mention of Wide Voice.

In the second allegation, however, Inteliquent claims that Defendants "compounded and expanded upon" these misrepresentations in the Master Addendum, which (according to Inteliquent) stated that it would only be charged the "applicable LEC's tariffed end office rates." *Id.* ¶ 201. Wide Voice is a party to the Master Addendum. *Id.* Ex. A.

Moreover, Count III incorporates by references the preceding portions of the Second Amended Complaint, which, as described above, state that Wide Voice's

---

[5] The Court notes that, despite being alleged within the same count, common law fraud and fraud in the inducement constitute independent torts. *See White Pearl Inversiones v. Cemusa, Inc.,* No. 07-cv-6365, 2010 WL 2836747, at *6 (N.D. Ill. July 16, 2010), *aff'd sub nom. White Pearl Inversiones S.A. (Uruguay) v. Cemusa, Inc.,* 647 F.3d 684 (7th Cir. 2011) (analyzing fraud and fraud in the inducement pled as two separate claims); *Guarantee Co. of N. Am., USA v. Moecherville Water Dist., N .F.P.,* No. 06-cv-6040, 2007 WL 2225834, at *1 (N.D. Ill. July 26, 2007) (same). Wide Voice's specific objection, however, applies to both theories. The Court, therefore, analyzes both theories in conjunction.

CEO misrepresented to Inteliquent in October 2015 that the access charges were "necessary" and "reasonable" because of the services that the Native American Telecom LECs were purportedly providing to HD Tandem. *Id.* ¶ 106. Consequently, Wide Voice's Motion to Dismiss [65], as it relates to Count III against Wide Voice, is denied.

### 5.    Count IV: Breach of Contract

In Count IV, Inteliquent alleges that it was charged at a rate higher than the Master Addendum permits. Second Am. Compl. [55] ¶ 211. According to Inteliquent, under the Master Addendum, it can only be charged at a rate that is "not greater than the combination of *the applicable LEC's tariffed end office rates* and the applicable usage based port recovery credit." *Id.* Ex. A. ¶ 3 (emphasis added). Inteliquent theorizes that, because Free Conferencing is not a legitimate end user, no LEC could charge Inteliquent *any* tariffed end office rate. Second Am. Compl. [55] ¶ 215.

The merits of Inteliquent's argument aside, Wide Voice argues that there is no allegation that Wide Voice charged Inteliquent *anything* under the Master Addendum. The Court agrees. The Second Amended Complaint [55] refers only to charges levied by *HD Tandem*. Plaintiff alleges, for example, that "Inteliquent delivers the traffic to HD Tandem, and then *HD Tandem* sends Inteliquent invoices that reflect the rates as described in . . . the Master Addendum. Inteliquent provides the service, then *HD Tandem* invoices the rates." Second Am. Compl. [55] ¶ 101 (emphasis added). Indeed, even within the language of Count IV itself,

Plaintiff claims that "*Free Conferencing and HD Tandem* have charged, and continue to charge, Inteliquent rates for traffic destined for Native American Telecom that exceed the permissible amounts under the Master Addendum." *Id.* ¶ 216.

Nowhere does Plaintiff allege, however, that it has been charged by Wide Voice under the agreement. Although Plaintiff claims that Wide Voice submitted two invoices after July 27, 2016, *id.* ¶ 117, Exs. L-M., these charges cover services provided *after* the Master Addendum was suspended, and thus cannot support Plaintiff's breach of contract claim. Therefore, Wide Voice's Motion to Dismiss [65], as it relates to Count IV against Wide Voice, is granted.[6]

### 6. Count V: Unfair Competition Under California Law

In Count V, Plaintiff alleges that Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, "by concealing the network architecture actually involved in delivering traffic to Free Conferencing and misrepresenting the services [that] are actually provided to Inteliquent under the Master Addendum." Second Am. Compl. [55] ¶ 226.

California's UCL prohibits, *inter alia*, "any unlawful, unfair or fraudulent business act or practice." *Id.* Because the statute "is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). In other words, each of the three adjectives—unlawful, unfair, and fraudulent—"captures 'a

---

[6] The Court makes no ruling regarding the sufficiency of Count IV against the remaining Defendants.

separate and distinct theory of liability.'" *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quoting *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1127 (9th Cir. 2009)). Here, Inteliquent relies upon the "unfair" and "fraudulent" prongs. *See* Second Am. Compl. [55] ¶ 230; Inteliquent Resp. Wide Voice Mot. Dismiss [72] 18 (stating that Count V asserts a violation of the UCL "based on the defendants' *unfair and fraudulent* practices") (emphasis added).

The term "unfair," as it is used in the UCL context, "has been defined in numerous ways, none of which has yet been adopted as controlling" by the California Supreme Court. *Lee v. Pep Boys-Manny Moe & Jack of California*, 186 F. Supp. 3d 1014, 1034-35 (N.D. Cal. 2016) (quoting *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 921 (N.D. Cal. 2013)). Under the first test, a business practice is unfair "where the practice implicates a public policy that is tethered to specific constitutional, statutory, or regulatory provisions." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 933 (N.D. Cal. 2013) (internal quotations omitted). The second test determines "whether the alleged business practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id*. (internal quotations omitted). Under the third test, "unfair" conduct requires that the consumer injury: (1) be substantial; (2) not be outweighed by any countervailing benefits to consumers or competition; and (3) be an injury that consumers themselves could not have reasonably avoided. *Id*.

At this preliminary stage, the Court need only determine whether Inteliquent's allegations, taken as true, state a plausible claim for relief. Given the nature of the alleged scheme, Defendants' conduct plausibly satisfies at least the first and second "unfair" practice tests. As to the third test, at this time, the Court cannot find as a matter of law that any supposed benefits to Defendants' enterprise outweigh Inteliquent's injuries. Therefore, Wide Voice's Motion to Dismiss [65] Inteliquent's UCL claim based upon the "unfair" prong is denied.

Inteliquent's "fraudulent" theory, however, is another story. A business practice is considered fraudulent under the UCL only if "members *of the public* are likely to be deceived." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (emphasis added); *Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.*, No. 15-CV-1576-AJB-RBB, 2016 WL 4087302, at *13 (S.D. Cal. Aug. 1, 2016) (interpreting "fraudulent" as used in section 17200 as requiring a showing that "members of the public are likely to be deceived").

Here, Inteliquent's "fraudulent" UCL claim fails to allege that Wide Voice's conduct "has or is likely to deceive the public or that the public was even aware" of Wide Voice's conduct. *See Imperial Irrigation Dist.*, 2016 WL 4087302, at *13; *Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 865 (N.D. Cal. 2014) (dismissing fraudulent UCL claim because "Cisco d[id] not allege that members of the public have been deceived by Capella's alleged fraudulent misrepresentations . . . . Indeed, Cisco does not even allege that members of the public are aware of Capella's misrepresentations."). Although Inteliquent alleges that *it* was deceived

by Defendants' fraudulent enterprise, a corporate-competitor "is not entitled to the protection of [the fraudulent] prong of [§ 17200] because it is not a member of the public or a consumer entitled to such protection." *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001); *Imperial Irrigation Dist.*, 2016 WL 4087302, at *13. Though "many courts have described the scope of business activities prohibited by § 17200 in sweeping terms, there is no case authority that 'fraudulent' business acts are separately actionable by business competitors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived." *Watson*, 178 F. Supp. 2d at 1121.

In response, Inteliquent claims that the UCL authorizes suits by private corporations. Inteliquent Resp. Wide Voice Mot. Dismiss [72] 19; *see* Cal. Bus. & Prof. Code § 17204 ("Actions for relief pursuant to this chapter shall be prosecuted . . . upon the complaint of a board, officer, person, corporation, or association . . . who has suffered injury in fact and has lost money or property as a result of the unfair competition."). A private right of action, however, does not exempt a corporate plaintiff from the UCL's proof requirements. *See Travelers Prop. Cas. Co. of Am. v. Centex Homes*, No. 11-3638-SC, 2013 WL 4528956, at *5 (N.D. Cal. Aug. 26, 2013) ("As Travelers points out, the UCL expressly allows for actions by private corporations. However, both private individuals and corporations must show that the alleged wrongdoing has some impact on the general public."). Therefore, Wide Voice's Motion to Dismiss [65] the fraudulent prong of Inteliquent's UCL claim is granted.

### 7. Count VIII: Civil Conspiracy

Illinois law defines civil conspiracy as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quoting *Buckner v. Atlantic Plant Maintenance, Inc.*, 694 N.E.2d 565, 571 (Ill. 1998)). To state a claim for conspiracy, a plaintiff must allege: (1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure*, 720 N.E.2d at 258). A civil conspiracy cause of action exists "only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Simon v. Nw. Univ.*, 175 F. Supp. 3d 973, 986 (N.D. Ill. 2016) (quoting *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994)); *see also Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012).

Wide Voice argues that Inteliquent cannot establish that the alleged fraudulent scheme was tortious or unlawful. As discussed *supra*, however, the Court has found that Inteliquent adequately pled, as it relates to Wide Voice, causes of action for RICO, fraud, fraud in the inducement, and the California UCL. Therefore, Wide Voice's Motion to Dismiss [65], as it relates to Count VIII, is denied.

### 8. Count IX: Breach of Contract

In Count IX, Inteliquent accuses Defendants of breaching the Master Addendum by suspending services to Inteliquent in July 2016, after Inteliquent disputed certain charges and filed its initial complaint in the present litigation. Second Am. Compl. [55] ¶¶ 265-304.  As with Count IV, Wide Voice seeks dismissal of Count IX as to Wide Voice because there is no allegation that *Wide Voice* either suspended service under the Master Addendum or was obligated to handle Inteliquent's traffic.  Once again, the Court agrees.

Inteliquent specifically alleges that, on July 5, 2016 (the day Inteliquent filed its initial complaint), "*defendants* demanded that Inteliquent make a deposit of disputed amounts within two days of the notice," and that "*defendants* offered no justification for that demand other than claiming the right to do so under the terms of the Master Services Agreement."  Second Am. Compl. [55] ¶ 276 (emphasis added).  In this way, Inteliquent attempts to impute the deposit demand upon all defendants generally.  Inteliquent, however, attached a copy of the July 5, 2016 notice to its complaint.  *Id.* Ex. O; *see* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  A review of the notice reveals that it was sent on behalf of *HD Tandem* specifically, not all Defendants.  *Id.*  This makes sense, since Inteliquent and HD Tandem constitute the only parties to the Master Services Agreement.  *Id.* Ex. N.

Inteliquent further alleges that on July 6, 2016, "*defendants* issued a notice to Inteliquent that Inteliquent had allegedly defaulted on paying the May 2016

invoice," and that "*defendants* threatened that if Inteliquent did not pay the full amount of the invoice . . . within seven days of the notice . . . the defendants would stop delivering Inteliquent's traffic." *Id.* ¶ 278. Once again, Inteliquent's general allegation against *all* Defendants must be read in context. Like the July 5, 2016 notice, the notice sent on July 6, 2016 was sent only on behalf of *HD Tandem. Id.* Ex. P.

Inteliquent also alleges that, on July 11, 2016, all Defendants imposed a $1.5 million credit limit upon Inteliquent under Master Services Agreement. *Id.* ¶ 282. Inteliquent asserts that this demand was "baseless pretext to threaten retaliation against Inteliquent for raising a good-faith dispute about the defendants' overcharges." *Id.* Here again, however, the complete record shows that the relevant act was implemented by HD Tandem, not all Defendants. *Id.* Ex. Q.

Finally, Plaintiff alleges that "*defendants* suspended services to Inteliquent" on July 27, 2016. *Id.* ¶ 300. Pursuant to both the Master Services Agreement and Master Addendum, such services were provided by HD Tandem, not Wide Voice. *Id.* Exs. A, N. In short, to the extent Inteliquent asserts a contract dispute regarding the suspension of services, it exists between Inteliquent and HD Tandem, not Wide Voice. Therefore, Wide Voice's Motion to Dismiss [65], as it relates to Count IX against Wide Voice, is granted.[7]

---

[7] The Court makes no ruling regarding the sufficiency of Count IX against the remaining Defendants.

**B.      Counterclaiming Plaintiffs' Second Amended Counterclaim [94] and Inteliquent and Carter's Motions to Dismiss [102, 104]**

HD Tandem and Free Conferencing assert seven causes of action in their Second Amended Counterclaim [94]: (1) breach of contract (Count I); (2) unjust enrichment (Count II); (3) tortious interference with HD Tandem's contracts (Count III); (4) intentional interference with HD Tandem's prospective economic advantage (Count IV); (5) tortious interference with Free Conferencing's contracts (Count V); (6) intentional interference with Free Conferencing's prospective economic advantage (Count VI); and (7) violation of the ICFA (Count VII).

### 1.      Counts III through VI: Tortious Interference

#### a)      *Carter's Managerial Privilege*

Carter claims that Counterclaiming Plaintiffs' tortious interference claims against him fail because, under Illinois and California law, he is protected by "managerial privilege." Carter Mem. Supp. Mot. Dismiss [105] 10-16. Carter asserts that, under the privilege, a corporate officer may, under certain circumstances, counsel the breach of a contract which he reasonably believes to be harmful to his client's interests. *Id.*

Carter's argument fails. Every case cited in Carter's motion—from both Illinois and California—involves a fiduciary interfering with a beneficiary's *own* contract. Here, Counterclaiming Plaintiffs allege tortious interference with Counterclaiming Plaintiffs' contracts and business expectances with independent third parties. To the extent any "managerial privilege" exists, it does not apply to such allegations. *See Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC*, 78

F. Supp. 3d 852, 865 (N.D. Ill. 2015) (stating that purpose of managerial privilege is to protect corporate defendants from litigation every time they exercise "their business discretion to cause *their* corporations not to perform a contract") (emphasis added) (internal quotations and modifications omitted); *O'Grady v. CONMED Corp.*, No. C 13-5242 CW, 2014 WL 794028, at *4 (N.D. Cal. Feb. 26, 2014) ("[T]he manager's privilege protects a company's manager from liability to a third party for advising or inducing *his* company to breach its contract with the third party. . . . The managerial privilege does not apply where the manager interferes with contracts to which the employer *is not* a party.") (emphasis added) (internal citations omitted).

### b)    *Sufficiency of Allegations*

Counts III through VI allege that Inteliquent and Carter tortuously interfered with contracts and prospective business opportunities of both HD Tandem and Free Conferencing. The Court begins, therefore, with a discussion of the elements required under Illinois law to assert both types of claims.

To state a claim for tortious interference with contracts, a plaintiff must allege: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir.

2015) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 676 (Ill. 1989)).

To state a claim for intentional interference with prospective economic advantage, a plaintiff must allege: (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy; and (4) damage to the plaintiff resulting from the defendant's interference. *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015) (quoting *Voyles v. Sandia Mortgage Co.,* 751 N.E.2d 1126, 1133 (Ill. 2001)). The Federal Rules do not require a plaintiff to allege, at the pleading stage, "the *specific* third party or class of third parties" with whom the plaintiff claims to have had a valid business expectancy. *Cook v. Winfrey,* 141 F.3d 322, 328 (7th Cir. 1998) (emphasis added); *Tamburo v. Dworkin*, No. 04-cv-3317, 2010 WL 5476780, at *7 (N.D. Ill. Dec. 29, 2010).

Nevertheless, "there is a long line of cases—both from the Illinois appellate courts and from federal courts within this district—explaining that the element of interference [in both torts] requires more than mere allegations of conduct between the plaintiff and defendant." *Premier Transp., Ltd. v. Nextel Commc'ns, Inc.*, No. 02-cv-4536, 2002 WL 31507167, at *1-2 (N.D. Ill. Nov. 12, 2002) (collecting cases). Rather, a plaintiff must assert action by the interfering party directed toward the party with whom the plaintiff is conducting, or expects to conduct, business. *See Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir. 1998) (discussing

requirement "that the defendants' actions be 'directed toward' the third party or parties with whom the plaintiff had the business expectancy"); *Peco Pallet, Inc. v. Nw. Pallet Supply Co.*, No. 1:15-cv-06811, 2016 WL 5405107, at *13 (N.D. Ill. Sept. 28, 2016) ("[T]o state a claim for tortious interference with contract, the alleged interference must have been directed toward the third party, not the plaintiff."); *Hackman v. Dickerson Realtors, Inc.*, 746 F. Supp. 2d 962, 972 (N.D. Ill. 2010) ("Actions directed towards plaintiffs, even if they allegedly interfered with plaintiffs ability to continue dealing with their own customers[,] cannot support a claim for tortious interference."); *Int'l Star Registry of Illinois v. ABC Radio Network, Inc.*, 451 F. Supp. 2d 982, 992 (N.D. Ill. 2006) (although under *Cook*, a plaintiff "is not required to allege the specific third party or class of third parties with whom it claims to have had a valid business expectancy," it is "well established that the assertedly tortious interference allegedly committed by the defendant must be directed toward the third party or parties with whom the plaintiff had the business expectancy—not simply toward the plaintiff") (quotations omitted); *Unique Envelope Corp. v. GSAmerica, Inc.*, No. 00-cv-7811, 2002 WL 598511, at *4 (N.D. Ill. Apr. 18, 2002) ("A plaintiff states a cause of action only if he alleges . . . action by the interfering party directed toward the party with whom the plaintiff expects to do business."); *Boffa Surgical Grp. LLC v. Managed Healthcare Assocs. Ltd.*, 47 N.E.3d 569, 577 (Ill. App. Ct. 2015) ("A plaintiff states a cause of action for tortious interference with prospective economic advantage only if he alleges a business expectancy with a specific third party as well as action by the defendant directed

toward that third party; it is not enough for the defendant's action to impact a third party, rather, the defendant's action must be directed towards the third party.") (internal citation and quotation omitted).

HD Tandem's tortious interference claims (Counts III and IV) fail this test. Both causes of action focus on HD Tandem's existing and prospective business relationships with LECs.  *See* Second Am. Compl. [94] ¶¶ 116 ("HD Tandem has valid and enforceable contracts with its LEC partners"), 120 ("Inteliquent and Carter intentionally and without justification interfered with the LEC Contracts"), 130 ("HD Tandem is a growing company that relies upon new connections with LECs in different geographic areas to grow its business and be successful"), 133 ("Inteliquent and Carter intentionally and without justification interfered with HD Tandem's prospective economic advantage and relationships with other LECs").

Count III (tortious interference with contract), however, alleges that Inteliquent and Carter disrupted HD's Tandem's contracts with LECs by "purposefully withholding payments" *from HD Tandem* in order to "extort and coerce HD Tandem to provide Inteliquent with a rock bottom rate."  Second Am. Counterclaim [94] ¶ 119.  Similarly, Count IV (tortious interference with prospective economic advantage) alleges that Inteliquent and Carter interfered with HD Tandem's prospective relationships with other LECs by "purposefully and without cause withholding payments to HD Tandem and otherwise extorting HD Tandem to lower the rate it was charging Inteliquent for T-Mobile traffic" and "supplying T-Mobile with information to target calls to HD Tandem's network with

additional charges." *Id.* ¶¶ 133, 136. This purported misconduct is not directed toward the LECs with whom HD Tandem conducts, or expects to conduct, business. Under Illinois law, this is not enough to adequately allege a tortious interference claim. Therefore, Inteliquent and Carter's Motions to Dismiss [102, 104], as they relate to Counts III and IV, are granted.

These deficiencies extend, in part, to Free Conferencing's tortious interference claims (Counts V and VI). Count V alleges that Inteliquent and Carter intentionally interfered with Free Conferencing's existing user agreements with its registered users (what it deems as its "customer contracts."). *See, e.g.*, Second Am. Compl. [94] ¶ 143 ("Free Conferencing currently has millions of registered users who have signed up for its service and agreed to its contract entitled 'Terms and Conditions,' pursuant to which they use the service"). Free Conferencing alleges, however, that Inteliquent and Carter's misconduct caused *Free Conferencing* to breach its customer contracts. *Id.* ¶ 145 ("Inteliquent and Carter knew of the Customer Contracts and intentionally and without justification disrupted the performance of the Customer Contracts c*ausing Free Conferencing to breach its Customer Contracts.*") (emphasis added). To state a claim for tortious interference with contracts, Free Conferencing must allege, *inter alia*, the existence of a valid and enforceable contract between the plaintiff and another, and a subsequent breach *by the other*, caused by the defendant's wrongful conduct. *Healy*, 804 F.3d 836, 842 (7th Cir. 2015). Free Conferencing fails to plead this particular scenario.

Therefore, Inteliquent and Carter's Motions to Dismiss [102, 104], as they relate to Count V, are granted.

Free Conferencing's pleading deficits, however, end there. Count VI details Free Conferencing's prospective business relationships with registered users with whom it hopes to establish new customer contracts. *See, e.g.,* Second Am. Compl. [94] ¶ 157 ("Inteliquent and Carter knew of the prospective economic advantage Free Conferencing enjoys with the participants in its conferences that are the source of its success and growth"). As in Count V, Free Conferencing alleges action by Inteliquent and Carter directed towards those specific third parties. *See, e.g., id.* ¶¶ 145 (stating that Inteliquent and Carter "prevent[ed] large numbers of its customers from using Free Conferencing's services"), 57, 89, 159 (accusing Inteliquent and Carter of intercepting calls intended for Free Conferencing and playing a message "requiring callers to press a button to complete the call" and "advising them of an additional charge to complete calls to Free Conferencing"). These allegations are sufficient to plead a claim for tortious interference with prospective economic advantage. *See Foster v*, 806 F.3d at 971 (7th Cir. 2015). Therefore, Inteliquent and Carter's Motions to Dismiss [102, 104], as they relate to Count VI, are denied.[8, 9]

---

[8] Inteliquent briefly argues that Free Conferencing fails "to identify any principle that makes Inteliquent's alleged conduct unjustified." Inteliquent Mot. Dismiss [102] 17; Inteliquent Reply [137] 8. Indeed, to *prove* tortious interference, a plaintiff must show that the defendant's actions were unjustified. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398-99 (7th Cir. 2003). At this preliminary stage, however, the Court only evaluates the sufficiency of the pleadings, and Free Conferencing alleges that Inteliquent's acted with "malice" and "without justification." Second Am. Counterclaim [94] ¶¶ 145-46, 153, 158, 161, 164. These allegations, combined with the remainder of the Second Amended Counterclaim, satisfy federal pleading requirements.

## C.    Remaining Causes of Action

### 1.    Unjust Enrichment

Count VII of Inteliquent's Second Amended Complaint [55] and Count II of HD Tandem's Second Amended Counterclaim [94] both allege unjust enrichment. Unjust enrichment "is a 'quasi-contract' theory that permits courts to imply the existence of a contract where none exists in order to prevent unjust results." *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 622 (N.D. Ill. 2008). When a relationship is governed by contract, however, the parties "may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004) (citing *Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 397 (7th Cir. 2003)). The reason for this prohibition "is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Id.* In determining whether a claim falls outside a contract, "the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim." *Id.*

---

[9] Inteliquent also argues that Counts V through VII of Counterclaiming Plaintiffs' Second Amended Counterclaim should be referred to the FCC under the doctrine of primary jurisdiction. Inteliquent Mem. Supp. Mot. Dismiss [103] 9-13. The doctrine of primary jurisdiction allows a federal court to refer a matter "extending beyond the conventional experiences of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience, expertise, and insight." *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (internal quotations omitted). The doctrine, however, "should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution." *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984) (internal quotations omitted). At this preliminary stage, the Court is simply evaluating whether, as a matter of law, Counterclaiming Plaintiffs' allegations state plausible claims for relief. Clearly, the doctrine "does not extend to a legal question that is within the conventional competence of the courts." *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 223 (2d Cir. 1995) (internal quotations omitted). Therefore, at this juncture, the Court declines Inteliquent's invitation.

Here, both Inteliquent and HD Tandem acknowledge the existence an express contract governing payment for termination services.  *See* Second Am. Compl. [55] ¶ 208 ("The Master Addendum is a valid and enforceable contract."); Second Am. Counterclaim [94] ¶ 95 ("The MSA and Master Addendum are valid and enforceable contracts executed by Inteliquent and HD Tandem").  As a result, both unjust enrichment claims are barred.  *See Grayson v. Shanahan*, No. 16-cv-1297, 2016 WL 6962827, at *3 (N.D. Ill. Nov. 29, 2016).

In response, HD Tandem argues that it has pled its unjust enrichment claim in the alternative.  Under Illinois law, a party may make an unjust enrichment claim in the alternative to a breach of contract claim "if the party demonstrates that the claim is brought in the alternative and does not refer to an express contract governing the parties' relationship."  *Id.*  This exception does not apply, however, "when a plaintiff's unjust enrichment claim incorporates allegations of the existence of an express contract between the parties."  *Id.*  Here, both Inteliquent and HD Tandem have done exactly that by pleading that all "foregoing" paragraphs of their respective complaints—which discuss the Master Services Agreement and Master Addendum at length—"are incorporated by reference as if fully set forth in this paragraph."  Second Am. Compl. [55] ¶ 249; Second Am. Counterclaim [94] ¶ 108.  Such language has proven to be "the downfall of complaints" in similar cases.  *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 623 (N.D. Ill. 2008); *see also Cole-Haddon, Ltd. v. Drew Philips Corp.*, 454 F. Supp. 2d 772, 777 (N.D. Ill. 2006) (dismissing unjust enrichment claim where "paragraph 29 of the

complaint reasserts all allegations previously stated, including those claiming the existence of a contract"); *Homestead Ins. Co. v. Chicago Transit Auth.,* No. 96-cv-4570, 1997 WL 43232, at *4 (N.D. Ill. Jan. 23, 1997) (dismissing unjust enrichment claim where claim "adopts by reference all the allegations in the contract claim . . . including paragraphs alleging an express contract between the parties."). Therefore, Wide Voice's Motion to Dismiss [65], as it relates to Count VII of Inteliquent's Second Amended Complaint, is granted, as is Inteliquent's Motion to Dismiss [102], as it relates to Count II of the Counterclaiming Plaintiffs' Second Amended Counterclaim.

### 2. Violations of the ICFA

Count VI of Inteliquent's Second Amended Complaint [55] and Count VII of HD Tandem's Second Amended Counterclaim [94] both allege violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), which prohibits, *inter alia*, "unfair or deceptive acts or practices." 815 ILCS § 505/2.

The ICFA is a "regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*, 787 F. Supp. 2d 747, 751 (N.D. Ill. 2011) (quoting *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill. 2002)). It is to be "liberally construed to effectuate that purpose." *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 32 (Ill. 2005). The statute provides redress "not only for deceptive business practices, but also for business practices that, while not

deceptive, are unfair." *Boyd*, 787 F. Supp. 2d at 751. The elements of an ICFA claim are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely upon the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce. *Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d 779, 793-94 (N.D. Ill. 2010).

### a)  Counterclaiming Plaintiffs Sufficiently Allege Unfair Acts

Inteliquent argues that the particular allegations brought by HD Tandem and Free Conferencing do not constitute unfair acts. Unfairness under the ICFA "depends on a case-by-case analysis." *Siegel v. Shell Oil Co.,* 612 F.3d 932, 935 (7th Cir. 2010). To determine whether a business practice is unfair, the court considers whether the practice: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers. *Boyd*, 787 F. Supp. 2d at 751 (quoting *Robinson*, 775 N.E.2d at 961). All three criteria "do not need to be satisfied to support a finding of unfairness." *Id*. A practice may be unfair "because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id*.

Here, HD Tandem and Free Conferencing allege that Inteliquent and Carter: (1) extorted HD Tandem in an attempt to lower its terminal service rates; (2) raised frivolous disputes in order to wrongfully withhold $7 million in payments; (3) in concert with T-Mobile, disrupted calls en route to Free Conferencing with messages requiring callers to press a button to complete the call and advising them of

additional charges; and (4) fraudulently transmitted calls through HD Tandem's network without its consent. Second Am. Counterclaim [94] ¶ 167. Accepting these allegations as true, the Court finds such allegations sufficient to state a claim of unfair business practices under the ICFA. Therefore, Inteliquent and Carter's Motions to Dismiss [102, 104], as they relate to Count VII of the Counterclaiming Plaintiffs' Second Amended Counterclaim, are denied.

### b)    *Inteliquent Qualifies as a Consumer*

Finally, Wide Voice asserts that Inteliquent lacks standing to bring its ICFA claim because the ICFA is limited to: (1) consumers; and (2) non-consumers who can demonstrate a nexus between their injuries and injuries to the ultimate consumer. Indeed, the ICFA is "primarily concerned with protecting consumers." *AGFA Corp. v. Wagner Printing Co.*, No. 02-cv-2400, 2002 WL 1559663, at *2 (N.D. Ill. July 10, 2002); *Web Communications Group, Inc. v. Gateway 2000, Inc.,* 889 F. Supp. 316, 323 (N.D. Ill. 1995). When a dispute "involves two businesses that are not consumers," the alleged conduct must satisfy the "consumer nexus test"; the plaintiff "must allege facts showing the conduct involves trade practices directed to the market generally or otherwise relates to consumer protection issues." *Glob. Total Office Ltd. P'ship v. Glob. Allies, LLC*, No. 10-cv-1896, 2011 WL 3205487, at *2 (N.D. Ill. July 28, 2011); *Athey Products Corp. v. Harris Bank Roselle,* 89 F.3d 430, 437 (7th Cir. 1996). On the other hand, "as long as the plaintiff, whether a business entity or a person, is a consumer, it need only show a personal injury caused by the fraudulent or deceptive acts." *AGFA Corp.*, 2002 WL 1559663, at *2

(quoting *Skyline International Development v. Citibank, F.S.B.,* 706 N.E.2d 942, 946 (Ill. App. Ct. 1998)); *Cocroft v. HSBC Bank USA, N.A.,* No. 10-cv-3408, 2012 WL 1378645, at *6 (N.D. Ill. Apr. 20, 2012); *Sutter Ins. Co. v. Applied Sys., Inc.,* No. 02-cv-5849, 2004 WL 161508, at *6 (N.D. Ill. Jan. 26, 2004).

Here, Inteliquent qualifies as a consumer under the statute. The ICFA defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS § 505/1(e). A "person" includes a corporation or other business entity. *Id.* § 505/1(c). Moreover, "merchandise" includes "services." *Id.* § 505/1(b); *Underwriters Labs., Inc. v. Solarcom LLC,* No. 02-cv-3933, 2002 WL 31103476, at *4 (N.D. Ill. Sept. 18, 2002) ("The [ICFA] expressly includes 'services.'"). Inteliquent contracted, through the Master Addendum, for the provision of "Voice Termination *Services.*" Second Am. Compl. [55] Ex. A ¶ 3 (emphasis added). As described *supra*, these services include "tandem switching," "tandem transport," and "end office" services. Inteliquent does not resell these items to customers. *See AGFA Corp.,* 2002 WL 1559663, at *2. Therefore, based upon the facts alleged, Inteliquent maintains standing to pursue an ICFA claim. Wide Voice's Motion to Dismiss [65], as it relates to Count VI, is denied.

## IV. Conclusion

The Motions to Dismiss for Failure to State a Claim filed by Wide Voice [65], Inteliquent [102], and Carter [104] are granted in part and denied in part, as

discussed above. Counts IV, VII, and IX of Inteliquent's Second Amended Complaint [55] are dismissed as they relate to Wide Voice, as is Count V, to the extent it alleges fraudulent business practices. The remainder of Inteliquent's Second Amended Complaint stands. Counts II-V of Counterclaiming Plaintiffs' Second Amended Counterclaim [94] are dismissed. The remainder of Counterclaiming Plaintiffs' Second Amended Counterclaim stands. The status hearing previously set for April 4, 2017 stands. At that time, the parties shall be prepared to discuss additional case management dates and issues.

Date: March 30, 2017

Entered:

John Robert Blakey
United States District Judge