**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

INTELIQUENT, INC.

    Plaintiff and Counterclaim
           Defendant,

             v.

FREE CONFERENCING
CORPORATION, individually and
d/b/a HD TANDEM; HDPSTN, LLC
d/b/a/ HD TANDEM; WIDE VOICE,
LCC; and CARRIERX, LLC,

    Defendants and Counterclaimants.

Case No. 16-cv-06976

Judge John Robert Blakey

**MEMORANDUM OPINION AND ORDER**

This case arises from the breakdown of the relationship between Inteliquent, Inc. and various players in the telecommunications industry. Plaintiff Inteliquent, Inc. sued Free Conferencing, HD Tandem, Wide Voice, CarrierX, and Yakfree. *See* [315]. Defendants counter-sued, *see* [336], [338], naming Inteliquent and Matthew J. Carter as counter-defendants. Defendants move for summary judgment on all of Inteliquent's remaining claims. *See* [566]. They also move for partial summary judgment on all claims as to the calls HD Tandem transmitted to local exchange carriers (LECs) other than certain Native American Telecommunications (NATs) entities that terminated in the geographic regions of those non-NAT LECs. [566]; [582]. Inteliquent and Carter (collectively Inteliquent or Counter Defendants) cross-move for summary judgment on

1

Inteliquent's remaining claims. [580]. Inteliquent and Carter also seek summary judgment in their favor on HD Tandem, CarrierX, and Free Conferencing's remaining counterclaim and on Wide Voice's counterclaims.

For the reasons explained herein, the Court grants in part and denies in part the parties' motions.

## BACKGROUND

The following facts come from Defendants' LR 56.1 statement of material facts, [570], and Counter Defendants' statement of material facts, [583].

### I. The Parties

Inteliquent, a Delaware corporation, operates its principal place of business in Chicago, Illinois. [583] ¶ 1. Inteliquent's business includes servicing other telecommunication companies such as T-Mobile, primarily as a long-distance carrier, known as an interexchange carrier (IXC). *Id.* ¶ 16.

Counter Defendant Matthew J. Carter formerly served as Inteliquent's CEO from June 2015 to March 2017. *Id.* ¶ 2. Mr. Carter served as CEO when Inteliquent entered into a commercial agreement with T-Mobile, allowing Inteliquent to carry a substantial portion of T-Mobile's long-distance traffic. *Id.* ¶ 46.

Defendant Free Conferencing runs a free voice, video, and data conferencing service. *Id.* ¶ 3; [570] ¶ 12.

Defendant Yakfree similarly offers conferencing and calling card services. [570] ¶ 18.

2

Defendant HD Tandem provides "tandem and termination services" within the telecommunications industry (i.e., the handoff of traffic from a long-distance carrier to a local exchange carrier), [583] ¶ 19, offering its services through commercial agreements, [570] ¶ 13.

Defendant Wide Voice offers end-office services and tandem connection services pursuant to both federal and state tariffs as well as commercial agreements. *Id.* ¶ 15.

Defendant CarrierX participated in a restructuring involving Free Conferencing and HD Tandem, among other companies. *Id.* ¶ 14. It now owns all of HD Tandem's outstanding shares and partially owns and operates FreeConferenceCall.com. *Id.* Wide Voice is also a subsidiary of CarrierX. *Id.* ¶ 17. David Erickson founded Free Conferencing, HD Tandem, and other companies that support Free Conferencing's services. *Id.* ¶ 16. He also serves as the CEO of CarrierX, Free Conferencing, and HD Tandem. *Id.* Josh Lowenthal, a member of Free Conferencing's senior management, founded Yakfree. *Id.* ¶ 18.

Although not parties to the case, two other businesses play an important role in the parties' motions. Native American Telecom, LLC provides local phone services on the Crow Creek reservation in South Dakota. *Id.* ¶ 26; [583] ¶¶ 9–10. Similarly, Native American Telecom—Pine Ridge, LLC (collectively, the NATs) provides local phone services in Pine Ridge, South Dakota. [583] ¶ 10. In the telecommunications industry, industry members refer to local phone companies like the NATs as local exchange carriers (LECs). The NATs and Defendants maintain degrees of overlapping ownership, employees, investors, management, and physical office locations. *Id.* ¶ 14;

3

*see* [570] ¶¶ 37–38.  On July 1, 2009, the NATs also signed revenue sharing agreements with Free Conferencing.  [570] ¶ 40.  Under these agreements, the NATs "assigned Free Conferencing telephone numbers, referred to [as] direct inward dials ('DIDs'), and each agreed to pay Free Conferencing a portion of the 'tariffed access charges' they received from long distance providers for terminating calls to Free Conferencing's equipment." *Id*.

## II.    The Telecommunications Industry

The telecommunications industry involves many different players, each playing a role in what seems from the outside to be a straightforward process.  When a customer places a long-distance call, that call may be completed in one of two ways.  The first option constitutes the regulated path.  When companies complete a call under the regulated path, the customer's phone carrier transfers the call to a long-distance carrier (like Inteliquent), which then connects that call to the LEC where the end user resides.  [570] ¶¶ 2–3; [583] ¶¶ 16–17.  Figure 1, [583] ¶ 19, illustrates the regulated path:

*(Figure 1)*



The FCC regulates this pathway through established benchmark rates LECs may charge the IXC for taking the call and terminating it to the dialed party.  [570] ¶¶ 3–5.  The end user's geographic location heavily informs these rates, meaning that LECs in remote areas often may charge substantially higher tariffs.  [583] ¶ 21.

Commercial agreements govern the alternative pathway: rather than pay tariffed rates directly to an LEC, an IXC (like Inteliquent) may sign a private commercial contract with another intermediary company (here, HD Tandem) that will deliver traffic via non-regulated arrangements. *Id.* ¶ 22. In this scenario, the tandem "accepts traffic from the IXC and makes arrangements with LECs for switching and transport to end users." *Id.* That tandem company then delivers the call to the LEC. *Id.* Figure 2, *id.* ¶ 22, illustrates this pathway:



*(Figure 2)*

Because commercial agreements govern these transactions, the tariff rates do not bind the parties; rather, the parties negotiate the rates as reflected in various commercial agreements. *Id.* ¶ 22. IXCs typically enter these agreements to circumvent the FCC tariff system, as tandem switch providers often maintain established commercial rates with various LECs. [570] ¶ 10.

Under either pathway, however, IXCs make money by charging their business customers. [583] ¶ 18. In this case, Inteliquent charged T-Mobile. *Id.* T-Mobile, in turn, makes money by charging its customers according to the terms and conditions of their contracts. *Id.*

5

### III.    Access Stimulation

Access stimulation occurs when companies enter into revenue sharing agreements with LECs with high tariff rates.  [570] ¶ 39.  The agreements further the purpose of increasing traffic to high tariff LECs and then the parties split the increased revenue.  *Id.*  In this case, Free Conferencing and Yakfree entered into revenue sharing agreements with the NATs.  [583] ¶ 27.  The NATs provided Free Conferencing and Yakfree with NAT-associated phone numbers.  [570] ¶¶ 39–40.  Free Conferencing and Yakfree then had their customers use those numbers for their conference calls, driving traffic to NAT numbers and splitting the increased revenue with the NATs.  *Id.* ¶¶ 63–64.  This process greatly increased costs for Inteliquent because it delivered a high volume of free conferencing traffic to the NATs.  *Id.*; [583] ¶ 47.  Aside from this free conferencing traffic, the NATs served a very small number of local customers.  [583] ¶ 38.

Although the FCC has confirmed that access stimulation may be done lawfully in certain situations (while continuing to crack down on the practice), *see Connect Am. Fund*, 26 FCC Rcd. 17663 (2011), the FCC has also determined that free conferencing numbers do not meet the definition of "end user" under the FCC's tariff regime, *Qwest Commc'ns Corp.*, 24 FCC Rcd. 14801, 14805–13 (2009).  Because free conferencing callers do not qualify as end users, the FCC held, the LEC in question could not charge IXCs the tariffed rates under the Communications Act of 1934.  *Id.*  Courts refer to this FCC decision as the *Farmers II* case.

### IV.   The Phases

In its statement of material facts, Inteliquent lays out three phases of conduct.

**Phase One.** During this time period, Inteliquent engaged in "modest" business with the Defendants under an assortment of contracts. [583] ¶ 45. One of these agreements included the Reciprocal Master Services Agreement (MSA) between HD Tandem and Inteliquent, signed in 2013. [570] ¶ 53. Under the MSA, HD Tandem provided some tandem switching services, but Inteliquent did not use HD Tandem's services often until the parties amended the agreement two years later. *Id.* ¶ 54. Instead, Inteliquent delivered T-Mobile's calls to the NATs through the regulated path. [583] ¶ 47; [570] ¶¶ 63–64. The NATs would then split free conferencing-associated revenue with Free Conferencing and Yakfree, as stipulated by the parties' revenue sharing agreements. [583] ¶ 48; [570] ¶¶ 39–40, 63–64.

**Phase Two.** In 2015, Inteliquent entered into an agreement with T-Mobile to carry a substantial portion of T-Mobile's long-distance traffic. [583] ¶ 46. Following the execution of that agreement, Inteliquent "saw a spike in traffic" to the NATs. *Id.* ¶ 47. As a result, Inteliquent began negotiations with the Defendants for tandem switching services so that it could reduce tariff costs. *Id.* ¶ 51. During these negotiations, Inteliquent asked Free Conferencing whether its calls associated with the NATs physically terminated at the NATs footprint. *See, e.g.*, *id.* ¶¶ 49, 52–54. According to Counter Defendants, Mr. Lowenthal, Free Conferencing's COO, allegedly represented to Inteliquent that LECs delivered calls placed to South Dakota numbers to physical locations in South Dakota, including Free Conferencing calls. *Id.* ¶ 52.

7

Inteliquent also asserts that during this time, Defendants assured Inteliquent that the NATs and Free Conferencing constituted separate and distinct entities. *Id*. ¶ 54.

On October 22, 2015, as Inteliquent's T-Mobile contract became less profitable, *id*. ¶ 81, Inteliquent, HD Tandem, Free Conferencing, Wide Voice, and Yakfree entered into the Master Addendum to Agreements (the MAA), [570] ¶ 68. Following the execution of the MAA, Inteliquent routed a substantial portion of its traffic through HD Tandem. [583] ¶ 62. HD Tandem, in turn, charged Inteliquent the MAA-stipulated rates rather than tariffs, including for Inteliquent's long-distance traffic involving NAT-associated numbers. *Id*. ¶¶ 51, 56.

**Phase Three.** In January 2016, Inteliquent traced certain calls to see if it could determine where HD Tandem physically delivered those calls. [583] ¶ 63. The result of these tests made Inteliquent suspicious that HD Tandem did not deliver Free Conferencing's calls to South Dakota. *Id*. ¶¶ 63–64. T-Mobile also became suspicious that Free Conferencing and Yakfree's calls did not terminate in South Dakota. *Id*. ¶ 82. T-Mobile and Inteliquent soon began working together to reduce traffic from free conferencing numbers to high cost locations. *Id*. ¶¶ 82–83; [570] ¶ 80. To that end, Inteliquent and T-Mobile developed whisper functionality. [583] ¶ 83. Inteliquent's whisper functionality "directed callers to press two random digits to be able to complete certain calls." *Id*. Inteliquent used the whisper functionality to determine if "fraudulent machines" were generating some of those calls (whisper functionality thwarted such machines, as a computer cannot press the numbers as directed). *Id*.

Ultimately, Inteliquent used the whisper functionality on just sixteen numbers, only one of which was associated with Free Conferencing. *Id.* ¶ 84.

Additionally, T-Mobile instituted a one cent policy, whereby it charged its customers one cent per minute for certain high cost call destinations. *Id.* ¶ 90. Although they constitute separate and distinct companies, Inteliquent and T-Mobile continued to work together to bring down their respective costs through these polices. *Id.* ¶¶ 87–107.

As a result of Inteliquent's suspicions regarding Free Conferencing's traffic and Inteliquent's work with T-Mobile to reduce traffic from free conferencing numbers, the relationship among the parties in this case broke down. *See, e.g.*, [570] ¶ 96. Eventually, Defendants demanded payment under the MSA. *Id.* ¶ 99. Inteliquent disputed these charges, causing HD Tandem to terminate services under the MAA. *Id.* ¶¶ 100–12.

Ultimately, Inteliquent sued Free Conferencing, HD Tandem, Wide Voice, Yakfree, and CarrierX, and these entities counter sued. Inteliquent now moves for summary judgment on all of its remaining claims, which allege: (1) violation of the Racketeer Influenced & Corrupt Organizations Act (RICO) under 18 U.S.C. § 1962(c); (2) RICO conspiracy under 18 U.S.C. § 1962(d); (3) fraud; (4) breach of contract; (5) unfair competition under sections 17200–17210 of the California Business & Professions Code; (6) unfair competition under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 Ill. Comp. Stat. 505/1–12; (7) civil

9

conspiracy; and (8) unjust enrichment.  Defendants cross-moved for summary judgment on these claims.

Additionally, Inteliquent and Carter seek summary judgment on HD Tandem, Free Conferencing, and CarrierX's remaining counterclaims, which allege: (1) breach of contract; (2) intentional interference with prospective business advantage; and (3) unfair competition (under 815 Ill. Comp. Stat. 505/1–12).  Likewise, they seek summary judgment on Wide Voice's remaining counterclaims, which allege: (1) breach of contract; (2) breach of implied contract[1]; (3) intentional interference with prospective business advantage; and (4) unfair competition (under 815 Ill. Comp. Stat. 505/1–12).

## LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment bears the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When, as here, the parties file cross-motions for summary judgment, "the Court views the facts in the light most favorable to the respective non-moving party."  *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 912 (N.D. Ill. 2019).  The non-moving party

---

[1] Counter Defendants, however, do not address Wide Voice's breach of implied contract claim in their memorandum in support of their motion for summary judgment.

has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## ANALYSIS

### I.  Inteliquent's Claims

#### A.  RICO § 1962 (Counts I and II)

This Court turns first to Inteliquent's RICO claims, Counts I and II. Inteliquent seeks to hold Defendants liable under RICO, 18 U.S.C. §§ 1962–1968.[2] As part of RICO's remedial scheme, a private civil plaintiff may sue under § 1964(c) for a violation of the statute that proximately causes an injury to his business or property. 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the

---

[2] In 1970, Congress enacted the Organized Crime Control Act containing Title IX, otherwise known as RICO. 18 U.S.C. §§ 1961–1968. Creating enhanced criminal and civil remedies, Congress drafted RICO to address "'enterprise criminality,' that is, 'patterns' of unlawful conduct, including: (1) acts of violence and terrorism; (2) the provision of illegal goods and services; (3) corruption in labor or management relations; (4) corruption in government; and (5) criminal fraud by, through, or against various types of licit or illicit enterprises." *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1091 (N.D. Ill. 2016).

suit, including a reasonable attorney's fee . . . ."); *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–68 (1992).

In Counts I and II, the complaint alleges both a substantive RICO violation under § 1962(c) and a RICO conspiracy violation under § 1962(d). Under § 1962(c), it is unlawful for any "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Moreover, because § 1962(d) prohibits any person from conspiring to violate subsections (a), (b) and (c) of § 1962, the overall objective of a RICO conspiracy claim often mirrors the underlying RICO substantive claim. This case is no exception; thus, under § 1962(d), Inteliquent must establish that each Defendant joined an agreement to participate in "an endeavor which, if completed, would satisfy all of the elements" of a substantive violation of RICO, here, the elements of the § 1962(c) offense. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir. 2000).

Both sides seek summary judgment on the RICO claims. [581] at 23; [568] at 31. This Court will consider the parties' arguments in turn.[3]

---

[3] Of course, if a triable issue of material fact exists as to an otherwise legally sufficient RICO claim, this Court must deny the request for summary judgment.

12

### 1. Substantive RICO (Count I)

To prevail on this claim, Inteliquent must establish a violation of § 1962(c), namely: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998), *holding modified by Brouwer*, 199 F.3d 961 (7th Cir. 2000).

### a. RICO "Conduct": Participation in Operation/Management

In *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), the Supreme Court held that the phrase "conduct or participate" under § 1962(c) requires "some part in directing those affairs" through "operation or management." *Id.* at 177–86. This requirement, however, includes not just upper management, but also those who facilitate or operate the affairs of the enterprise. *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995) (observing that the "operation" of an enterprise includes "foot soldiers" as well as "generals"). The law on this point is well-settled:

> In other words, a person conducts or participates in the conduct of the affairs of an enterprise only if that person uses his position in, or association with, the enterprise to perform acts which are involved in some way in the operation or management of the enterprise, directly or indirectly, or if the person causes another to do so. To be associated with an enterprise, a person must be involved with the enterprise in a way that is related to its affairs or common purpose, although the person need not have a stake in the goals of the enterprise and may even act in a way that subverts those goals. A person may be associated with an enterprise without being so throughout its existence.

*Menzies*, 197 F. Supp. 3d at 1102.  The *Reves* "operation-management" test, as it has become known, is deployed to include and exclude certain RICO defendants.

In this case, material fact issues exist as to the requisite participation in the operation or management of the affairs of the RICO enterprise.  For example, Inteliquent cites evidence that all Defendants played concerted roles in carrying out a "traffic pumping" enterprise, *see, e.g.*, [583] ¶¶ 3–14, 48, 50, and Defendants introduce countervailing evidence they argue shows Defendants acted more independently, *see, e.g.*, DRSOMF[4] ¶¶ 3, 14 (even though they also acknowledge that Free Conferencing and Yakfree's business model operates via access stimulation achieved through working with the NATs, *id*. ¶ 23).  Thus, a reasonable jury could render a verdict for or against Defendants on the current record.

### b.    RICO "Enterprise": Existence of An Association-in-Fact

Under 18 U.S.C. § 1961(4), an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  These examples are illustrative, not exhaustive.  *See Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125 n.1 (1934) (distinguishing the non-exhaustive statutory term "includes," which is used in RICO, from its counterpart "means").[5]

---

[4] DRSOMF refers to Defendants' response to Inteliquent's statement of material facts.  [632].

[5] The entities comprising a RICO enterprise can also play different roles in the case, including the roles of victim, prize, instrument, or perpetrator of the violation.  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 n.5 (1994); *see* Prof. G. Robert Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg*, 58 Notre Dame L. Rev. 237, 307–25 (1982).

14

As relevant here, Inteliquent alleges the existence of a "traffic pumping" enterprise constituting an "association-in-fact" enterprise under RICO. [315] at ¶¶ 40, 195–210, 213; [581] at 24. The Supreme Court defines an association-in-fact enterprise as a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such enterprises, licit or illicit, may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* Congress has broadly defined the "enterprise" concept to mean any group of persons "whose association, however loose or informal, furnishes a vehicle for the commission" of two or more predicate crimes (or the collection of unlawful debt). *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978).

Although an "association-in-fact" enterprise must have some ascertainable structure, it need not be "much" more than a bare-bones conspiracy to commit the predicate acts themselves. *Boyle v. United States*, 556 U.S. 938, 948–49 (2009) (explaining the "breadth" of RICO's enterprise concept). In *Boyle*, the Supreme Court outlined the three essential features of an "association-in-fact" enterprise: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. *Id.* at 946–48. The Court then gave examples of how such an enterprise might satisfy this broad structural requirement:

Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 948; *see also Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010). Given the flexibility of RICO's statutory language, a single "association-in-fact" enterprise can exist even when its members and associates constitute opposing factions. *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994) (finding that internal divisions did not undermine the existence of a single association-in-fact enterprise under RICO). As with all RICO enterprises, however, the existence of an association-in-fact "enterprise" is a "separate" element from the "pattern" of racketeering activity itself. *Turkette*, 452 U.S. at 583 (finding that RICO requires "separate" or distinct elements, even though the proof at trial may "coalesce"); *see United States v. Torres*, 191 F.3d 799, 805–06 (7th Cir. 1999) (general discussion of sufficient RICO "association-in-fact" allegations).

Here, based upon the record, triable issues of material fact exist as to whether Defendants engaged in an association-in-fact "traffic pumping" enterprise. For

example, as to the enterprise's purposes, Inteliquent cites evidence that the enterprise acts for the purpose of splitting enhanced revenue obtained through access stimulation, for the purpose of inducing IXCs to sign contracts based upon misrepresentations about the industry, or for both purposes. [583] ¶¶ 27–30, 49–54. As to the relationship among the associated actors, Inteliquent relies upon evidence that the Defendants and the NATs maintain extensive overlapping management and employees, which Inteliquent claims further supports the existence of a RICO enterprise. *Id*. ¶ 14. Finally, Inteliquent cites evidence that this scheme lasted for years, covering multiple stages of conduct. *See, e.g., id*. ¶¶ 27, 38, 41, 72.

In response, Defendants contradict these facts and conclusions with other evidence in the record. For example, citing to the deposition testimony of multiple witnesses, Defendants dispute the evidence concerning the intertwined nature of the Defendants and the NATs. DRSOMF at ¶ 14. Defendants also submit facts disputing allegations that they misled Inteliquent about where calls to the NATs terminated in order to induce Inteliquent to sign the MAA. *Id*. ¶¶ 49–50. For these reasons, a jury must weigh the evidence to determine the existence of an association-in-fact traffic pumping enterprise.[6]

The facts here differ markedly from those in *Green v. Morningstar, Inc.*, upon which Defendants rely. *See* [568] at 32. In that case, the court dismissed a RICO claim

---

[6] This Court also rejects Defendants' argument that this Court must grant them summary judgment because they believe the evidence makes no distinction between the enterprise and the person. [568] at 34–35. An "'association-in-fact' enterprise generally constitutes an exception to the 'enterprise-person' rule arising under violations of § 1962(c)." *Menzies*, 197 F. Supp. 3d at 1093 n.2.

because the plaintiff's enterprise allegations contained little more than the fact that defendants entered into some revenue sharing agreements. No. 17 C 5652, 2018 WL 1378176, at *5 (N.D. Ill. Mar. 16, 2018). But here, as noted above, Inteliquent submits evidence supporting the alleged enterprise's structure, goals, and operation (for example, that organizations have overlapping ownership and management and work in concert to send Free Conferencing and Yakfree traffic to the NATs, *see, e.g.*, [583] ¶¶ 14, 48, 50–54), such that they demonstrate "many more facts and detail than simply the procurement of unlawful commissions," *Green*, 2018 WL 1378176, at *6.

### c. RICO "Pattern" of "Racketeering Activity"

For substantive violations, a RICO "pattern" under § 1961(5) requires the commission of at least two acts of "predicate" activity enumerated in § 1961(1) that occur within ten years of each other (excluding any period of imprisonment), with at least one act occurring after the enactment of RICO itself on October 15, 1970. 18 U.S.C. § 1961(1), (5).

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, the Supreme Court set forth the process for determining what conduct meets this "pattern" requirement under RICO. 492 U.S. 229, 236–50 (1989). The Court began with the proposition that proof of two acts of racketeering activity, without more, does not establish a pattern. Instead, the Court found that the "pattern" element requires a showing of continuity, plus relationship. *Id.* at 237–39. Although these two elements of a RICO offense are discussed separately for analytic purposes, their proof often will overlap in practice. *Id.* at 239.

18

In its analysis in *H.J.*, the Supreme Court developed a six-step process for determining if a "pattern" is present within the meaning of RICO. To determine whether the goals of relationship and continuity are met, this Court must ask up to six questions, the first two being: (1) Are the acts—at least two—in a series related to one another, for example, are they part of a single scheme?; and (2) If not, are they related to an external organizing principle, for example, to the affairs of the enterprise?[7] *See H.J.*, 492 U.S. at 238; *see also United States v. Sinito*, 723 F.2d 1250, 1261 (6th Cir. 1983); *Elliott*, 571 F.2d at 899. When analyzing a RICO pattern, a broad range of criminal conduct can exhibit relationship, including unlawful acts that have the same or similar purposes, results, participants, victims or methods of commission, or acts that are otherwise interrelated by distinguishing characteristics. In this way, RICO's pattern element can be shown with either a "horizontal" relationship between the predicate acts themselves or a "vertical" relationship of the predicate acts to the RICO enterprise itself. If the Court answers both of the above questions in the negative, no relationship is present, and this Court need not proceed further.

If the Court answers either question in the affirmative, however, relationship is present and the following additional questions must be asked: (3) Are the acts in the series open-ended, that is, do the acts have no obvious termination point?; and (4) If

---

[7] Of course, this RICO "pattern" must also be *in the affairs* of the enterprise. *United States v. Starrett*, 55 F.3d 1525, 1542 (11th Cir. 1995) (noting that the pattern must regularly utilize the facilities or services of the enterprise, or otherwise have an effect upon the common affairs of the enterprise). If not, liability will not obtain. *Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 149 (4th Cir. 1997) (reversing RICO judgments where there was no evidence of conduct in the affairs of the enterprise).

not, did the acts in the closed-ended series go on for a substantial period of time, that is, more than a few weeks or months? *See H.J.*, 492 U.S. at 241–43. Generally, if either question is answered in the affirmative, continuity is present. If both questions are answered in the negative, however, up to two additional questions must be asked: (5) May a threat of continuity be inferred from the character of the illegal enterprise?; and (6) If not, may a threat of continuity be inferred because the acts represent the regular way of doing business of a lawful enterprise? *See id.* at 242–43; *Torres*, 191 F.3d at 808. If either question is answered in the affirmative, a threat of continuity is present.

As to a "threat" of continuity (questions (5) and (6)), the Seventh Circuit in *Torres* emphasized that, "in cases where the acts of the defendant or the enterprise were inherently unlawful" or "were in pursuit of inherently unlawful goals," then courts generally have "concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering activity was short." 191 F.3d at 808 (internal quotations omitted). As such, the continuity requirement may be satisfied by showing past conduct that "by its nature projects into the future" with a "threat" of repetition. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992) (internal quotations omitted); *see also Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1296–97 (7th Cir. 1992) (finding that a threat of continuity may be shown by establishing that the conduct is a "regular way" of doing business) (internal quotations omitted); *United States v. Aulicino*, 44 F.3d 1102, 1112 (2d Cir. 1995)

20

(observing that continuity is assessed  prospectively and not from hindsight, after the pattern ends).

When assessing a RICO pattern, the Seventh Circuit includes among the relevant factors "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, and the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986).  In *Morgan*, however, the court also cautioned that "the mere fact that the predicate acts relate to the same overall  scheme or involve the same victim does not mean that the acts automatically fail to  satisfy the pattern requirement" because the pattern requirement is "a standard,  not a rule." *Id.* at 975–76. Thus, the determination "depends on the facts and  circumstances of the particular case, with no one factor being necessarily determinative."  *Id.* at 976.   Elements of the RICO violation beyond the racketeering activity itself also may be considered in assessing relatedness and continuity.  In  the end,  this Court must evaluate all the allegations with the goal of "achieving a natural and commonsense result, consistent with Congress' concern with long-term criminal conduct." *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 673 (7th Cir. 2005) (internal quotations omitted); *see also 420 E. Ohio Ltd. P'ship v. Cocose*, 980 F.2d 1122, 1124 (7th Cir. 1992) (finding that the Seventh Circuit still examines the *Morgan* factors post-*H.J.* when assessing continuity "with an eye towards achieving a natural and  common-sense result") (internal quotations omitted).

Based upon the record, issues of material fact also exist as to the requisite

21

existence of a pattern of racketeering activity.[8]  As to the pattern requirement, the parties dispute the existence of open-ended continuity, [568] at 35–38; [581] at 25–26, which "refers 'to past conduct that by its nature projects into the future with a threat of repetition,'" *Vicom*, 20 F.3d at 782 (quoting *H.J.*, 492 U.S. at 241).  As discussed above, a plaintiff may show open-ended continuity when: "(1) a specific threat of repetition exists; (2) the predicates are a regular way of conducting an ongoing legitimate business; or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id*. (internal citations and quotations omitted).  Importantly, the threat of repetition must be viewed "at the time the racketeering activity occurred." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012).  Subsequent events "are irrelevant." *Id*.

Here, Defendants argue that Inteliquent cannot introduce any facts regarding a threat of repetition.  [568] at 36–38.  They argue that most of Defendants' wrongful conduct simply involved inducing Inteliquent to sign the MAA, with that conduct being completed by a clear endpoint in October 2015 (i.e., when Inteliquent signed the MAA).  *Id*.  Yet Inteliquent also introduces evidence of possible further harm: in particular, Inteliquent offers proof that Defendants made additional misrepresentations to keep

---

[8] Even though the existence of a RICO pattern remans in dispute, no genuine issues exist as to the relatedness question, because if nothing else, the undisputed portions of the record confirm that the alleged predicates in this case, if any, would all relate to "an external organizing principle," that is, to the affairs of the same enterprise. *H.J.*, 492 U.S. at 238; *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 779 (7th Cir. 1994) (noting that the "vast majority of cases dealing with RICO pattern requirement" fail to "turn on the relatedness of the alleged predicate acts" and that courts must then decide whether the continuity prong may be satisfied through "open ended continuity" ).

Inteliquent in the MAA and to induce Inteliquent to renew the MAA. *See, e.g.*, [583] ¶¶ 64, 67–68. Defendants question the strength of this evidence and whether any misleading statements actually influenced Inteliquent, *see* DRSOMF ¶¶ 64, 67, but such evidence creates another fact issue for the jury; Defendants' evidence does not negate the fact that Inteliquent introduces evidence of ongoing misrepresentations meant to further the continuing enterprise.[9]

Moreover, Inteliquent and Defendants submit competing evidence as to whether Inteliquent would have continued renewing the MAA. *Compare* [583] ¶ 60, *with* [570] ¶¶ 81–82, 105. Defendants argue that Inteliquent would not have renewed the MAA, eliminating any risk of repetition. [568] at 37–38. But the threat of the continued activity must be judged at the time the racketeering activity occurred. *Heinrich*, 668 F.3d at 410. And Defendants' argument that Inteliquent would not have renewed the MAA because it discovered that calls to the NATs did not physically terminate there judges the threat at the wrong moment.

---

[9] This Court also notes that the MAA invoices need not be fraudulent themselves (as Defendants assert) in order to constitute wire fraud. [568] at 36 n.20 (claiming the invoices cannot amount to wire fraud because the invoices adhered to the MAA). The MAA invoices may still amount to wire fraud even if the invoices adhered to the MAA's terms because "a given mailing or wire communication need not be fraudulent on its face in order to constitute an act of mail or wire fraud; even innocuous communications can qualify for this purpose so long as they are incident to an essential part of the scheme." *United States v. Green,* 786 F.2d 247, 249 (7th Cir. 1986). Inteliquent introduces evidence upon which a reasonable jury could conclude that HD Tandem submitted these invoices as part of a scheme to use access stimulation with the NATs to split revenue and drive Inteliquent into commercial agreements under false pretenses and then keep Inteliquent in that agreement through false pretenses. *See, e.g.*, [583] ¶¶ 64, 67.

Finally, Inteliquent cites evidence (albeit contested) supporting its theory that the acts occurred over a substantial period of time and represent the regular way of doing business for Defendants. [581] at 25.

Because material issues of fact remain in dispute, this Court cannot grant summary judgment based upon RICO continuity. Accordingly, this Court denies the parties' cross motions for summary judgment on Inteliquent's RICO claim.

### 2. RICO Conspiracy (Count II)

Inteliquent and Defendants also move for summary judgment on Inteliquent's RICO conspiracy claim. [581] at 23; [568] at 31, 39.

As in all conspiracies, the essence of a RICO conspiracy violation is the agreement itself; the distinction between a traditional conspiracy and a RICO conspiracy is simply the breadth of the overall objective. *Salinas v. United States*, 522 U.S. 52, 63–66 (1997). Accordingly, the fact that the "many defendants and predicate crimes were different, or even unrelated," is irrelevant in a RICO case, so long as it can "be reasonably inferred that each crime was intended to further the enterprise." *United States v. Gonzalez*, 921 F.2d 1530, 1539–40 (11th Cir. 1991); *see also United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988) (finding that a RICO conspiracy is "by definition broader than an ordinary conspiracy to commit a discrete crime"); *United States v. Valera*, 845 F.2d 923, 930 (11th Cir. 1988) (finding that "a series of agreements, which, pre-RICO, would constitute multiple conspiracies, can form, under RICO, a single 'enterprise' conspiracy").

Consistent with these general principles, the essential elements of a

24

conspiracy to violate § 1962(c) are well-settled. A plaintiff must prove that the conspiracy existed and that each named defendant knowingly became a member of the conspiracy with an intention to further that conspiracy. *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014). Obviously, a conspiracy may be established even if its purposes were not accomplished, and, in order to be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or means by which its purposes were to be accomplished. A defendant, however, must be generally aware of the common purpose or purposes of the RICO conspiracy, and be a willing participant. *Goren*, 156 F.3d at 732 ("In order to plead a viable § 1962(d) claim, a plaintiff must allege that a defendant agreed to the objective of a violation of RICO." (internal quotations omitted)).

Additionally, RICO conspirators need not personally commit any predicate act, or otherwise agree as to *which* two predicates would be committed. Instead, RICO merely requires that each defendant, "by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise," through the proposed commission of "two or more predicate crimes" by any member of the conspiracy. *United States v. Campione*, 942 F.2d 429, 436 (7th Cir. 1991) (citing *United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir. 1986), *holding modified by Brouwer*, 199 F.3d 961 (7th Cir. 2000)); *see also Salinas*, 522 U.S. at 63–66 (applying usual conspiracy rules apply to RICO); *H.J.*, 492 U.S. at 237; *Brouwer*, 199 F.3d at 963–64 (stating that a RICO conspiracy does not require an agreement to commit statutorily enumerated predicate acts, but rather

25

an agreement to facilitate a pattern of two or more such acts); *United States v. Glecier*, 923 F.2d 496, 499–501 (7th Cir. 1991) (noting that the agreed upon predicate-act objectives of the conspiracy need not "come to fruition"); *Elliott*, 571 F.2d at 903. Each RICO conspiracy defendant, however, must knowingly facilitate the activities of one who constitutes a manager or operator of the enterprise. *United States v. Cummings*, 395 F.3d 392, 397–98 (7th Cir. 2005).[10]

For many of the reasons discussed previously, both parties submit countervailing evidence that all Defendants agreed to engage in the traffic pumping enterprise and intended to further that enterprise. *See e.g.*, [583] ¶¶ 3–14, 27, 48–69; [570] ¶¶ 24–25, 29; DRSOMF ¶¶ 14, 27–28. Thus, given the genuine issues of material fact, this Court denies the cross-motions for summary judgment on Count II.

### B. Breach of Contract (Count IV)

This Court turns next to Inteliquent's first breach of contract claim. Inteliquent claims that Defendants Free Conferencing, HD Tandem, and CarrierX breached the MAA by overcharging Inteliquent, particularly as it relates to calls associated with the NATs that did not physically terminate in South Dakota. [581] at 30–32. As relevant

---

[10] In a conspiracy case like this one, the law adjusts the *Reves* concept. Specifically, a RICO conspiracy does not require violators to meet the "operation or management" test themselves, but instead a conspiracy defendant must "knowingly agree to perform services of a kind which facilitate" the activities of those who are operating or managing the RICO enterprise. *Brouwer*, 199 F.3d at 967; *see also United States v. Quintanilla*, 2 F.3d 1469, 1485 (7th Cir. 1993) (noting that *Reves* does not "address the principles of conspiracy law undergirding § 1962(d)"), *holding modified by United States v. Coleman*, 22 F.3d 126 (7th Cir. 1994); *Goren*, 156 F.3d at 731 (stating that "a defendant can be charged under § 1962(d) even if he cannot himself be characterized as an operator or manager of a RICO enterprise under *Reves*").

here, the MAA instructs that HD Tandem will charge Inteliquent based upon the
following terms:

> HD Tandem will provide voice Termination services to
> Inteliquent. The Voice Termination Services will be
> available to carry traffic terminating to the LECs (the 'LEC
> Footprint') . . . at the rates set out in the following rate:
> hdtandem IQNT rates 09242015.xlsx. These rates are
> effective on September 25, 2015. Subject to further obligation
> set forth in Section 3, HD Tandem represents that the rates
> offered to Inteliquent will be the lowest rates made available
> to any carrier other than [Company X], [Company Y],
> [Company Z] or a third party as part of a legal settlement.

[315-1] at 3. The MAA also states:

> Where Inteliquent has traffic terminating to the LEC
> Footprint, Inteliquent will route such traffic via HD Tandem
> (and not over Inteliquent's own tandem) so long as the HD
> rates provided to Inteliquent (i) are the lowest rates made
> available to any carrier (excluding [Company X], [Company
> Y], [Company Z] or a third party as part of a legal settlement)
> and such rates are not greater than the combination of the
> applicable LEC's tariffed end office rates and the applicable
> usage based port recovery credit set out in Section 1 above
> and (ii) are lower than any rate offered to Inteliquent by a
> third party (the "Third Party Offer").

*Id.*

Inteliquent argues that the parties entered into the contract with the purpose of
charging Inteliquent rates linked to lawful tariff rates. [581] at 31. Thus, Inteliquent
claims Defendants overcharged it by charging rates for certain rural areas based solely
upon the rate sheet and not charging "a rate lower or equal to the 'applicable LEC's
tariffed end office rates'" as referenced in Section 3. *Id.* In other words, Inteliquent
claims HD Tandem must charge rates based upon the tariff rates associated with the

27

physical termination point of the call[11] rather than the rate sheet, which is based upon LEC-associated area codes. *Id.* at 30–32; [603] at 30. Defendants counter that the MAA dictates only that rates must come from the negotiated rate sheet entitled "hdtandem IQNT rates 09242015." [568] at 9.

The parties stipulate that New York law governs this claim. [315-1] at 5–6 ("The Parties agree that this Master Addendum shall be governed . . . by New York law."). Under New York law, "unambiguous contracts are interpreted as a matter of law." *82-11 Queens Blvd. Realty, Corp. v. Sunoco, Inc. (R & M)*, 951 F. Supp. 2d 376, 381 (E.D.N.Y. 2013) (citing cases). Thus, courts may appropriately grant summary judgment when the contractual language unambiguously conveys a clear meaning. *Sunoco, Inc. (R & M) v. 175-33 Horace Harding Realty Corp.*, 969 F. Supp. 2d 297, 303 (E.D.N.Y. 2013), *aff'd*, 697 F. App'x 38 (2d Cir. 2017). That is the case here.

Section 2 covers the rates HD Tandem must provide Inteliquent. [315-1] at 3. That section makes no reference to applicable tariffs. *Id.* Indeed, Section 2's only rate mandate stipulates that HD Tandem charge Inteliquent the negotiated rates contained in the identified rate sheet. *Id.* While Inteliquent could have included language that bound the contractual rates to the physical location where the call terminated rather than by area codes, it failed to do so. Accordingly, Inteliquent cannot now seek protection by retroactively amending an unambiguous contractual provision.

---

[11] This argument presumes that the law does not permit LECs to charge Inteliquent LEC tariff rates for calls that do not terminate to an end-user actually within the LEC territory. *See Sprint Commc'ns Co. v. Crow Creek Sioux Tribal Court*, 200 F. Supp. 3d 857, 864–65 (D.S.D. 2016).

Though Inteliquent concedes that Section 2 does not link the contractual rates to tariffed rates, it nonetheless points to Section 3 and other contractual provisions to show the parties' intent to link the contractual rates to tariffed rates. [581] at 31. While Section 3 references applicable tariffs, it does so only to specify when Inteliquent must route such traffic to HD Tandem. [315-1] at 3 ("Where Inteliquent has traffic terminating to the LEC Footprint, Inteliquent will route such traffic via HD Tandem [] so long as the HD rates provided to Inteliquent . . . are not greater than the combination of the applicable LEC's tariffed end office rates and the applicable usage based port recovery credit."). Section 3 does not determine the contractual rates and even provides that Inteliquent need not use HD Tandem services when the tariffed rate would be cheaper. *Id*.

Counter Defendants claim that reading Section 3's reference to the applicable LECs as only determining when Inteliquent must send its traffic to HD Tandem leads to absurd results. [603] at 30. For example, they contend that because the MAA requires Inteliquent pay "*after* HD Tandem provides services," and because Inteliquent could not determine beforehand whether it remained more cost effective to use another provider, this contractual construction becomes nonsensical. [581] at 31 (emphasis in original). Not so. Under the plain language of the contract negotiated by the parties, HD Tandem must charge Inteliquent the agreed-upon rate and Inteliquent must use HD Tandem's services unless HD Tandem's rates exceed the applicable LEC's tariffed rates. Moreover, Inteliquent possessed the rate sheet and could determine the cost of a given call prior to receiving the bill or even routing the call. Thus, Section 3's plain

29

language provides Inteliquent certain routing requirements, including that Inteliquent must send its traffic to HD Tandem when the contractual rates remain lower than the applicable LEC's tariffed rates. While the contract does not provide instruction on how to calculate those contractual rates, Inteliquent could have done so beforehand using the predetermined rate sheet identified in Section 2. This reading, thus, does not render the references to the applicable tariffed rates in Section 3 and other provisions meaningless, in contrast to Inteliquent's reading, which renders meaningless the area code-based rate sheet described in Section 2.

Finally, even though Inteliquent asserts this contractual claim against HD Tandem, Free Conferencing, and CarrierX, *see* [315] ¶¶ 253–265, it provides no theory as to how Free Conferencing or CarrierX breached the MAA. Even if HD Tandem overcharged Inteliquent, Free Conferencing and CarrierX cannot be held liable by association, and they are not parties to the contract. Accordingly, nothing in the record precludes granting Free Conferencing and CarrierX's motion for summary judgment on this claim.

For these reasons, this Court finds the contract unambiguous and grants Defendants' motion for summary judgment as to Count IV and denies Counter Defendants' motion.

### C.    Breach of Contract (Count IX)[12]

The Court next considers Inteliquent's other breach of contract claim, Count IX, in which Inteliquent alleges that Free Conferencing, HD Tandem, and CarrierX improperly suspended service in 2016, thereby breaching the MSA.  [315] ¶¶ 302–41.  Defendants seek summary judgment on this claim.[13]  [568] at 25–29.  Defendants argue this Court should grant summary judgment on two bases.  First, assuming the MSA prohibited HD Tandem from suspending service, HD Tandem's actions did not constitute an actionable breach because Inteliquent breached first by re-routing its traffic away from HD Tandem.  *Id.* at 27–28.  Second, Defendants argue that HD Tandem did not breach the MSA because the MSA entitled HD Tandem to suspend service after Inteliquent failed to provide a requested security.  *Id.* at 28–29.  Defendants also argue that under any theory, this Court must grant summary judgment in favor of Free Conferencing and CarrierX as they did not provide relevant services under the MSA.  *Id.* at 25 n.16.

### 1.    Inteliquent's Conduct

This Court first considers Defendants' argument that Inteliquent breached the MSA first by re-routing its traffic away from HD Tandem.  *Id.* at 25.  Defendants argue

---

[12] HD Tandem also brings an inverse breach of contract claim based upon the same conduct.  [336] at Count I.

[13] Inteliquent asserts that it also seeks summary judgment on Count IX, but it provides no argument on this claim.  *See* [581] at 30–32.  As a result, the argument is waived.  *White v. Campanelli*, No. 1:14-CV-7215, 2017 WL 528380, at *9 n.5 (N.D. Ill. Feb. 9, 2017) (citing *Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 597 (7th Cir. 1999)) (deeming summary judgment argument waived where plaintiff had presented an underdeveloped argument).

that even assuming HD Tandem's suspension qualified as a breach, Inteliquent's prior breach excused HD Tandem's suspension. *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004) ("As a general principle of contract law, a material breach excuses the other party's nonperformance."). Yet Defendants fail to explain how Inteliquent's actions, even if true, materially breached the contract or triggered a legal right to suspend. Thus, this Court declines to grant summary judgment on this theory.

### 2. Suspension under the MSA

Defendants next contend that the MSA entitled HD Tandem to suspend the contract because Inteliquent failed to provide the security HD Tandem requested in order to increase the credit limit. [568] at 26; [570] ¶ 109; [640] at 14. Section D.1 of the Attachment A to the MSA provides that the credit provider, here HD Tandem, maintains the right to increase or decrease the credit limit if it gives three days' notice to the customer, i.e., Inteliquent. [572-1] at 963. If HD Tandem determined that the sum of the "(i) total invoiced amounts which remain unpaid, plus (ii) the unbilled but accrued usage of CUSTOMER has exceeded the then current Credit Limit," it has the right "to demand by written notice" that Inteliquent "make an immediate payment." *Id.* Upon a payment demand, Inteliquent "shall pay such amount within three (3) business days," and if Inteliquent "fails to remit such payment when due and no Deposit is being held by Provider," HD Tandem "shall have the right without notice to suspend and/or terminate the Services." *Id.*

Defendants argue that after Inteliquent refused to pay certain portions of HD Tandem's invoices, [568] at 25–29; [570] ¶¶ 96–97, HD Tandem requested credit under

32

Section D.1, *id.* ¶¶ 99–112. Yet Inteliquent never provided the required payment. *Id.* Counter Defendants fail to introduce any countervailing evidence, though they do claim HD Tandem rejected both Inteliquent's letter of credit and its offer to provide a cash deposit. [603] at 37; IRSOF[14] ¶ 110.

On the record before it, this Court lacks sufficient information to determine whether HD Tandem properly invoked Section D.1's suspension provision. Defendants point to no facts regarding Inteliquent's credit limit, whether Inteliquent exceeded that limit, or whether HD Tandem held a deposit from Inteliquent, all of which are relevant under the terms of the MSA. For this reason, this Court denies Defendants' motion for judgment on Inteliquent's second breach of contract claim.

### 3. Breach of Contract Against Free Conferencing and CarrierX

Defendants also argue that this Court should grant summary judgment in favor of Free Conferencing and CarrierX. [568] at 25 n.16. As before, Defendants argue that even though Inteliquent asserts this claim against Free Conferencing and CarrierX, there remains "no evidence" against them; they also argue that Counter Defendants fail to show that Free Conferencing or CarrierX "provided Inteliquent a service under the MAA that was improperly withheld." *Id.* This Court agrees that Counter Defendants fail to provide any evidence that Free Conferencing or CarrierX improperly withheld a service from Inteliquent, and, accordingly, grants Defendants' request for summary

---

[14] IRSOF refers to Inteliquent's Response of Undisputed Material Facts. [604].

judgment in favor of Free Conferencing and CarrierX as to Inteliquent's second breach of contract claim.

### D.    Fraud and Fraud in the Inducement (Count III)

Counter Defendants and Defendants further seek summary judgment on Inteliquent's fraud and fraudulent inducement claim against HD Tandem, Free Conferencing, CarrierX, and Wide Voice (Count III). [568] at 12; [581] at 30. As to the fraud theory, Counter Defendants first claim that Defendants HD Tandem, Free Conferencing, CarrierX, and Wide Voice fraudulently induced Inteliquent "to enter into, and stay in, the Master Addendum by multiple false representations." [581] at 30 (citing [583] ¶¶ 49–69). Counter Defendants also argue that HD Tandem, Free Conferencing, CarrierX, and Wide Voice engaged in fraud, not just fraudulent inducement, during the various phases. [603] at 14–15. This Court will consider these arguments in turn.

### 1.    Choice-of-Law

The Seventh Circuit has explained that choice-of-law provisions cover not only breach of contract claims, but also claims "arising" out of the contract, including fraudulent inducement. *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007) (interpreting fraudulent inducement claims under the law stipulated in the contract's choice of law provision). As a result, given the parties' stipulation that New York law governs their contract claims, this Court will, for the most part, apply New York law to Inteliquent's fraud and fraudulent inducement claims as well. The Court

will apply Illinois law to Inteliquent's fraud claim directed at Defendants' conduct prior to the MAA's execution, however, as that claim does not arise out of the MAA.

### 2. Fraudulent Inducement

A successful fraudulent inducement claim under New York law requires the plaintiff to show: "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 306 (S.D.N.Y. 2010) (quoting *Lumbermens Mut. Cas. Ins. Co. v. Darel Grp. U.S.A. Inc.,* 253 F. Supp. 2d 578, 583 (S.D.N.Y. 2003)). Here, Inteliquent argues that HD Tandem pitched itself as a way for Inteliquent to reduce costs. [583] ¶¶ 50–51. In trying to determine whether to enter into an agreement with HD Tandem, Inteliquent sought information about whether Free Conferencing's traffic was actually routed to South Dakota. *Id.* ¶¶ 49–52. During these pre-contract negotiations, Inteliquent argues, Free Conferencing's COO and CEO misled Inteliquent about the relationship between the Defendants and where free conferencing calls terminated. *Id.* ¶¶ 52–54. Inteliquent claims that it agreed to the MAA based upon these false assurances. *Id.* ¶ 55.

As to the first element of Inteliquent's fraudulent inducement claim, triable issues of fact exist about whether Defendants made materially false representations to Inteliquent, thereby precluding both sides' cross-motions on the current record. For example, Inteliquent submits a series of statements by Free Conferencing's COO containing alleged misrepresentations about where calls to the NATs physically

35

terminated and about the relationships between the NATs and Free Conferencing. *See, e.g.*, [583] ¶¶ 52–55 ("I asked if calls would be delivered to those destinations, for example, our [sic] calls . . . actually going to the Indian reservation in South Dakota. And the answer was yes."). Defendants challenge the COO's credibility and the strength of Inteliquent's evidence in general, *see, e.g.*, [570] ¶¶ 38, 67, but this Court cannot weigh evidence or make credibility determinations at the summary judgment stage. Accordingly, given this conflict (and other factual disputes in the record), this Court declines to enter summary judgment on Inteliquent's fraudulent inducement claims.

### 3. Fraud

This Court next examines Inteliquent's claim of Phase One fraud. To prevail on a fraud claim, Illinois law requires Inteliquent to show materially the same requirements as New York law on fraudulent inducement. Those elements are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *GMAC, LLC v. Hillquist*, 652 F. Supp. 2d 908, 920 (N.D. Ill. 2009) (quoting *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 591 (Ill. 1996)).

Inteliquent claims that Defendants engaged in Phase One fraud but fails to explain this theory or otherwise support it with citations to the record. [581] at 30; [603] at 15. Ostensibly, Inteliquent accuses Free Conferencing of engaging in fraud by entering into revenue sharing agreements with the NATs. But it offers no evidence

36

regarding what Free Conferencing (or HD Tandem, CarrierX, and Wide Voice) sought to induce Inteliquent to do by entering into revenue sharing agreements with the NATs, given that Inteliquent already sent its traffic to the NATs under the regulated path. In fact, the record shows that, during Phase One, Inteliquent sent all its traffic from numbers associated with the NATs to the NATs under the regulated path, apparently unaware that Free Conferencing had revenue agreements with the NATs, and that those calls did not physically terminate in South Dakota. [583] ¶ 49. Thus, Inteliquent fails to show how these Defendants induced Inteliquent to do anything under Phase One. This Court accordingly denies Inteliquent's motion for summary judgment on Phase One fraud and grants Defendants' motion for summary judgment on this claim.

This Court now turns to Inteliquent's claim of Phase Three fraud (i.e., fraud occurring after Inteliquent had already entered the MAA). As before, Inteliquent raises this theory, but does not explain it, merely stating that Free Conferencing's post-MAA fraudulent comments "furthered the scheme and *kept* Inteliquent deceived." [603] at 18–19 (emphasis in original); *see also* [581] at 30 (explaining that HD Tandem, Free Conferencing, CarrierX, and Wide Voice engaged in fraud by materially mispresenting facts to get Inteliquent to "stay in" the MAA). Because triable issues of fact remain as to whether Free Conferencing made any material misrepresentations that could conceivably have not only induced Inteliquent to sign the MAA but also to continue operating under the MAA, this Court denies both sides' motions as to Phase Three fraud.

### E.    California Unfair Competition Statute (Count V)

Next this Court considers the parties' cross-motions on Inteliquent's claim against Free Conferencing, HD Tandem, Wide Voice, and CarrierX for violating California's Unfair Competition law (UCL).  Defendants argue that they are entitled to summary judgment on this claim because a choice-of-law analysis requires this Court to apply the Illinois Consumer Fraud Act rather than the UCL.  [568] at 23 (arguing that Inteliquent may only bring a claim under the Illinois consumer fraud statute or the California consumer fraud statute).  But Inteliquent also brought a claim under Illinois' unfair competition statute, Count VI, and Defendants fail to explain why this Court's considering of two separate claims requires a choice of law analysis.  *Id*. at 23–24.

To support their claim, Defendants rely upon *Barbara Sales, Inc. v. Intel Corp.* [568] at 23–24.  But the procedural posture in that case required a choice-of-law analysis, where this case does not.  In that case, the plaintiffs sought to certify a nationwide class under California law.  879 N.E.2d 910, 916–17 (Ill. 2007).  Because the plaintiffs' class included a great number of non-California residents, the court engaged in a choice of law analysis to determine whether California law could appropriately govern the nationwide class claims.  *Id*. at 917.  This case is not a class action, so *Barbara Sales*' analysis does not govern.  Inteliquent may assert separate causes of action under separate state consumer fraud statutes.  *See, e.g., Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 891 (S.D. Cal. 2016) (permitting a suit to go forward with plaintiffs alleging violations under three different states' consumer protection laws).

38

Moreover, Defendants have not suggested that Inteliquent does not have standing to assert its California consumer fraud claims. And California law confirms that although Inteliquent is not a California resident, [581] ¶ 1, it has standing to assert this claim.

Courts have instructed that a nonresident plaintiff may pursue claims under the UCL so long as "California has sufficiently significant contacts with the plaintiff's claims" so that the case does not raise constitutional concerns. *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012) (citing *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589–90 (9th Cir. 2012)). Here, Inteliquent's claim presents a sufficient connection to California to pass constitutional muster. Free Conferencing, HD Tandem, and CarrierX operate their principal places of business in California. [570] ¶¶ 12–14. *Forcellati*, 876 F. Supp. 2d at 1160 ("Plaintiff alleges that Defendants are headquartered in Los Angeles, California. Therefore, application of [the UCL] poses no constitutional concerns."). While Wide Voice does not operate its principal place of business in California (and is headquartered in Nevada), it has a California business address and owns and operates "telecommunications network equipment" in California. [583] ¶ 5. Inteliquent also presents facts showing that Free Conferencing, HD Tandem, Wide Voice, and CarrierX's alleged misconduct arose in California. *See* [583] ¶¶ 5, 9, 11, 62, 75; *see also Klaehn v. Cali Bamboo, LLC*, No. 19CV1498-LAB (KSC), 2020 WL 3971518, at *3 (S.D. Cal. July 13, 2020) (explaining that whether the "misconduct originated in California" constitutes a relevant factor in evaluating the constitutional question). Thus, this Court affirms that Inteliquent presents facts showing it possesses

39

standing to assert this claim, and accordingly, denies Defendants' request for summary judgment on this count.

Inteliquent too asserts that it is entitled to summary judgment on its California unfair competition claim, arguing that Defendants' business model constitutes an unfair practice. [581] at 30 (citing Cal. Bus. & Prof. Code § 17200). But Inteliquent fails to explain how the conduct in the three identified phases relates to this claim or otherwise cite facts to support this claim. *Id.* Instead, Inteliquent states that previous sections in its brief lay out the relevant prior conduct, inappropriately leaving the task of piecing together Inteliquent's claim to this Court. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (explaining that parties bear the burden of developing their arguments because judges "are not like pigs, hunting for truffles buried in briefs"). Because Inteliquent failed to develop its argument, the argument is waived, and the Court denies summary judgment on this basis. *White*, 2017 WL 528380, at *9 n.5 (citing *Pond*, 183 F.3d 592 at 597) (deeming summary judgment argument waived where plaintiff had presented an underdeveloped argument).

### F. ICFA Claim (Count VI)

Next, this Court considers Inteliquent's claim that Defendants HD Tandem, Free Conferencing, CarrierX, and Wide Voice violated the Illinois unfair competition statute. Both sides move for summary judgment. Inteliquent claims that HD Tandem, Free Conferencing, CarrierX, and Wide Voice engaged in unfair or deceptive business practices by: (1) participating in access stimulation with the NATs; and (2) working together to sign tandem switching agreements with IXCs while misleading the IXCs

about the businesses' interrelationships and where free conferencing numbers terminate. [581] at 29–30.

### 1. Standing

Beginning with Defendants' motion, Defendants argue that Inteliquent lacks standing to assert this claim because it does not meet the statutory criterion to bring a claim. [568] at 24–25. The ICFA constitutes "a regulatory and remedial statute" intended to protect consumers, borrowers, and business-persons against "fraud, unfair methods of competition, and other unfair business practices." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013) (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). The Act concerns itself "with consumers." *Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 805 (N.D. Ill. 1996) (citation omitted). To bring a suit under the Act, corporations must either show they meet the statutory definition of a consumer or meet the consumer nexus test. *Thrasher-Leon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 912 (N.D. Ill. 2012); *see also Frazier v. U.S. Bank Nat'l Ass'n*, No. 11 C 8775, 2013 WL 1385612, at **3–4 (N.D. Ill. Apr. 4, 2013).

Defendants' standing theory fails because Inteliquent is a consumer under the statute and, therefore, has the right to bring this claim. First, courts have long concluded that the statutory definition of a "person" includes corporations and other business entities or associations, *Stepan*, 948 F. Supp. at 805, so long as that corporation consumes another "business's product," *Am. Roller Co., LLC v. Foster-Adams Leasing, LLP*, 472 F. Supp. 2d 1019, 1022 (N.D. Ill. 2007) (citing *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1368 (N.D. Ill. 1996)). As

41

the MAA provides, "HD Tandem provides long distance *services* to Inteliquent." [315-1] at 2 (emphasis added). Additionally, Defendants' Statement of Material Facts further shows that it provides a service as it sells "switched access services" to long distance carriers, and those carriers use HD Tandem's switched access services themselves. [570] ¶¶ 10, 13, 67–71. Thus, Defendants themselves concede they maintained a "consumer-seller relationship" under the MAA; and this relationship confers standing under the ICFA. *Lefebvre Intergraphics*, 946 F. Supp. at 1369.

Because Inteliquent is a consumer, this Court denies Defendants' motion for summary judgment on Inteliquent's ICFA claim and now turns to the merits of Inteliquent's motion.

### 2. The Claim's Elements

Under the ICFA, a plaintiff can recover when the defendant engaged in unfair or deceptive conduct. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (citing *Robinson*, 775 N.E.2d at 960). This Court will first examine whether Counter Defendants presents evidence of unfair conduct. A court determining whether a practice is "unfair" under the ICFA "must consider (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury." *Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1003 (N.D. Ill. 2016) (citing *Osborn v. J.R.S.-I., Inc.*, 949 F. Supp. 2d 807, 813 (N.D. Ill. 2013)). A practice need not meet all three criteria, but rather "may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (citing *Robinson*, 775 N.E.2d at 961).

42

As it relates to Phase One, Counter Defendants agree that the NATs, not Defendants, overcharged Inteliquent for traffic that did not physically terminate in the NATs' territory. *See, e.g.*, [583] ¶¶ 39, 45–48. Thus, for Inteliquent to hold Free Conferencing, HD Tandem, Wide Voice, and CarrierX liable, it needs to show the unfairness of access stimulation such that even though the NATs overcharged Inteliquent, these Defendants also engaged in wrongdoing by participating in the access stimulation. One way to do so could be to show that Free Conferencing controls the NATs. But to bring in the other Defendants, Inteliquent must show that the NATs, Free Conferencing, Wide Voice, and CarrierX all work together. The parties, however, dispute these facts, *compare, e.g.*, [583] ¶¶ 14, 48, 54, *with, e.g.*, [570] ¶¶ 24–25. Inteliquent runs into these same factual issues in trying to show that Free Conferencing, HD Tandem, CarrierX, and Wide Voice acted deceptively. *See* [570] ¶¶ 32, 37 (alleging Inteliquent knew that these Defendants engaged in access stimulation and that the parties had interrelationships). Thus, the Court declines to enter judgment in Inteliquent's favor on its Phase One ICFA claim.

Turning to Phase Two, Inteliquent argues that Free Conferencing, acting on behalf of itself (as well as HD Tandem, Wide Voice, and CarrierX), made materially false statements to Inteliquent to induce it to enter into the MAA. But this theory presents many triable fact issues. First, as stated previously, the parties dispute whether Free Conferencing made materially false representations to Inteliquent and whether those statements influenced Inteliquent to enter the MAA because, as Defendants claim, Inteliquent already knew of the information it now claims deceived

it. *See, e.g.*, [570] ¶ 32–38. And again, Defendants dispute that they are essentially one entity or that they are substantially interrelated. DRSOMF ¶ 14. These fact issues apply to both an unfairness and a deceptive conduct claim. For these reasons, this Court denies Counter Defendants' motion for summary judgment on Inteliquent's ICFA Phase Two claim.

Finally, to the degree that Inteliquent claims that Free Conferencing, HD Tandem, Wide Voice, and CarrierX engaged in unfair or deceptive conduct based upon suspending the MSA in Phase Three, that claim too remains unsuitable for summary judgment. Inteliquent may not bring a consumer fraud or unfair practices claim based upon a breach of contract. *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) ("The Consumer Fraud Act is 'not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy.'") (quoting *Zankle v. Queen Anne Landscaping,* 724 N.E.2d 988, 992–93 (Ill. App. Ct. 2000)). And again, triable fact issues exist as to whether the relevant misrepresentations deceived Inteliquent or whether Inteliquent was aware at all times of Defendants' business model and interrelationships.

For these reasons, this Court denies Inteliquent's motion for summary judgment on its ICFA claim.

### G. Unjust Enrichment (Count X)

In Count X, Inteliquent claims unjust enrichment against Free Conferencing, Yakfree, and CarrierX. Both sides seek summary judgment in their favor. [581] at 28–29; [568] at 29–30. Inteliquent argues that Defendants "unjustly retained a benefit to

44

Inteliquent's detriment by imposing charges—paid by Inteliquent——that were not permitted under the law." [581] at 28 (referring to the charges Inteliquent paid the NATs under the regulated path during Phase One).

Under Illinois law, an unjust enrichment claim's success turns upon whether the defendant "unjustly retained a benefit to the plaintiff's detriment" when "the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (quoting *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012)). Inteliquent claims Free Conferencing and Yakfree retained an improper benefit through their revenue sharing agreements with the NATs when the NATs improperly charged Inteliquent the tariffed rate. [581] at 28–29; [583] ¶¶ 23–32. Defendants concede they engaged in this conduct. [570] ¶¶ 39–42, 95.[15]

Defendants argue, however, that this Court should follow the remanded district court decision laid out in *Qwest Communications Corp. v. Free Conferencing Corp.* [568] at 29–30. In that litigation, Qwest brought unjust enrichment claims against Free Conferencing for engaging in similar arrangements with Sancom, another South Dakota LEC. No. 4:07-CV-04147-KES, 2017 WL 5198190, at *1 (D.S.D. Nov. 9, 2017), *aff'd*, 920 F.3d 1203 (8th Cir. 2019). At a previous stage in the litigation, the Eighth Circuit concluded that Free Conferencing's behavior amounted to unlawful conduct as

---

[15] Yakfree never submitted its own statement of material facts. It did, however, join the other Defendants' motion for summary judgment and accompanying filings. [582]. As such, it remains bound by the material fact filings submitted by those Defendants.

articulated in the *Farmers II* opinion.  *Qwest Commc'ns Corp. v. Free Conferencing Corp.*, 837 F.3d 889, 899 (8th Cir. 2016) (citing *Qwest Commc'ns Corp.*, 24 FCC Rcd. 14801, 14813 (2009)).  Defendants emphasize that, on remand, the district court determined, despite Free Conferencing's unlawful conduct, that Free Conferencing did not unjustly enrich itself because it provided Qwest certain benefits, making it equitable for Free Conferencing to retain the benefit of enhanced revenues.  [568] at 30; [614] at 16; *see also Qwest*, 2017 WL 5198190, at *3.  On a second appeal, the Eight Circuit affirmed the district court, finding it did not abuse its discretion.  *Qwest*, 920 F.3d at 1207.

Defendants argue that they likewise bestowed benefits on Inteliquent, such that it remains equitable for them to keep the increased revenue.  [568] at 30.  But this Court finds that argument unpersuasive.  The benefits Defendants set forth merely reflect improvements to Free Conferencing's own product.  [570] ¶ 94 (noting Free Conferencing now offers enhanced services such as call recording).  Defendants fail to explain how these improvements benefited Inteliquent, if at all.  Accordingly, because Defendants fail to demonstrate that Free Conferencing and Yakfree provided countervailing benefits to Inteliquent in this case, this Court denies summary judgment to Defendants on this claim.

Turning to the merits of Inteliquent's motion, this Court finds the Eighth Circuit's initial reasoning persuasive.  In *Qwest*, the Eighth Circuit first confirmed that *Farmers II* settled that LECs may not charge IXCs tariff rates for calls that do not physically terminate at the LECs' local infrastructure but instead at a conference call

bridge. 837 F.3d at 894 ("Today, it is well-settled that an LEC cannot bill an IXC under its tariff for calls 'terminated' at a conference call bridge when the conference calling company does not pay a fee for the LEC's services."). The Eight Circuit further clarified that the *Farmers II* ruling also reached Free Conferencing's conduct prior to the *Farmers II* opinion. *Id.* ("This decision was not merely prospective (that LECs could no *longer* bill IXCs for this traffic) but retrospective as well (that LECs never could have billed IXCs for this traffic)."). The court then opined that even though the LEC rather than Free Conferencing illegally charged Qwest, Free Conferencing's "conduct might be characterized as inequitable because it retained a benefit based on Sancom's tariff violation, which it partly caused." *Id.*

Defendants do not explain how the tariffed charges the NATs imposed for Free Conferencing's calls pass muster under the *Farmers II* test. In fact, separate litigation involving Free Conferencing's revenue sharing agreements with Native American Telecom, LLC, also confirms that Free Conferencing fails the *Farmers II* test and LECs that charged IXCs tariffs for free conferencing calls acted illegally. *Sprint*, 200 F. Supp. 3d at 874. In taking advantage of the NATs' unlawful practices, Free Conferencing and Yakfree unjustly received a benefit at Inteliquent's expense. *Williams v. Nat'l Hous. Exch, Inc.*, 949 F. Supp. 650, 652 (N.D. Ill. 1996). Thus, this Court holds that Free Conferencing and Yakfree unjustly enriched themselves during Phase One.

Turning to the question of damages, Defendants only challenge Inteliquent's damages calculation by pointing out that the *Farmers II* test is fact specific. DRSOMF ¶ 120. But they again fail to show what facts in this case distinguish Defendants'

conduct from the defendants in *Farmers II*. *See id*. Because this Court finds the NATs violated *Farmers II*, and because Defendants only challenge Inteliquent's damages calculation on the basis that *Farmers II* does not control, there remains no other factual dispute regarding Inteliquent's unjust enrichment damages.

Thus, this Court grants Inteliquent's motion for summary judgment on Count X and will adopt Inteliquent's $2,313,697 Phase One damages calculation when later entering final judgment on this claim (which absent other evidence does not involve any genuine issues of material fact on the record presented). [583] ¶ 120.

## H. Civil Conspiracy (Count VIII)

Both parties also seek summary judgment on Inteliquent's civil conspiracy claim against all Defendants. [568] at 25; [581] at 26–28. In Illinois, plaintiffs may prove a civil conspiracy claim by showing: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (citing *Adcock v. Brakegate, Ltd.,* 645 N.E.2d 888 (Ill. 1994)). Inteliquent claims that during Phase One, Defendants engaged in a conspiracy with the NATs to unlawfully charge Inteliquent for calls that did not physically terminate to an end-user within the NATs' footprint. [581] at 26–28.

Beginning with Defendants' motion, Defendants argue that civil conspiracy does not constitute an independent tort and, accordingly, that this Court may only grant summary judgment if it also grants summary judgment on an underlying tort claim,

48

such as fraud. [568] at 25. Yet, the Illinois Supreme Court has made clear that civil conspiracy may rest upon an "overt tortious *or unlawful act*." *Fritz*, 807 N.E.2d at 470 (emphasis added). At a minimum Free Conferencing and Yakfree engaged in unlawful action through its Phase One revenue sharing agreements with the NATs. *Qwest*, 837 F.3d at 899; *Sprint*, 200 F. Supp. 3d at 874. Defendants retort that the NATs' charges were not unlawful because "at the time of the alleged conspiracy, NAT-CC was hotly contesting this issue in court and it was not resolved until well after 'Phase One' concluded." [640] at 14. But the conduct did not become unlawful when a court determined it so; instead, this conduct was unlawful from the outset. *Qwest*, 837 F.3d at 899 ("The phrase 'loophole' implies that the Sancom-FC contract was legal prior to the FCC's decision in *Farmers II*. But that is not the case."). Accordingly, this Court denies Defendants' motion on this count.

Defendants also argue that Inteliquent is not entitled to judgment on this claim because Inteliquent fails to show "an agreement to harm" Inteliquent. [614] at 21. To prove an agreement, Inteliquent must show that Defendants understood the general objectives of the Phase One scheme, accepted them, and agreed, either explicitly or implicitly, to further them. *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 926 (N.D. Ill. 2019) (citing *McCann v. Mangialardi*, 337 F.3d 782, 789–90 (7th Cir. 2003)).

While Defendants correctly assert that the parties contest the degree of interrelationship between Defendants and the NATs, *see* DRSOMF ¶ 14, the record establishes that Free Conferencing and Yakfree entered into revenue sharing agreements with the NATs based upon unlawful charges associated with Free

49

Conferencing and Yakfree numbers. [570] ¶¶ 39–42; [583] ¶¶ 27–29; DRSOMF ¶¶ 23, 27–29. These revenue sharing agreements establish a conspiracy between the NATs, Free Conferencing, and Yakfree by showing that Yakfree and Free Conferencing understood the general objective (generating unlawful revenue) and accepted that objective (by entering the revenue sharing agreements). Thus, the undisputed evidence on the record shows that during Phase One, Yakfree and Free Conferencing conspired with the NATs, in violation of the Communications Act of 1934, to split revenue, and the NATs took steps towards this goal by charging Inteliquent tariffed rates for Yakfree and Free Conferencing traffic.

Inteliquent's claim that the other Defendants participated in the conspiracy relies upon their assertion that Defendants are intertwined entities. Yet that fact remains contested, DRSOMF ¶ 14; DSAF[16] ¶ 4, and, thus, must be determined by the jury. Accordingly, this Court grants Inteliquent's motion for summary judgment on Inteliquent's civil conspiracy claim as to Yakfree and Free Conferencing's Phase One liability and denies it as to the other Defendants. As to damages, Inteliquent offers the same $2,313,697 figure, for which Defendants do not submit countervailing evidence. [583] ¶ 120; DRSOMF ¶ 120. Yet because Inteliquent's claim here involves Defendants beyond just Yakfree and Free Conferencing, whose liability has not yet been determined, this Court declines to grant summary judgment for damages based upon the record currently before it.

---

[16] DSAF refers to Defendants' Statement of Additional Facts in Opposition to Inteliquent's motion. [632].

## II.     Defendants' Counterclaims

### A.     Intentional     Interference     with     Prospective     Economic     Advantage (Counts III)

Inteliquent seeks summary judgment on Free Conferencing and Wide Voice's claims for intentional interference with prospective economic advantage. [336] at Count III; [338] at Count III; [581] at 32–35. The crux of Free Conferencing and Wide Voice's claims is that Inteliquent improperly interfered with their expectation in future customers' business by implementing the whisper policy and working with T-Mobile to develop T-Mobile's one cent policy. [336] ¶¶ 148–57. Inteliquent claims that Free Conferencing and Wide Voice lack Article III standing to assert this claim and also fail to present evidence for each of the claim's elements. [581] at 32–35. This Court begins, as it must, by considering the standing question.

In order to properly hear a case, courts must possess Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs demonstrate Article III standing when they: (1) suffer an injury in fact; (2) show a causal connection between the injury and the defendant's conduct; and (3) show that the injury can likely be redressed by a favorable decision. *Id*. at 560–61 (citing cases).

### 1.     Injury in Fact

To show an injury in fact, Free Conferencing and Wide Voice must show an invasion of a legally protected interest. *Id*. Although demonstrating a legally protected interest "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," it does require the court to evaluate the "nature and source of the

51

claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). To confer standing, the claim must exist "by virtue" of statutes, common law, or constitutions "creating legal rights, the invasion of which creates standing." *Id.* (internal quotation marks omitted) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972)).

Here, Defendants assert that Free Conferencing possessed an interest in continuing to have current customers use its services (they are under no contractual obligation or commitment to continue using Free Conferencing's services, DSAF ¶ 1) and adding new customers. DSAF ¶ 54. Defendants claim Wide Voice possessed an interest in gaining new business with voice application providers.[17] *Id.* ¶ 56 (stating that Wide Voice sought to enter into revenue sharing agreements with new voice applications, e.g., free conferencing companies, but "the 1-Cent Policy ruined the calls").

While Illinois law recognizes an interest in prospective economic relationships, the right to engage in a business relationship is not absolute and "must be exercised with regard to the rights of others. The rights of others most commonly take the form of lawful competition, which constitutes a privileged interference with another's business." *Belden Corp. v. InterNorth, Inc.*, 413 N.E.2d 98, 102 (Ill. App. Ct. 1980)

---

[17] Defendants do not develop their arguments explaining the precise prospective business relationships Wide Voice believes Inteliquent impacted. Indeed, they devote a mere sentence explaining Wide Voice's injury. [614] at 24. Yet to the extent Defendants complain that Inteliquent's conduct made Wide Voice's existing revenue sharing agreements with various voice application providers less profitable, that argument mistakenly treats Wide Voice as bringing a claim for interference with contractual relations, which Wide Voice does not assert. *See* [338]. As an aside, for Wide Voice to show a protected interest from revenue sharing agreements with voice application providers, these contracts would need to be valid, and, accordingly, not run afoul of FCC's rules about access stimulation or the *Famers II* opinion.

(citing *Candalaus Chi., Inc. v. Evans Mill Supply Co.*, 366 N.E.2d 319, 326–27 (Ill. App. Ct. 1977)). In other words, when defendants possess "only the hope of continued benefits," defendants cannot prevent others from engaging in lawful actions that might impede that hopeful future business. *Id.* at 102. Illinois law, however, does not extend this privilege to unfair competition such as "fraud, intimidation, or disparagement." *Id.* at 103. And when analyzing interference with prospective business rather than interference with contractual relations, "the degree of enforceability of a business relationship decreases," while "the extent of permissible interference by an outsider increases." *Id.*

Turning to the arguments presented, Free Conferencing and Wide Voice complain that through the whisper policy and T-Mobile's one cent policy, Inteliquent impermissibly interfered with its business interest with current and future customers.[18] [614] at 5–8; DSAF ¶¶ 16–60. But Inteliquent's actions fall into the lawful competition camp, meaning Free Conferencing and Wide Voice do not have standing to pursue this claim because they have no legal right to prohibit Inteliquent from lawfully

---

[18] In their Opposition brief, Defendants also argue that Inteliquent engaged in "illegitimate or illegal routing methods to complete" calls to Free Conferencing's telephone numbers. [614] at 32. Yet Defendants do not develop this argument or explain what made the routing "illegitimate or illegal." *Id.* Defendants' own facts also indicate that Inteliquent did not fraudulently route these calls, just that it may have benefited from such third-party actions. DRSOMF ¶¶ 111–12. Additionally, much of the complained of routing appears to have occurred after the filing of this lawsuit. *Id.* ¶ 111. Nor do Defendants contend that the calls failed to connect, just that another party routed these calls onto another carrier's network. *Id.* ¶¶ 108–12 (noting that while PBX hacking and SIM box fraud effectively " 'dump' calls onto another carrier's network, avoiding the costs of delivering the call," they do not cause the calls to fail to be delivered, which is what would matter to Free Conferencing's customers). Thus, Free Conferencing's customers likely remained unaware and unaffected by such practices and fraudulent routing would not have influenced customers to stop using Free Conferencing's services. These vague suggestions remain insufficient to carry this claim.

competing in a manner that harms their expectancy of future business. *Belden*, 413 N.E.2d at 102–03. For example, Defendants note that in order to reduce high-cost Free Conferencing traffic, Inteliquent created a whisper policy functionality and T-Mobile initiated a one cent policy. *See, e.g.,* DSAF ¶¶ 35, 46–48; [614] at 24. Free Conferencing and Wide Voice claim that as a result of these actions, they lost existing and potential future customers, leading to decreased revenue. DSAF ¶ 54; [614] at 24. While that might be true, these actions did not amount to fraud, intimidation, or disparagement, but instead amounted to lawful, vigorous competition: Free Conferencing and Wide Voice sought to increase Inteliquent's costs and Inteliquent (through T-Mobile) attempted to resist those charges despite knowing that such resistance might cause these Defendants to do less business.

Failing to show Free Conferencing or Wide Voice possessed a legally protected right to be free from lawful interference with its prospective customers, Defendants also point to their "legally protected right to be free from unfair and deceptive business practices" under the ICFA. [614] at 24. While Free Conferencing and Wide Voice could bring such a claim, and in fact do bring such a claim in different counts, *see* [336] at Count IV; [338] at Count IV, the legally protected right they must show to support their counts for intentional interference with prospective economic advantage is, unsurprisingly, the legal right to be free from intentional interference with prospective business advantage as defined by Illinois law. Therefore, Free Conferencing and Wide Voice possess no legal right that could prohibit Inteliquent from engaging in lawful competition, even if Inteliquent's lawful actions harmed their profitability. Thus, Free

54

Conferencing and Wide Voice cannot point to a legally cognizable injury in fact in order to demonstrate standing.

### 2. Traceability

As to T-Mobile's one cent policy, Defendants also struggle to show the requisite causation necessary to establish standing. Courts have defined traceability as "whether a party can demonstrate that the injury of which he complains is 'fairly traceable' to the challenged conduct of the defendants," *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 923 (7th Cir. 1995) (explaining that traceability requires the plaintiff to show the causal links between its injury and the defendant's conduct), and "not the result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560–61 (internal punctuation omitted) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).

As relevant here, no issue of material fact exists that T-Mobile (not Inteliquent) instituted and carried out the policy. *See* DRSOMF ¶¶ 90–91 (failing to dispute that T-Mobile carried out the policy, charged the fee, and did not give any portion of that fee to Inteliquent). While Defendants introduce evidence that Inteliquent wanted T-Mobile to institute these polices and worked closely with T-Mobile to implement them, *id*. ¶¶ 90–92, they fail to introduce any evidence showing that T-Mobile was anything other than an independent actor, *id*. ¶ 87. And critically, independent third parties typically break the causal chain. *Beckman v. Chi. Bear Football Club, Inc.*, No. 17 C 4551, 2018 WL 1561719, at *5 (N.D. Ill. March 30, 2018) (finding that plaintiff lacked standing to sue NFL for injury caused by Chicago Bears' policy where "the Bears' discretion appears

to be unfettered" and, thus, "breaks the chain of causation from Beckman's injury to the NFL"), *reconsideration denied*, No. 17 C 4551, 2018 WL 11200549 (N.D. Ill. Dec. 11, 2018). Even assuming Inteliquent might have designed the policies, absent evidence that Inteliquent exerted some control over T-Mobile, it cannot be considered the cause of Free Conferencing or Wide Voice's harm on this factual record. *See DH2, Inc., v. U.S. Sec. & Exch. Comm'n*, 422 F.3d 591, 597 (7th Cir. 2005) (holding that a mutual fund investor seeking to challenge SEC rules lacked standing because even if the SEC rule changes caused the mutual funds the plaintiff invested in to be less profitable, "the injury DH2 complains of hinges on the decisions of independent actors whose discretion—though subject to securities laws and regulation by the SEC—is nonetheless quite broad").

While some concerted action may certainly confer liability on a party that did not implement the action—for example when a defendant's agent carried out the harmful conduct—here, Defendants seek to stretch causation too far. In essence, Free Conferencing and Wide Voice seek to hold Counter Defendants liable for actions taken by an independent third-party which may have resulted in *potential* customers declining to use Free Conferencing's services or signing future revenue sharing agreements with Wide Voice. This theory remains too attenuated to support Article III standing.

### 3. Redressability

Finally, as to the whisper policy, Free Conferencing and Wide Voice also have a redressability issue. To show their claims are redressable, they must show that it is

"'likely,' as opposed to merely 'speculative,' that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561.

The short-lived whisper policy only impacted 16 numbers, only one of which was a Free Conferencing number, [583] ¶ 84; DRSOMF ¶ 84, and ran for only a few weeks from April 27, 2016, through May 12, 2016, [583] ¶ 83; DRSOMF ¶ 83. Moreover, Inteliquent did not stop callers from completing their calls using the whisper policy, it just required them to enter a two-digit number first. [583] ¶ 83. Thus, Free Conferencing and Wide Voice must show that they lost future business based upon a policy that affected one Free Conferencing number, for a period of a few weeks, and still permitted that caller to complete the call.

This Court finds that these Defendants' alleged injury cannot be redressed by a favorable decision. For one, the whisper policy stopped, so this Court could not issue an injunction. And damages based upon one caller who still had the ability to place the call free of charge are so speculative that they must be denied. *Cf. Eiben v. A. Epstein & Sons Int'l, Inc.*, 57 F. Supp. 2d 607, 612–13 (N.D. Ill. 1999) (explaining that the law does not permit damages that are too speculative and that courts cannot permit defendants to introduce such speculative damages at trial). Accordingly, Free Conferencing and Wide Voice cannot show that they possess redressable claims based upon the whisper policy.

Because Free Conferencing and Wide Voice lack standing to assert this claim, this Court need not reach the merits. Accordingly, this Court grants Inteliquent's motion for summary judgment on Free Conferencing and Wide Voice's counterclaims

for intentional interference with prospective economic advantage based upon a lack of standing.

### B.    ICFA (Counts IV)

Inteliquent also seeks summary judgment on Free Conferencing and HD Tandem's consumer fraud counterclaim and Wide Voice's consumer fraud claim. [581] at 37–40. Inteliquent argues that these claims suffer from many of the same standing deficiencies as Free Conferencing and Wide Voice's interference with prospective economic advantage claim. *Id.* This Court agrees.

As for the standing issue, while Free Conferencing, HD Tandem, and Wide Voice possess a legally protected right to be free from unfair competition (assuming they meet the ICFA's standing requirements), their claims based upon T-Mobile's one cent policy nevertheless suffers from the same traceability issue given that T-Mobile's actions break the causal chain. Similarly, their claims based upon the whisper policy are not redressable.[19]    Therefore, this Court also grants Inteliquent's motion for summary judgment on Free Conferencing and HD Tandem's and Wide Voice's counterclaims for violation of the ICFA.[20]

---

[19] Defendants assert that HD Tandem lost profits because fewer calls traversed its network. [614] at 24.

[20] This Court also notes that Defendants present no argument as to one of ICFA's essential elements: the defendant's intent that the plaintiff rely on the deceptive or unfair practice. *Siegel*, 612 F.3d at 934; [614] at 37–39. Without making an argument that a triable factual issue exists as whether Inteliquent intended for Wide Voice, HD Tandem, or Free Conferencing to rely on its actions, this Court would have to grant Inteliquent's motion.

### III.    Miscellaneous

####    A.    Calls Terminated to LECs Other than the NAT LECs

Defendants alternatively seek summary judgment on all counts for calls terminated to LECs other than the NATs.  [568] at 39–40 (seeking partial summary judgment "on all counts as to the calls that were transmitted to LECs other than the NAT LECs that terminated in the geographic region of those non-NAT LECs").  As it relates to calls that contribute to contract overcharges, this Court already granted summary judgment for Defendants on the breach of contract claim, so this claim is moot.

Defendants also suggest that this Court should grant summary judgment on calls terminated to LECs other than the NATs relating to Inteliquent's fraud claim.  [568] at 39.  This Court declines Defendants' invitation, as it previously ruled factual issues exist regarding Inteliquent's fraud claim.  Moreover, while the claim centers upon calls associated with the NATs, it remains premature to determine whether representations made about the NATs had any impact upon Inteliquent's understanding of how Defendants completed calls to other LECs and whether that information impacted its decision-making.  Therefore, given the current record, this Court declines to grant partial summary judgment on all calls terminated to LECs other than the NAT LECs.

####    B.    All Claims against Counter Defendant Matthew Carter

Finally, Inteliquent seeks summary judgment on all claims against Counter Defendant Matthew Carter.  [581] at 40.  Defendants ask this Court to deny this motion, first arguing that Inteliquent waived this argument because its brief only "contains a

single sentence concerning Defendants' counterclaims against Matthew Carter." [614] at 40. This argument fails to persuade, as Mr. Carter joined in the entirety of Inteliquent's motion. Moreover, the fact that the briefing rendered Mr. Carter relatively unimportant cuts in Mr. Carter's favor, not Defendants, by demonstrating how inconsequential he personally remains to the claims at issue.

Turning to the merits, typically, high-ranking corporate officers cannot be held personally liable for the corporation's actions. *Live Face on Web, LLC v. Kam Dev., L.L.C.,* No. 16 C 8604, 2016 WL 7374279, at *5 (N.D. Ill. Dec. 20, 2016) ("Merely being an officer in the corporation will not confer liability on the individual." (quoting *Asher Worldwide Enters. LLC v. Housewaresonly.com Inc.*, No. 12 C 568, 2013 WL 4516415, at *3 (N.D. Ill. Aug. 26, 2013))). Although Defendants manage to string together a few citations they say demonstrate Mr. Carter's "tortious conduct," [614] at 40, these citations only show Mr. Carter's concern about revenue shortfalls and communications with T-Mobile regarding reducing expensive traffic. Inteliquent did not commit a tort against Defendants through these actions, so these facts remain insufficient to show that Mr. Carter personally, through his participation as Inteliquent's CEO, engaged in a tortious act against Defendants. *Prince v. Zazove*, 959 F.2d 1395, 1401 (7th Cir. 1992) (explaining that in order to hold an officer vicariously liable for a corporation's actions, the officer must be personally involved in tortious conduct giving rise to liability). Thus, this Court grants Inteliquent's motion for summary judgment on Defendants' claims against Mr. Carter.

## CONCLUSION

For the foregoing reasons, this Court grants in part and denies in part Defendants' and Counter Defendants' respective motions for summary judgment. [566]; [580]. As to Inteliquent's claims, this Court denies both parties' cross-motions on Counts I, II, V, VI; grants Defendants' motion for summary judgment on Count IV, and denies Inteliquent's motion as to Count IV. This Court denies Counter Defendants' motion for summary judgment on Count IX (HD Tandem's counterclaim Count I) and Defendants' motion for summary judgment on Count IX as to HD Tandem, but grants Defendants' motion as to Free Conferencing and CarrierX. This Court denies both parties' cross-motions for summary judgment on Count III as to fraudulent inducement and for fraud as to Defendants' Phase Three conduct. This Court grants Defendants' motion for summary judgment and denies Inteliquent's motion on this count as to Phase One fraud. This Court denies Defendants' motion and grants Inteliquent's motion for summary judgment on Count X. This Court denies Defendants' motion and grants Inteliquent's motion for summary judgment on Count VIII as to liability for Yakfree and Free Conferencing but denies it as to the other Defendants and as to damages.

On Inteliquent's motion for summary judgment on Defendants' counterclaims, this Court grants the motion as to Free Conferencing's Count III and Wide Voice's Count III, and as to Free Conferencing and HD Tandem's Count IV and Wide Voice's Count IV.

Finally, this Court denies Defendants' motion for partial summary judgment on all calls transmitted to LECs other than the NATs. This Court grants Inteliquent's

motion for summary judgment on all claims against Counter Defendant Matthew J. Carter.

Dated: November 30, 2020.

John Robert Blakey
United States District Judge